**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW COLYER and DARIUS PINEX, | ) ) ) | |
| Plaintiffs, | ) ) | No. 12 C 04855 |
| v. | ) ) ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, GILDARDO SIERRA, and RAOUL MOSQUEDA, | ) ) ) | |
| Defendants. | ) | |

**ORDER**

This Order decides Plaintiffs' motions in limine in advance of the January 26, 2015 pretrial conference.

### I. Plaintiffs' Expert-Testimony Motions

1. *To preclude Dr. Daniel McCoy from testifying as to the state of mind, judgment, or reasonableness of Darius Pinex.* R. 175. The Court construes Plaintiff's motion as seeking to bar two numbered opinions from McCoy's report: Opinion 7 and Opinion 8. R. 189 ¶¶ 7, 8. The motion is granted in part as to Opinion 7 and granted in full as to Opinion 8.

In Opinion 7, McCoy opines:

At 01:34 a.m. on January 7, 2011, the time he was shot, Darius Pinex would have been experiencing considerable impairment due [to] the alcohol he had consumed. This impairment would have included: diminished sensory awareness; reduced visual acuity; altered cognitive function with reduced ability to process information and form normal judgment; loss of normal control of emotions resulting in reduced inhibitions and inappropriate responses to his surroundings; reduction in both fine and gross motor skills; and an increase in normal reaction time. The totality of his impairment

1

would have resulted in a lack of recognition of the appropriate response to the activity occurring about him, and a lack of critical judgment and an increase in his risk-taking behavior.

R. 189 ¶ 7. Under Federal Rule of Evidence 702, this opinion must be limited. McCoy may testify that someone of Pinex's body size who has a blood alcohol content of 0.136 is more likely to suffer the listed impairments then when that person has not consumed alcohol. The defense supplement, R. 252, explains McCoy's specific grounds for his opinion about the toxicological effect of alcohol. But McCoy may not testify that *Pinex* himself was actually suffering from those impairments.

There are two problems with opining that Pinex actually suffered from those impairments. The first is a Federal Rule of Evidence 702 problem. McCoy's deposition testimony undermines his own report when it comes to this particular opinion. During the deposition, McCoy conceded that he has no specific reason to believe that Pinex suffered from these impairments. *E.g.*, R. 189-2 at 18 ("[C]an you point to any specific facts in the materials that demonstrate that [Pinex] had less sensory input? A: No."). In his own words: "I have no doubt [Pinex's] actions were affected . . . by his blood alcohol, but I *can't say specifically in what way*." *Id.* (emphasis added). In other words, the application of McCoy's expertise cannot go farther than testifying about the increased likelihood of impairment for comparable body-size persons, and not to the specific actions of Pinex. McCoy does not purport to opine, for example, that the BAC was so high that it is certain that every person of that body size would suffer from the impairments. Nor does McCoy purport to have specific information about Pinex's reaction to alcohol. The second problem is a Rule 403 problem. Even if McCoy's testimony specifically about Pinex were admissible under Rule 702, the testimony is so weakly probative that it is outweighed by the substantial unfair prejudice of clothing this barely (if at all) supported opinion in the guise of expert testimony.

To be clear: this decision still allows defense counsel to ask the jury to infer that Pinex was experiencing the impairments that McCoy describes, and that the BAC increased the likelihood that Pinex was suffering from those impairments. What the defense cannot do is elicit from McCoy that, in his expert opinion, Pinex "would have" been suffering from those impairments.

The other opinion targeted by the motion in limine is Opinion 8. Opinion 8 says that Pinex's "conduct," as reported by Defendants, is "consistent" with Pinex's level of intoxication. R. 189-1 at 4. For the scope of the "conduct" referred to by

2

McCoy, the defense cites, in its response brief, to particular pages of McCoy's deposition testimony. R. 189 at 4 (citing R. 189-2, Dep. at 31:21-32:12, 36:4-11, 52:6-21, 59:10-62:10). But these opinions again go beyond toxicological expertise. The first category of conduct was Pinex not "hav[ing] control of his vehicle in a fashion that prevented him from hitting a pole or a tree," Dep. at 32:4-32:6, but McCoy conceded that he was not "an accident reconstructionist so I can't describe specifically." Dep. at 32:1-2. It is one thing for a toxicologist to opine (if he or she has the right training and experience) about reaction times for driving maneuvers and how alcohol could affect those times. It is quite another to dress-up, as expert toxicological testimony, a general description of the end-result of driving conduct and vaguely connect it to alcohol impairment. Viewed from this perspective, the opinion is also unhelpful. Fed. R. Evid. 702 ("[a] witness who is qualified as an expert . . . may testify . . . if . . . [it] will help the trier of fact"). McCoy's opinion amounts to saying that drunk people might drive badly.

In addition, under Rule 403, McCoy may not express Pinex's level of intoxication in terms of shots of tequila, nor try to connect the liquor bottle found in Pinex's car to the intoxication. The blood alcohol content is the relevant evidence, and it is unfairly prejudicial for a toxicology expert to opine about the liquor bottle and to use tequila as the explanatory example. Plus, the helpfulness of the tequila example is premised on jurors having particular experience with that form of liquor. These aspects of McCoy's opinion are excluded under Rule 403.

2. *To preclude Dr. Edward Hueske from testifying to his opinion about the credibility of Officers Mosqueda and Sierra or Mr. Colyer*. R. 176. The motion is granted. Specifically, the Court bars Hueske, who is a forensic reconstructionist, from testifying at trial *at all*. There are four reasons. First, Hueske's testimony will not assist the jury. Expert opinion testimony that does not assist the jury is not admissible. Fed. R. Evid. 702 ("[a] witness who is qualified as an expert . . . may testify . . . if . . . [it] will help the trier of fact"). Hueske's testimony will not assist the jury because his opinions do not apply his expertise—reconstruction—to the facts. Rather, Hueske does nothing more than a lawyer can do in closing or the jury can do for themselves. *E.g.*, *Hoffman v. Caterpiller, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming exclusion of expert because "the jury could then draw inferences . . . and the expert would be of no help"). Hueske lists statements made by the parties, compares them to the physical evidence, and opines which party's statement is more consistent with the physical evidence. Yet he does this in a way that does *not* rely on any particular knowledge, expertise or analysis in deciding which version fits the physical evidence. What analysis there is lies within the ken of any lay person.

3

Defense counsel can make the same points in the same fashion in closing, without dressing these common-sense, non-expert arguments in the guise of an expert opinion.

Second, Hueske's opinions are inadmissible because Hueske opines too directly on credibility. *E.g.*, *Jordan v. City of Chicago*, 2012 WL 88158, at *4 (N.D. Ill. Jan. 11, 2012). Defendants are right that opining that "the witness is lying" and opining that "based on my expert analysis, the situation unfolded like this (which, incidentally is inconsistent with the other party's theory)" are two different things. *Fowler v. United States*, 2011 WL 1004574, at *6 (N.D. Ill. Mar. 18, 2011). The former is almost always impermissible; the latter almost always is fine. The case law sets a spectrum between opining directly on a witness's credibility at one end and opining on facts in a way that incidentally destroys a witness's credibility at the other. Hueske's opinion is so close to the former end of the spectrum that the Court's decision is not a difficult one. Hueske was hired to opine on credibility; not to ascertain the facts: "It was requested that the documentation and the physical evidence associated with the incident be evaluated in an effort to establish whether the accounts given by Coyler, Sierra and Mosqueda were supported by the physical evidence." R. 146-9 at 3. The way he frames his sub-opinions and his ultimate opinion are consistent with that assignment: "[I]t is my opinion that . . . the physical evidence in this incident is consistent with the accounts of the shooting given by Officers Sierra and Mosqueda. Conversely, most of the substantive statements regarding the shooting incident that were given by Mr. Colyer are inconsistent with that same evidence." R. 176-1 at 8. Instead of trying to reconstruct the scene based on the physical evidence, Hueske just picks between the two versions (and as discussed above, uses no expertise to do so).

Third, some of Hueske's opinions would be independently inadmissible because they are unreliable. Fed. R. Evid. 702(c), (d). For example, Hueske opines that, because the light pole was some distance away from where Pinex's car was originally stopped, and because "[B]oth [Pinex's license and insurance paper] were found on the street near the light pole," the location of the license and insurance paper is "inconsistent with Officer Sierra having ever had them in his possession." R. 176-1 at 5. This opinion is bizarre. Not even Sierra disputes that Pinex tried to hand Sierra his papers. R. 176-2 at 5. Sierra himself does not remember whether he took them: "I am not sure if I took it from him, or he dropped it on the ground." *Id.* In other words, even Sierra—who was there—cannot say that he never had the papers in his possession. And it is passing strange how many possibilities Hueske discounts with so little information. Maybe Sierra took the papers and dropped

4

them; maybe Sierra took the papers and then gave them back to Pinex, who dropped them; maybe Pinex dropped them, and then after the shooting, Sierra picked them up and dropped them where they were found. Another example: Hueske's opinion that in his "experience of nearly 40 years, what seems like minutes for individuals involved in incidents such as this is typically actually a matter of seconds." R. 176-1 at 4. What experience? As a person involved in tense situations? As a forensic consultant? If the latter, how does a forensic consultant's experience allow him to judge stressed individuals' perceptions of time? These unexplained opinions would have been excluded in any event.

Finally, even if Hueske's opinions were admissible under Rule 702, the Court would still bar them under Rule 403. His testimony would add little to what the defense lawyers themselves already can argue in closing (assuming, of course, that the evidence comes in as they plan), and at the same time, would give an unfairly prejudicial stamp of expert approval on the lawyers' arguments. And in a trial that already will be laden with experts, the testimony is just not worth the time.

3. *To preclude David E. Dix from invading the province of the jury by stating that the shooting incident was the result of Darius Pinex's intentional actions.* R. 177. The motion is granted. The Court bars Opinion 2 entirely. R. 177-1 at 3. Dix is a mechanical engineer. Opinion 2 has three parts, purportedly based on mechanical-engineer expertise: Dix says that the shooting was the result of Pinex's conduct; that the conduct was intentional; and that Pinex endangered the officers. *Id.* The Court briefly addresses each in turn.

There is no basis in the opinion for Dix to testify that Pinex caused the shooting. Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data"). Dix never opines, cites evidence, or even discusses whether Sierra fired first and then Pinex moved the car, or whether Pinex moved the car and then Sierra fired. Absent that, Dix has no basis for the causation opinion. Reading his report, this opinion seems to come out of nowhere.

Dix cannot testify that Pinex acted intentionally. Yes, Dix's expertise allows him to testify to the constituent steps required to make the car do what Defendants claim the car did. By explaining those steps, including with expertise (for example, how much force must be exerted to move a gear shifter), Dix will get across the constituent expert-based facts for the defense to make the argument about intentionality. But Dix cannot take the final inferential step and say that no one could take those steps without doing so intentionally, and thus Pinex acted

intentionally—those ultimate conclusions are not based on mechanical-engineering expertise. That inference is for the jury to make, or not. Fed. R. Evid. 702(a).

The defense obliquely admits that the "endangered" part of the opinion is improper. R. 187 at 2 ("That the actions of Mr. Pinex endangered the lives of the officers is not offered as a stand-alone opinion."). It must not be offered at all. This is not for a mechanical engineer to testify about, and the jury is capable of understanding the dangers of a moving vehicle. Fed. R. Evid. 702(a).

4. *To preclude certain testimony of Dr. Daniel Spitz.* R. 178. The motion is denied. Spitz can testify as to the cause of the injury to Colyer's hand. To the extent Spitz's testimony relies on disputed facts, defense counsel shall endeavor to make clear that the facts are disputed and Spitz is testifying based on an assumed set of facts (this applies to most experts most of the time).

### B. Plaintiffs' Non-Expert Motions

1. *To prohibit the City from arguing at trial that the officers' microphones were not working as a result of any mechanical failure or malfunction.* R. 207.[1] The motion is denied. Plaintiff argues that Defendants have no evidence of a mechanical failure or malfunction. Not so. Defendants' own testimony that they did nothing to prevent the recording (assuming they so testify), and the fact that no audio was recorded, is itself enough for the jury to infer a malfunction. There simply is no such thing as a perfect system that works every time, so it is not unreasonable to infer from those facts that the audio system malfunctioned.

2. *To bar argument that the incident took place in a "dangerous neighborhood."* R. 208. The motion is granted. Defendants fail to explain how the specifics of this case connect to Sierra and Mosqueda's alleged knowledge of the neighborhood in a relevant way; that is, in a way that informs the jury about the objective circumstances that bear on the reasonableness of the shooting. The way Defendants seek to submit this evidence is therefore inadmissible as irrelevant, Fed. R. Evid. 401; and even if relevant, would be inadmissible under Rule 403, because it unfairly smears Pinex and Colyer with the criminal activity occurring in the neighborhood. *Peters v. City of Chicago*, 2011 WL 679911, at *1 (N.D. Ill. Feb.

---

[1]Two things: First, the plaintiffs filed two versions of this motion. R. 200, 207. The second, R. 207, is the amended version and it is the Court's understanding that it supplants the prior version. Accordingly, R. 200 is denied as moot. Second, the plaintiffs' expert-related motions are numbered 1 through 4 and the non-expert motions 1 through 13.

16, 2011); *but see Ross v. City of Chicago*, 2014 WL 1344279, at *2 (N.D. Ill. Apr. 3, 2014) (denying similar motion but without considering Rule 403).

     3. *To bar any reference to Darius Pinex's blood alcohol level, and any alcohol found in the vehicle after the incident.* R. 209. The motion is denied. Defendants are allowed to introduce intoxication evidence in excessive-force cases where, as here, it "tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life." *Saladino v. Winkler*, 609 F.2d 1211, 1214 (7th Cir. 1979). On this theory of relevance, that Sierra and Mosqueda were unaware that Pinex was intoxicated is immaterial and so Plaintiff's arguments based on Sierra and Mosqueda's ignorance of the intoxication are rejected. That said, Defendants may not mention the tequila bottle found in Pinex's car. Fed. R. Evid. 403 (allowing trial courts to exclude otherwise relevant evidence if cumulative or unfairly prejudicial). As discussed in the section dealing with toxicologist McCoy, the blood alcohol content and the increased likelihood of impairment are what is relevant, not the source of the intoxication.

     4. *To bar all inference, argument, and implication that plaintiffs, or the mothers of Darius Pinex's daughters, are just trying to make money.* R. 210. The motion is granted in part and denied in part. Defendants may not use the phrases: "litigation lottery," "legal welfare," "get rich quick," or refer to Pinex's daughters as "takers." The defense concedes the first three phrases but does not specifically discuss the "takers" comment; it is difficult to imagine a circumstance that would render that as proper argument. Defendants may, on the other hand, explain to the jury that civil complaints are only accusations and not evidence. And Defendants may also argue that the financial recovery sought by Plaintiffs gives them an incentive to shade their testimony.

     5. *To bar any reference to plaintiffs' prior arrests and convictions.* R. 211. The motion is granted. Defendants agree not to introduce Colyers' arrests and convictions but want to use two of Pinex's felony convictions and unspecified arrests[2] to argue against damages for Pinex's survivors under the Illinois Wrongful Death Act.

---

    [2]Defendants mention that they want to introduce arrests but then say nothing more, waiving any arguments they may have had as to any of Pinex's arrests.

7

*Cobige v. City of Chicago*, 651 F.3d 780, 784-85 (7th Cir. 2011), explains how a decedent's arrests and convictions could be relevant to damages. *Cobige*'s rationale is that a person's, for lack of a better term, poor choices are relevant to damages under Illinois law where they tend to show the decedent "was not likely to assist others or to have enjoyed life to the extent" the survivors claim. *Cobige*, 651 F.3d at 784-85. The past conduct supposedly tamps down the value of the loss, because the past conduct is supposedly a predictor of what the decedent might have done for herself and her survivors in the future had she not died. But that is the extent of the potential relevance.

In *Cobige*, the prior conviction, arrest, and drug addiction evidence was highly predictive of the decedent's future actions. The decedent there was in prison at the time of her death and, by all accounts, a drug addict. Here, on the other hand, the prior-conviction evidence has no obvious bearing on what Pinex might have done with his life. The later of the two convictions was five years old when Pinex died; the earlier ten. The decedent in *Cobige* "was in prison for extended periods, and in thrall to heroin when not imprisoned." *Cobige*, 651 F.3d at 784. Pinex, per Defendants' own argument, only spent "some time" in boot camp on his last conviction; a few years on his first.

So, although the contested evidence could be relevant to damages under *Cobige*, what little predictive—and therefore probative—value it has is overwhelmed by its unfairly prejudicial nature. Thus, the Court excludes it under Rule 403. Although Rule 403 was not helpful to *Cobige*'s survivor, *id.* at 785, the weights on the scales are very different here, and nothing in *Cobige* forecloses the traditional discretion (indeed, requirement) to perform the Rule 403 analysis on the facts in a particular case. *Cobige* did not, in other words, purport to create a categorical rule admitting this kind of evidence. The motion is granted.

6. *To bar reference to tattoos; old, unrelated injuries to Darius Pinex and Matthew Colyer, and unsubstantiated gang activity*. R. 212. The motion is granted to the extent conceded by Defendants: no tattoo evidence, gang evidence, and no evidence concerning Colyer's prior injuries. Defendants contend that they should be allowed to introduce evidence from Pinex's autopsy about his gunshot wound, prior surgery, and scarred lungs. The Court can see how this evidence could be relevant to damages because the wounds might have affected Pinex's quality of life or life expectancy. But that relevance is conditional. Defendants must be able to connect the autopsy evidence to quality of life or life expectancy, and presumably expert testimony is needed on those points. Defendants shall be prepared to explain, at the

8

pretrial conference, how they will make that connection, and if it is via expert testimony, when and where they disclosed that testimony under Federal Rule of Civil Procedure 26.

7. *To bar defendants from running any individual jurors' background using the "Clear System," "LEADS," or any other police resources and databases, before or during* voir dire *or during trial.* R. 213. The Court will likely deny this motion and require Defendants to supply Plaintiffs and the Court with *complete* records for any venireperson whose name is run through CLEAR. Litigants sometimes do have an imbalance in litigative resources, but that does not mean that disabling one side from using them is proper. That said, the Court orders Defendants to file a supplemental statement by this Friday, January 23, 2015, identifying from what sources CLEAR draws on to report arrests and convictions. (It appears that arrests likely are drawn from the CPD's own computerized booking system, but the statement must explain this, as well as from where convictions are drawn.)

8. *To bar reference to defendants' personal finances unless evidence of indemnification is also allowed.* R. 214. Personal finances are generally relevant to punitive damages, so the evidence would be otherwise admissible. But this motion cannot be decided yet, because there is a dispute over whether proper discovery disclosures were made. Plaintiffs are ordered to file, by Thursday, January 22, 2015, all of Plaintiffs' discovery requests and corresponding defense responses that Plaintiffs claim sought (and addressed) Defendants' financial information. Plaintiffs shall also submit—or if already submitted, identify by deponent, page, and line—depositions showing where they questioned Defendants about their financial condition.

9. *To bar reference to plaintiffs' financial circumstances or possible future circumstances pending the outcome of this action.* R. 215.[3] The motion is granted to the extent Defendants agree not to make a "big demand" argument. As for the remainder, Defendants shall be prepared to explain, at the pretrial conference, what arguments or evidence they may make that is inconsistent with the relief sought by this motion.

10. *To bar bolstering of Chicago Police Officers' character or moral standing through elicited testimony, conduct, or argument.* R. 216. The motion is granted as

---

[3]The plaintiff captioned this as motion *in limine* no. 8. But the prior filed motion, R. 214, was also no. 9, so the Court assumes this one should be no. 9.

follows, because the prohibited argument or conduct is too focused on character rather than admissible evidence:

- Defendants may not wear their police uniforms to Court;

- Witnesses who are police officers may not wear their police uniforms to Court;

- Outside observers and supporters affiliated with Defendants may not wear their police uniforms to Court;

- Defendants, witnesses, and outside observers are also prohibited from wearing medals or ribbons;

- Defendants will not use or argue the following phrases or their equivalents:

  - "ordinary people run away from danger, police run into danger so we don't have to"
  - "police are always first in line for blame and last in line for recognition"
  - "police work is the most dangerous work"
  - "it is impossible to know how terrifying police work can be unless you are a police officer"
  - "police don't use force without a good reason"
  - "any routine traffic stop could end with an officer being killed"
  - "police wouldn't lie because it would hurt their careers"

- No party may bring up Defendants or any other police officer's awards.

- No party may bring up Defendants or any other police officer's lack of disciplinary actions or complaints.

Defendants may, however, use rhetorical questions along the lines of "Why would an officer shoot someone for no reason?"

11. *To bar any reference to a gun or other weapon found in Darius Pinex's vehicle after the incident.* R. 217. The motion is denied. The presence of the gun is relevant because it makes it more likely that Sierra and Mosqueda are telling the truth when they claim that Pinex made a "furtive" movement to reach under the

10

driver's seat (where the gun was found). The presence of the gun also provides Pinex a motive to flee from arrest, because it was illegal for Pinex (or anyone, at the time) to carry a firearm in his car. That motive to flee is consistent with, and therefore supportive of, Defendants' version of events. At the pretrial conference, the Court will discuss with the parties how to minimize the unfairly prejudicial aspects of this evidence.

12. *To bar defendants from calling transport drivers*. R. 218. This motion is granted. Based on the discovery record, and the defense's own inability to identify who were the actual transport drivers until after the close of discovery, there was a discovery violation here. The defense argues that the General Progress Report was sufficient disclosure. Not so. Defendants led Plaintiffs—and the Court—to believe that someone other than the two men in the Report was the transport driver. Those incorrect representations by Defendants negated whatever disclosure value the Report may have had. Further, the Report listed the two names over the words "Hospital Guard Duty" not "driver."

Defendants also argue that the drivers will only testify in rebuttal and so need not have been disclosed per Rule 26(a)(1) (not requiring disclosure of witnesses who will testify "solely for impeachment"). Reading "solely for impeachment" to include percipient witnesses to disputed facts would eviscerate Rule 26(a)(1).

Plaintiffs have a choice to make. Plaintiffs may elect to depose the two transport drivers. If Plaintiffs do choose to depose the transport drivers, then the transport drivers may testify, because the prejudice of late disclosure will be minimized. If Plaintiffs do not wish to depose the transport drivers, which would be reasonable given the late date and intense trial preparation that is already at hand, then the transport drivers cannot testify. Fed. R. Civ. P. 37(c)(1). But Plaintiffs cannot depose the drivers and then, based on what they say, choose whether they can testify. Plaintiffs must make the choice from under the veil of ignorance. If Plaintiffs decide to take the depositions, all costs of the deposition—but not attorneys' fees (unless later recovered under § 1988)—will be paid by Defendants.

13. *Regarding witness criminal history*. R. 219. The motion is granted as the parties appear to agree that witnesses will not be impeached with arrests and, should any convictions arise, they will be fronted outside the presence of the jury.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 21, 2015