THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW COLYER, et al., | ) | |
| | ) | No.: 12 C 4855 |
| Plaintiffs, | ) | |
| | ) | Judge Edmund E. Chang |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, OFFICERS | ) | |
| R. MOSQUEDA, Star No. 13662 and | ) | |
| G. SIERRA, Star No. 3656, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## PLAINTIFFS' JOINT RULE 59 AND RULE 60(b)(3) MOTION

Plaintiffs Matthew Colyer and the Estate Gloria Pinex move this Honorable Court for a new trial and/or to set aside the verdict pursuant to Federal Rules of Civil Procedure 59 and 60.[1]

---

[1] On February 27, 2015, the Court took Plaintiffs' Motion for Directed Verdict under advisement. Plaintiffs submit that Defendants' gross misconduct, which essentially rendering their whole case a fraud, warrants granting that Motion. Therefore, Plaintiffs request that the arguments raised herein be considered in support of their Motion for Directed Verdict as well as this motion.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………………… iv

Introduction ………………………………………………………………………….... 1

Factual Background …………………………………………………………………… 3

    I.      The Two Dispatches ……...………………………………………...…….. 4

          A. Fourth District Call …………………………………………….. 5

          B. Zone Six Call …………………………………………………..… 5

    II.     Defendants' IPRA Statements …………………………………...……… 6

    III.    Defendants' Deposition Testimony …………………………...……… 6

    IV.    Plaintiffs' Discovery Requests ……. …………………………...……… 7

    V.     The Presentation at Trial …………………………………………….… 7

          A. Opening Statements ……………………………………………… 7

          B. Defendant Mosqueda ……………...……………………….…..… 9

          C. Detective Gallagher ….……………………………………….…... 10

          D. Laura Dunaj ……...…………………………………………. 10

          E. Defendants' Scheme Begins to Unravel …..……………………. 12

          F. Afternoon Apology ……...……………………………...……… 17

          G. The Morning After …..………………………………………..... 18

Argument …………………………...…………………………………………….... 19

    I.      The Legal Standard …..…………………………………...……. 21

          A. Rule 59 Standard …..……………………………………… 21

          B. Rule 60 Standard ……………………………………...…..… 23

    II.     OEMC-Related Errors....……………………………...……… 24

          A. Pretrial Ruling Allowing Fourth District Call into Evidence …………………….. 24

B. The In-Trial Remedies Did Not Cure The Prejudice ………………………….…..26

    1. The Limiting Instruction Was Insufficient ……………………………. 26

    2. Plaintiffs Should Have Been Given More Time to Prepare their Re-Cross Examination ……………………………………………....… 28

III.    Other Errors Compounded the Harm…………………….…………...….…...… 29

A. A Loaded Gun ……………………………………………………………....29

B. Sierra's Previous Sworn Testimony ………………………………………32

C. The 404(b) Rulings Were Erroneous………………………………………...34

    1. Evidence Relating to Flint Farmer's Death was Admissible under Rule 404(b) ……………………………………………………………… 34

        a.   The Evidence Was Admissible to Show *Modus Operandi* and Plan…………………………………………………….. 35

        b. The Evidence Was Admissible Under the Doctrine of Curative Admissibility …………………………………….………… 37

    4. Sierra Would Not Have Been Unduly Prejudiced by Admitting Evidence Related to Flint Farmer …………………………………………….. 39

Conclusion  …..………………….…..…………………………………………………….... 39

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*Brandt v. Vulcan, Inc.*, 30 F.3d 752 (7th Cir. 1994)……………………………………… 21

*Christmas v. City of Chicago,* 682 F.3d 632 (7th Cir. 2012) …………………………………….. 22

*Common v. City of Chicago*, 661 F.3d 990 (7th Cir. 2011) …………………………………… 30

*Envtl. Barrier Co., LLC v. Slurry Sys., Inc.*, 540 F.3d 598, (7th Cir. 2008) ……………………… 22

*Giffin v. Summerlin*, 78 F.3d 1227 (7th Cir. 1995) ……………………………………………….. 33

*Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025 (7th Cir. 1998) ……………………………. 28

*Gupta v. Austrian Airlines*, 211 F. Supp. 2d 1078 (N.D. Ill. 2002) …………………………… 33

*Hillard v. Hargraves*, 197 F.R.D. 358 (N.D. Ill. Feb. 4, 2000) …………………………………… 22

*Link v. Wabash N.R.*, 370 U.S. 626 (1962) …………………………………………………….... 4

*Lonsdorf v. Seefeldt*, 47 F.3d 893 (7th Cir. 1995) ……………………………………………...… 23

*Kiefel v. Las Vegas Hacienda* 404 F.2d 1163 (7th Cir. 1969) ……………………………………... 22

*Okai v. Verfuth*, 275 F.3d 606 (7th Cir. 2001) ………………………………………………… 36

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013) …………………………………… 22

*United States v. Beasley,* 809 F.2d 1273 (7th Cir. 1986) ……………………………………….. 39

*United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975) ……………………………………….. … 38

*United States v. Gomez,* 763 F.3d 845 (7th Cir. 2014) …………………………………….. ...34, 39

*United States v. Kieffer*, 68 F. App'x 726 (7th Cir. 2003) ……………………………………… 36

*United States v. Robinson*, 161 F.3d 463 (7th Cir. 1998) …………………………………….. 35

*United States v. Romero*, 189 F.3d 576 (7th Cir. 1999) …………………………………… 36-37

*United States v. Shepherd*, 576 F.2d 719 (7th Cir. 1978) ……………………………………... 22

*United States v. Tai*, 994 F.2d 1204 (7th Cir. 1993) …………………………………………… 37

*United States v. Taylor,* 522 F.3d 731 (7th Cir. 2008) ……………………………………….. 34

*United States v. Thompson*, 359 F.3d 470 (7th Cir. 2004) …………………………………………. 39

*United States v. Walker*, 652 F.2d 708 (7th Cir. 1981) ………………………………………… 22

*Walden v. City of Chicago*, 846 F. Supp. 2d 963, (N.D. Ill. 2012) ………………………………21, 22

**Statutes and Other Authority**

Fed. R. Civ. P. 59……...……………………………………………………............. i, 21, 22, 23

Fed. R. Civ. P. 60.…...……………………………………………………………….. i, 23

Fed. R. Evid. 403 …………………………………………………………………….... 21

Fed. R. Evid. 404(b) ……………………………………………………………….. 2, 20, 33, 35, 36

Fed. R. Evid. 611(a)(1) ………………………………………………………………… 27

## **Introduction**

The Defendants committed serious misconduct, by lying and withholding critical evidence, and their misconduct caused the Plaintiffs to prepare for and try the wrong case. Plaintiffs took the wrong depositions, had their experts prepare incomplete reports, submitted the wrong pretrial motions, and tried the wrong case. Plaintiffs acknowledge that new trials are not routinely granted, but Defendants' misconduct changed the entire case and deprived Plaintiffs of a fair trial. There is nothing unfair about putting the Defendants through another trial, but denying Plaintiffs' motion for a new trial would reward Defendants for their misconduct.

The Defendants' misconduct began when they shot and killed Darius Pinex and injured Matthew Colyer during a traffic stop on January 7, 2011, and then almost immediately began lying about it. Their misconduct continued throughout the pretrial proceedings and throughout the trial, causing a jury to return a verdict in their favor in March of 2015. They were aided by their counsel, either through intentional misconduct or, at best, reckless behavior during discovery, pretrial, and trial. Defendants' lies and their attorneys' misconduct infected the entire case and denied Plaintiffs a fair trial.

Plaintiffs are entitled to a new trial for two related reasons. First, they are entitled to a new trial because of the unfair prejudice they suffered as a result of Defendants' misconduct. Defendants concealed the recording of the only dispatch call about an Oldsmobile Aurora that they might have heard on January 6, 2011 or January 7, 2011—vital evidence in this case.[2] That call, which came over their Zone Six radio, was a brief message about an Aurora that had been wanted for fleeing and eluding and that had a different license plate than Mr. Pinex's case. Importantly, it did not say

---

[2] Defendants did not mention any earlier calls about an Aurora when they first called in the shooting, or when they first spoke to other officers. About 12 minutes after the shooting, the dispatcher asks for a description of Pinex's vehicle, and is told it is a 1998 Aurora. The dispatcher is not given any other information before he remarks that it is the Aurora from the earlier call. This remark was broadcast over the Defendants' zone.

anything about a gun or a shooting. Rather than produce that call in discovery, Defendants concealed it, and carefully constructed a story of a justifiable *high risk stop* involving a car that they had reason to believe was wanted for earlier shooting.[3] To support that story, they produced a dispatch call from the Fourth District, which they could not have heard, and then repeatedly and convincingly delivered false testimony that was supported with the details of that dispatch call. Most importantly, that call did mention a gun. This was Defendants' sole justification for treating this stop as a high risk situation that justified their decision to pull Plaintiffs over and approach with their guns drawn. In telling that story, the defense deceived the Plaintiffs, jurors, and the Court.

The Zone Six radio dispatch was crucial evidence and changed the entire complexion of this case.[4] If it had been disclosed, it would have altered the inquiry at Defendants' depositions and at trial. The Zone Six dispatch would have impacted the retention and focus of Plaintiffs' police practices experts. It would have completely changed Plaintiffs' trial strategy.

Second, Plaintiffs are entitled to a new trial because of a series of evidentiary rulings that, together, worked to deny Plaintiffs a fair trial. Summarized here, these rulings include: (1) the decision to allow Defendants to present evidence of the Fourth District call, which was a direct result of Defendants misleading the Court; (2) the decision to allow Defendants to admit evidence that a loaded handgun they attributed to Darius Pinex had been recovered on the scene; and (3) barring the presentation of Rule 404(b) evidence and questions about previous sworn testimony even after Sierra opened the door to such evidence.

---

[3] Defense counsel claimed that after learning of the call's possible existence, a recording was difficult to locate. Yet after being told by the Court to get the recording, Defense counsel retrieved it within hours. Defendants would never have disclosed the dispatch, if a City of Chicago employee, selected by Defendants to testify about the 911 dispatch center's practices and called during the last day of Plaintiffs' case, had not unexpectedly divulged its existence during a break.

[4] If the call the Defendants actually relied on (assuming they relied on anything other than a subjective desire to pull over Plaintiffs' car) had been promptly disclosed by the Defendants, it may have provided a sufficient basis for additional claims, such as Fourth Amendment False Arrest.

**Factual Background**

Since the beginning of this case, Defendants have sought to excuse their militant approach toward Darius Pinex and Matthew Colyer by claiming that they were involved in a high risk situation. Defendant Mosqueda testified that he heard a radio call with a detailed description of a car similar to the Plaintiffs'.[5] Mosqueda testified at trial that he heard information on that dispatch call about a gun in the car and its possible involvement in a shooting. During discovery, Defendants produced a dispatch call about a wanted Oldsmobile Aurora that did mention a gun, as well as numerous other details that Mosqueda "remembered" hearing, including that the car was dark colored and had rims. The existence of that dispatch call was hugely important to Defendants. After all, their sole justification for treating the stop as "high risk" was the fact that they had heard on their police radios that Plaintiffs' car had a gun and had been involved in a shooting. There was still one potential problem for Defendants, however – that call came from the Fourth District, which was not a zone their radios picked up, meaning that they never heard that call.

The Defendants did not produce any dispatch calls about an Oldsmobile Aurora from their radio zone, let alone any calls about an Oldsmobile Aurora that had been involved in a shooting and had a gun in the car. Given that they could not have heard the Fourth District call, the fact that they did not have a similar call from their District could have been a real problem for Defendants – the jury would have learned that the City of Chicago records dispatch calls, and the jury would likely have concluded that the Defendants were lying about their purported justification for pulling over Pinex and Colyer and then treating the stop as "high risk." The Defendants had a simple solution to overcome that problem – lie, both by omission and by making affirmative misstatements. Specifically, by failing to disclose: (1) the fact that there was in fact a dispatch call about an Oldsmobile Aurora from their radio zone; and (2) the fact that the dispatch from their zone

_____

[5] Defendant Sierra testified that Mosqueda related these details to him prior to the traffic stop.

sounded nothing like the Fourth District call, they were able to convince the Court that existence of the Fourth District call made it more likely that the purportedly missing call existed. They were therefore permitted to introduce evidence of the Fourth District call.

Although the pending sanctions-related discovery should shed more light on this issue, as the record stands now, it appears that there are two likely scenarios with respect to the Defendants' personal knowledge of the Zone Six call, either: (1) Defendants knew about the Zone Six call all along because they actually did hear it on January 6, 2011, and after they shot and killed Darius Pinex and injured Mr. Colyer, someone else told them the additional, crucial details from the Fourth District call, including the mention of a gun, as well as the details about the car's color and the fact that it had rims; **or** (2) they never actually heard any call about an Oldsmobile Aurora, and with the help of presently unknown individuals, they made the entire thing up by using the details from the Fourth District call. Regardless of which of those scenarios is true, of whether there is another explanation, there is no question that their attorneys knew that the call existed before trial, but never intended to turn it over to Plaintiffs or the Court.[6]

The following factual presentation highlights the nature of Defendants' behavior and its influence on Plaintiffs' case.[7]

## I.     The Two Dispatches

Around 10:00 p.m. on January 6, 2011, two series of dispatches were broadcast regarding a 1998 Oldsmobile Aurora, wanted for fleeing the police on the southeast side. Any chase had been terminated. The incident occurred in the Fourth District, many miles from the Defendants.

---

[6] It is well established that a lawyer's misconduct in litigation is imputed to his or her client. *See*, *e.g.*, *Link v. Wabash N.R.*, 370 U.S. 626, 632 (1962) (sanctions are appropriate for a lawyer's conduct even if the client is blameless). Certainly here, where the client is not blameless, both are liable for the wrong.

[7] The post-trial discovery could contain even more damaging revelations.

Thereafter, a perfunctory dispatch went out over the Zone Six radio, which included the Seventh District, where the Defendants were working on the evening of January 6-7, 2011.

Defendants claimed that they based their stop of the Plaintiffs on what they heard over their zone radio. The Zone Six call, then, was an important piece of evidence. The detectives investigating Mr. Pinex's death thought that the Zone Six call was important too, and they wanted to hear it. Detective Sgt. Lamperis, who supervised the investigating detectives, promptly requested three copies of the Zone Six call. Detective Gallagher, the lead detective, documented the Zone Six call's existence in an inventory report (this inventory was omitted from the case report).[8] The details of the calls are provided below.

## A. Fourth District Call

The Fourth District dispatches[9] described a black Oldsmobile Aurora with rims, two occupants, and a temporary license plate with number 378 M 393. During one of the calls someone stated that based upon the driving, they assumed there was a gun in the car. The parties agreed that this was not the car occupied by the Plaintiffs, as it had different plates, was in a different area of the city, and was a different color. Ex. A, Fourth Dist. Audio.

At trial, Defendants stipulated that they never heard the Fourth District call.

## B. Zone Six Call

The relevant call that came over the Zone Six radio stated "Zone Eight initiated a traffic pursuit at 8300 S. Marquette. They were chasing a 378 M 393 '98 Olds Aurora. Last seen at 9300 S. East End travelling westbound. 420 terminated." Dispatch repeated the description "1998 Olds

---

[8] It is unknown at this time whether this evidence was provided to the criminal authorities, including the federal government, who were investigating Defendant Sierra's spate of shootings.

[9] There were multiple related calls from the Fourth District, over a short period of time, in between other calls on other subjects.

Aurora, temp plate 378 M 393." Ex. B, Zone Six Audio. There was nothing about a shooting, no description of the car's color, nothing about rims, and no description of the car's occupants.

## II. Defendants' IPRA Statements

In his IPRA Statement, given on January 7, 2011, hours after the shooting, Mosqueda stated that he pulled over the Plaintiffs' car because it matched the description given in an All-Call on his radio of a vehicle wanted for shots fired. Ex. C, Mos. IPRA Stmnt. No All-Call message was ever produced.

Sierra also told IPRA that Mr. Pinex's car matched the description of a vehicle that was wanted in a shooting, something he claimed to have learned through a call that came over the radio. Ex. D, Sierra IPRA Stmnt.

At this very early stage, less than 24 hours after the shooting, Defendants were already adding details that they could not have heard over their zone radios.

## III. Defendants' Deposition Testimony

Mosqueda testified at his deposition that Mr. Pinex's car "matched the description of a flash that was given earlier during the tour and that … there was a weapon in the vehicle." Ex. E, Mos. Dep. at 16. "There was something related to shots fired in the Fourth District." *Id.* at 31. Mosqueda continued, "I knew that there was a gun in the car because dispatch – dispatch had earlier notified – notified everyone that this particular car that matched the description could be armed." *Id.* at 53. Mosqueda referred to the dispatch as a flash message. *Id.* Mosqueda testified that the call stuck out in his mind as being for "officer awareness" because "there may be safety issues if we see that vehicle." *Id.* at 209. Mosqueda specifically recalled that the dispatch call referenced shots being fired. *Id.* at 214.

At his deposition, Sierra testified that the Defendants stopped Plaintiffs' car because it was wanted for a shooting in the Fourth District. Ex. F, Sierra Dep. at 27. Sierra claimed that he knew

this through an OEMC dispatch, and that he remembered hearing the words over the radio. *Id.* at

28. He also testified that he learned the details of the vehicle's description from Mosqueda. *Id.* at 30-

31. Sierra remembered hearing an All-Call. *Id.* at 31.

## IV.    Plaintiffs' Discovery Requests

In written discovery, Plaintiffs made the following pertinent Requests and received the

following Joint Responses:

> 13.    All transcripts, tape recordings, electronic communications and radio
> transmissions (or Documents memorializing the same) relating to the events
> at issue in the Complaint including but is not limited to all Documents from
> the Office of Emergency Management Communications and all PDT
> communications.
> **Response:** Defendant Officers, upon information and belief refer plaintiff
> to OEMC documents (Bates # 1 l2- 136) and PDT documents (Bates
> #254_397) previously produced to Plaintiff along with the Defendant
> Officers, 26(a) disclosures. The Officers additionally refer Plaintiff to the
> OEMC audio (Bates # 112a, 114a) produced with this disclosure.
> Defendants Mosqueda and Sierra further refer plaintiff to the audio
> recordings of their IPRA statements, which will be tendered to plaintiff upon
> the entry of a protective order. Investigation continues.
> 36.    All Documents relating to the "all call" or "look-out" message
> referenced Plaintiffs 26(a)(1) disclosures, Document Bates Nos. 000016 and
> 000047 .
> **Response**: Investigation continues.

Ex. G, Response to Requests to Produce. These responses were never supplemented, and the Zone

Six call was never produced.

## V.    The Presentation at Trial

The Defendants continued on at trial as if the Zone Six call did not exist, from their opening

statements until Plaintiffs closed their case.

### A.  Opening Statements

During opening statements, Defendants represented that they pulled over Plaintiffs' car after

hearing a Seventh District dispatch (which, as explained above, includes Zone Six ), with Defense

counsel stating,

So early in their shift that night a flash message came over the police officers' zone radio for the 7th District. Now, a flash message is a message calling for all officers to be on the lookout for something. Now, it could be anything. It could be a vehicle, could be a person, anything at all. In this case the flash message told the officers to be on the lookout for a dark colored Aurora with rims and temporary license plates that had been wanted for fleeing and eluding police officers in the 4th District. And the flash message gave additional information that the dark colored Aurora may have been involved in a shooting.

Ex. H, Trial 2.23.15 pm, pp. 34-35. Plaintiffs were startled to hear this, given that no one had before clearly stated that they heard a call that went out in the Seventh District (other than possibly an All Call, which is not how defense counsel referred to the call in opening statements), and so they took the unusual step of requesting a sidebar during opening statements. As related above, all such calls were sought in discovery, none were produced, and Defendants' stories had shifted over the years on what type of call they heard. Yet somehow in opening they had resolved status of the call. During the sidebar, counsel for Defendants stated that it was irrelevant where the call came from because, "[i]t is going to be the same thing. They are going to – they are going to argue that there is no record of this, there is no audio of it. Officer Mosqueda's testimony will be that it was over their zone radio." *Id.* at 35. Defense Counsel Jordan Marsh, who participated in the sidebar, already knew about the unproduced audio that went out on the Zone Six radio (to Districts Seven and Eight) but did not inform the Court or Plaintiffs.

The opening continued,

At this point, Officer Mosqueda recognized that the Aurora matched the description of the car wanted for fleeing and eluding police in the 4th District that he heard earlier.

*Id.* at 38. Throughout the rest of their opening, Defendants continued to reference details that were not in the call that Mosqueda heard.

Now, both officers had their service weapons out as they approached the car. You will hear they did this for officer safety. Again, based on

8

that earlier call, they had reason to believe that there might be a gun in the Aurora.

*Id.* at 44-45. And again,

> Again, they suspected that there might be a gun in this car based on that earlier radio message, so they wanted to get the driver and the passenger out, pat them down for weapons, handcuff them, secure them, get them away from the car if possible, getting them away from any guns that might be in the car.

*Id.* at 45.

In their opening statement, Defendants referenced the dispatch that they had withheld eight times. In addition, Defendants let Plaintiffs' Counsel tell the jury that they would never hear the call that Mosqueda heard, because it did not exist.[10] Defendants did not reveal that they had the dispatch, even though Marsh later admitted that he knew while preparing for trial that a recording of the relevant time period existed.

### B. Defendant Mosqueda

In his trial testimony, Defendant Mosqueda referred to the call as one that came over his Seventh District Radio (Zone Six). Mosqueada testified,

> So earlier that day I heard our radio, and the message was something about a dark colored vehicle with rims and a yellow, obviously yellow temporary plate that had fled the 4th District officers, and that it possibly could be armed, and it had something to do with a shooting…. I was listening to, I believe it's Zone Six , which is the 7th and 8th district.

Ex. I, Trial, 2.25.15 pm, p. 27. Mosqueda acknowledged that this was an important call, but that he never tried to locate it. *Id.* at 30. Mosqueda's counsel knew that a recording of the relevant time period *had* been located and said nothing.

---

[10] When the call was in fact presented to the jury, the credibility of Plaintiffs' justifiably confident presentation was undermined, along with that of the Defendants.

### C. Detective Gallagher

Plaintiffs called Detective Gallagher to testify because he was the lead detective overseeing the shooting investigation. At the time of his testimony, Plaintiffs were unaware of, and had not been provided with, the inventory form that he completed identifying and inventorying the withheld Zone Six call. Ex. J, Inventory Form.

Detective Gallagher was examined, cross-examined, re-examined, and re-cross examined before he was excused. His inventory report was not disclosed until later in the trial, shortly before closing arguments.

### D. Laura Dunaj

Laura Dunaj is a City of Chicago employee who Plaintiffs called to testify regarding OEMC records and searches, based on Defendants' representation that she was the proper record keeper to testify in this case. Her job duties include substantial OEMC work, records retrieval, and trial testimony. OEMC trial duties are split between Ms. Dunaj and another OEMC employee, Jill Maderak. Despite being identified and called at trial for her knowledge of OEMC procedures and practices, Ms. Dunaj's knowledge purportedly did not extend to some basic and pertinent subjects. For example, she could not say whether or how all calls were memorialized by OEMC. Ex. K, Trial, 2.26.15 am, pp. 129-130. Whether this is true, or whether she was providing the officers an excuse regarding the lack of documentation for the Zone Six call, is unknown.[11]

---

[11] The court indicated that it viewed Ms. Dunaj as a neutral witness. Although this may be true with respect to certain issues in certain cases, it should be noted that she is a City of Chicago employee who routinely testifies at trial and, according to Mr. Marsh, meets at his office to prepare for her testimony. The parties do not have equal access to meet with her, and it is not unrealistic to suppose that she harbors some bias in favor of her employers, particularly given her testimony in this case, which at best was highly misleading.

The most disturbing aspect of Ms. Dunaj's testimony, however, involved her answers to

questions posed by Defense counsel. On cross-examination, Ms. Dunaj and Mr. Marsh engaged in

the following colloquy:

> Q. You did not do a search for a 4th District incident in Zone Six,
> correct?
> A. Correct.
> Q. Okay. And as you sit here today, can you say one way or another
> whether there was any radio call over Zone Six on January 6th, 2011,
> regarding a 4th District incident?
> A. **I am not aware of it**.
> Q. Either --
> A. I never reviewed it. I am not aware of anything like that.
> **Q. So can you say either way whether it ever went out?**
> **A. I have no knowledge of whether it went out, no.**
> Q. So yes or no --
> A. No.

Ex. K, Trial, 2.26.15 am, pp. 126-127. The questions appear calculated to indicate that

OEMC had searched extensively for the Zone Six call, but had not located it. Even assuming it is

true that Ms. Dunaj never personally conducted such searches, she testified with the full knowledge

that Jill Maderak, with whom her and Mr. Marsh had talked to prior to trial, *had* done the searches

for a Zone Six call *and* that a Zone Six recording existed. Importantly, Mr. Marsh has acknowledged

that he also met with Ms. Maderak while preparing for trial.

Instead of presenting Ms. Maderak, who might have revealed the suppressed dispatch,

Defendants presented a witness who they believed would not betray its existence.

Later during her testimony, Plaintiffs' Counsel called for a sidebar because they were

frustrated by the witness' inability to identify what types of records OEMC collected and preserved.

During that sidebar, Mr. Marsh said the following:

> She has looked. There are no such documents related that are
> currently in existence relative to that call.

*Id.* 131.

> She and I have talked and she has looked recently. But that
> information would no longer be -- certainly the audio would have
> been recycled a long time ago. And the event queries would have
> been recycled four years later.

*Id.* 133. Mr. Marsh was not telling the truth. He later admitted that he knew that

three copies of the relevant recording had been provided to Sgt. Lamperis shortly

after the shooting, in January 2011. Not only did Marsh withhold that information,

he went even further, trying to blame the Plaintiffs and their discovery requests.

> What [Plaintiffs] have known the entire time is that Officer
> Mosqueda heard this call, he stated it from the very beginning, they
> never -- if that was a discovery issue, it was never followed up on,
> and they –

*Id.* 135. As shown above, Plaintiffs made the proper requests, which were not objected to. Even if

Plaintiffs hadn't made targeted written discovery requests, Defendants' reliance on the Zone Six call

(besides the glaringly obvious relevance) mandated disclosure under Rule 26(a).

After this sidebar, the Court went on an extended break in order to give the parties a chance

to interview Ms. Dunaj before resuming her testimony. During that break, the fiction that had been

carefully sown by the Defendants began to unravel.

### E. Defendants' Scheme Begins to Unravel

Ms. Dunaj told Plaintiffs' Counsel, Steven Fine, that Jill Maderak may have completed a

request to a supervisor, Sgt. Lamperis, for Zone Six calls. Mr. Fine asked Ms. Dunaj to call Ms.

Maderak to verify the status and existence of the request. The substance of the conversation and the

ensuing revelations were shocking: an undisclosed Zone Six recording existed. Days after the

shooting, three copies of the recording were made and sent to Sgt. Lamperis. Plaintiffs would also

learn that Detective Gallagher had also documented the existence of the recording.

Ms. Dunaj had also brought with her to trial another undisclosed document. This document indicated that the Law Department of the City of Chicago had also requested audio of dispatches, also just days after the shooting. Ex. Q, 3.2.2015 am, pp 5-7.

Mr. Marsh, who entered the room during Ms. Dunaj's phone call with Ms. Maderak, became visibly upset. Minutes earlier he had been working on a stipulation with Plaintiffs regarding Ms. Dunaj's testimony. This stipulation would have allowed Ms. Dunaj to leave the stand, and the Zone Six recording would never have surfaced.

After Ms. Dunaj told Plaintiffs' counsel about the Zone Six call, Mr. Marsh promptly got on the phone with Sgt. Lamperis—a man from whom Marsh would later advise the Court he could not get a return call. Recess was now over, and Court back in session. Mr. Marsh addressed the Court,

> So there was back and forth communication with
> Ms. Dunaj, and what we know is that there was a CD that was
> requested by Sergeant L-a-m-p-e-r-i-s, Lamperis --
>
> THE COURT: Okay.
>
> MR. MARSH: -- in area 1, he is now in area central,
> that would have been Zone Six radio transmissions that would run
> from 2145 hours to 2215 hours, which would be 9:45 to 10:15, I
> believe, which encompasses the time of the 4th District call. I just
> talked to him and -- and Ms. Dunaj said, OEMC has no -- for some
> reason that was not saved, but they sent three copies of that CD to
> the sergeant in January of 2011. I just spoke to the sergeant now. He
> is going to look for it, he says that we traditionally request that the
> area would traditionally request audio. He doesn't know, he certainly
> at this point doesn't know what is on it, but he says it may be in the
> warehouse, he doesn't know how long it would take to get.

Ex. L, Trial 2.26.15 pm, pp. 3-4. Mr. Marsh's statements plainly suggest that he had just learned about the Zone Six call at the same time that Plaintiffs learned about the call. As the Court and Plaintiffs know now, that is not true.

Despite the fact that everyone now knew that a Zone Six call existed, Mr. Marsh kept pressing for an unseemly advantage, telling the Court that:

> [The parties] had initially discussed a stipulation regarding that, and then they came to me with another stipulation that said that the City has no evidence of any such call. I don't know that that is true. So we would be unable to stipulate to that. That is where I am at.

*Id* at 4. He again tried to lay the mess he created at Plaintiffs' feet, while avoiding a full accounting of his knowledge and what happened.

> We don't think it was an all-call, Your Honor. The all-call -- all-call or look-out message, and there is an all-call indicated in the GPR that they are referring to, and Officer Mosqueda may have believed at the time it was an all-call. At this point we don't believe it was. But he has testified consistently that he did receive this message. They never -- the way we look at it is they never closed the circle, they had a production request, but they never deposed anyone from OEMC for the information now that they are seeking. And it has been consistently Officer Mosqueda's position that he heard something, and that is what he heard.

*Id.* at 5. Mr. Marsh further stated,

> I just don't want to -- I just don't want to say something I don't know.

> *Id.*
> We would do that, sure. I just don't want to factually represent to you something that I do not know.

*Id.* at 6.

Based on Plaintiff's' motion *in limine* to bar evidence relating to the Fourth District call, Defendants knew before trial that Plaintiffs would argue that the dispatch Mosqueda claimed he heard did not exist. Instead of coming clean, Defendants tried to have it both ways, pressing their misconduct for maximum tactical advantage:

> I mean, I don't think we could stipulate to that without saying something that -- because that sounds like, without the jury knowing any more, it sounds like we are conceding that there was no call. So if the stipulation could continue that something -- something to the effect of, the City -- this does not foreclose the possibility that there was a call that went out.
> …
> The fact of the matter, what I think happened is back in the day when this happened, or a couple days later, there was a request by

Sergeant Lamperis, we don't know what was on the CD, it certainly encompasses the time, that makes sense. We don't know. We also know that OEMC recycles audio after 30 days if not requested, and recycles event queries after 4 years if not requested or preserved. And other than that CD that was sent, OEMC has no -- did not save anything. So obviously that is not the situation -- the way it is worded, but that picture that that factually paints, is different than the picture the stipulation paints, which sounds like it is just simply, you know, despite the fact that Officer Mosqueda said he heard something, there is no record of it ever having gone out, which the implication is it didn't go out. So the fact is, whatever went out has been either destroyed, recycled, or is in the hand of Sergeant Lamperis in Area 1. So I just don't think the stipulation would be accurate.

*Id.* at 6-8. Unfortunately for Mr. Marsh, his argument was becoming threadbare.

> THE COURT: This still fell within the request, so --
> And when did you learn that Lamperis has this CD?
>
> MR. MARSH: It was sent to him a couple days ago.

> *Id.*

> MR. RAUSCHER: If they knew about it two days ago, why didn't we learn it until 20 minutes ago when we asked the witness.
>
> MR. MARSH: What I did is I called Lamperis, I got his number, called and left him a message. He is not going to know what was on the audio and I wanted to know what was on it. I called him. He didn't call me back. I called him, as we were going through this moments ago and got ahold of him. He wasn't working the other day and left a message at home. He called me back -- he didn't call me back. I literally just got ahold of him today because he was working. I asked him about it and that's what he told us.
>
> THE COURT: What prompted your inquiry to Lamperis?
>
> MR. MARSH: It was Laura or Jill that told me that the only record they had was of this disk going out to a sergeant, and they don't know why there was no -- there was no preservation of that at OEMC, but they sent three copies to the sergeant.

*Id.* at 14-15. It seems unlikely that a Sergeant who requested *three* copies of a recording in connection

with an investigation that he supervised would be unaware of the recording's contents, and it is

certainly the case that Marsh could not have known whether Lamperis knew what was on the

recording without even talking to him. It is equally unlikely that Marsh would have made no effort to see if the recording corroborated his clients' claims.

Next came Marsh's first of three confessions and apologies, each one enlarging the scope of his complicity.

> THE COURT: So once you learned of the existence of a CD with Zone Six recordings from 9:45 to 10:15, why didn't you disclose it at that point?
>
> MR. MARSH: My thought process was I want to see what is on that. You know, in retrospect, I think I should have, but it just -- *my thought process was I wanted to see what was on that,* I wanted to talk to the sergeant, and to see whether it was even relevant.
> …
> *You are right. Just didn't -- I just didn't -- I wanted to know what was on it. I didn't know. I didn't tell.*

*Id.* at 15 (emphasis added). As for the challenge of locating the disc, now that he had been caught,

> He said he is -- I said this is what it is, he said he will take a look, but it could be a couple days, it could be in a warehouse, he just doesn't know. And that was literally why I was -- why I walked into court after you were on the bench, because I was talking to him, finally got ahold of him.

*Id.* at 16. Counsel continued to press for advantage in terms that would be revealed as untrue later in the afternoon.

> I think we can say something like, there is no record -- the OEMC, the Office of Emergency Management Communications has -- has no -- currently has no record –

*Id.* at 19. As it turns out, OEMC *did* have the recording.

After eliciting on the stand that Ms. Dunaj had no knowledge of such a recording, Marsh told the Court that she was the one who had provided the recording to the police;

> We since have been in touch with her and she and Jill have looked for this, so I think she was thinking -- that it was did you do a search on January 10th, because at that time Jill obtained whatever information she had according to Ms. Dunaj, Ms. Dunaj took it and gave it to the police.

*Id.* at 23.

> My understanding -- I think most of the facts we pretty much
> understand. There is no record at OEMC of this call. Laura Dunaj, I
> think, knows what she knows and she has expressed it. I don't know
> what further utility she would have other than this CD issue, which is
> -- which is – you

*Id.* at 25.

> It is really Jill -- I think it is Jill that did it. We can stipulate to that. I
> am not sure why we would talk to Laura Dunaj any more or what she
> would provide. What we know is she doesn't know whether that ever
> existed, she just knows there is no record of it currently within
> OEMC…

*Id.* at 26. These statements cannot be reconciled with OEMC's production of the recording just

hours later. Separately, Defense counsel indicated that IPRA, a city agency – staffed and salaried by

the City of Chicago – could have even more information:

> Presumably, as I am finding out, apparently IPRA made a request,
> maybe a broader request, I don't know, and Sergeant Lamperis made
> a request for this specific timeframe. These are things I am finding
> out now.

*Id.* at 24. Defendants have never turned over the complete IPRA file, stating that the case was still

open. Defendants have presumably had access to IPRA file, because they made limited disclosures

from it. Based on the mid-trial revelations, it is possible that other relevant information is contained

in the IPRA file that was known to Defendants but not disclosed to Plaintiffs. This possibility

deserves a full accounting in connection with a new trial.[12]

### F. Afternoon Apology

After the jury had been dismissed for the evening, Marsh delivered the following incomplete

apology to the Court:

---

[12] The United States Attorney for the Northern District of Illinois was also conducting an
investigation, at some point. It is unknown whether the Zone Six call provided to that office. The
Cook County State's Attorney also undertook an investigation. It is unknown if this recording was
given to that office.

> The discussion we had had before about the OEMC, specifically
> there were a number of aspects to it but the aspect about the fact that
> I knew about -- that there had been a CD transmitted or sent to
> Sergeant Lamperis a couple days before I mentioned it, when I
> thought about it at the time, I thought this is something that would --
> if found, would be favorable to us, so not telling them isn't hurting
> anything, and it was a complete blind shot on my part. It should have
> been disclosed. I don't practice that way. I feel -- there is no question
> that -- well, I don't know if there is any question, but somewhere in
> the back of my mind you are an advocate, I can separate that from
> advocacy, it was wrong. I don't operate that way. I apologize to
> counsel and I apologize to the Court. I just wanted – it bothers me
> profoundly, and I don't do that. So I just wanted to let the Court
> know, that is not the way I operate. And I do apologize.

*Id.* at 117.

This apology was immediately followed by Mr. Aumann's revelation that OEMC actually did

have the recording, and then Marsh's flustered response:

> We got -- I have been in and out of the courtroom obviously and got
> word from Sergeant Lamperis, as we talked about, and heard back
> from OEMC, and it turns out it sounds like OEMC was able to find
> a copy, of course.

*Id.*

> And Judge, for the record, we have asked them a lot,[13] and they --
> they have told us -- obviously they didn't find it, whatever, but that is
> -- that is news to us.

*Id.* at 118. The following morning would provide additional information regarding the timeline of

Defense Counsel's knowledge.

### G. The Morning After

After Plaintiffs moved for a directed verdict as a sanction for Defendants' failure to turn

over the Zone Six call, and with the knowledge that he would therefore be facing increased scrutiny,

Marsh told the Court that he knew about the recording before trial started.

---

[13] It is unclear why Defendants would have asked OEMC "a lot" for a recording that they allegedly
did not even know existed.

Second thing, Judge, as I am thinking about this issue with the CD and Sergeant Lamperis, I represented to the Court yesterday that it was a couple days ago that I first learned about the CD. I spoke to Jill Maderak at my office -- I remember that I was sitting in my office when I did it – I was going over the event queries, and I have to -- I have to believe that that was sometime last week, because I don't think I would be speaking with her after court. So it may very well -- and certainly, I have talked to her and Ms. Dunaj about the CD multiple times, it may have been that I learned about the CD Thursday or Friday of last week. I don't know. I just wanted to let the Court know that that -- I may have been mistaken yesterday when it came up that -- the first time I heard about it was Tuesday, or I said a couple days before, because I do have that recollection of talking with Jill Maderak in the office. So it may have been prior to trial.

Ex. M, Trial 2.27.15 am, pp. 13-14.

When did counsel know of this tape? And why was he meeting with Ms. Maderak despite having chosen Ms. Dunaj to testify at trial? Although many questions, such as these, have not yet been answered, the current record plainly shows that the Zone Six call would never have been disclosed if Plaintiffs had not stumbled onto it shortly before they closed their case.

Plaintiffs have done their best to clearly and concisely explain the details of the dispatch calls and of Defendants' related activities, but it has taken nearly twenty pages of this brief to adequately explain these issues. The jury, without the benefit of a complete explanation, must have been thoroughly confused. During their second day of deliberation, the jury returned a defense verdict.

## Argument

Plaintiffs were denied a fair trial in the most comprehensive sense of the term. Defendants sat on the Zone Six call, the key piece of evidence, pretending that it did not exist while letting Plaintiffs prepare for trial and present their case, and letting the Court issue substantive rulings relating to that piece of evidence. When this key evidence dropped in their lap as trial was winding down, Plaintiffs' focus was distracted from the ability to prosecute their case. Working late into the night, Plaintiffs' counsel were forced to grapple with the new evidence, and with how they might be able to cure the evident prejudice caused by the belated (and non-voluntary) disclosure. What did it

mean for their case, why had it never been produced before, and what other areas of their case might be upended by Defendants' non-disclosure?

If the Defendants' revelation mired counsel in quicksand, its effect on the jury was worse. In their eyes, the Plaintiffs likely looked sloppy or incompetent for not having discovered the missing Zone Six call before they finished putting on their case. The jury did not know anything about the discovery process or just how unprofessional Defense counsels' behavior had been, and the jury did not learn how this evidence was discovered. All they learned was that Plaintiffs had properly asked for it, and it had not been produced until trial. The jury could not be expected to understand the significance of Defendants'' misconduct, nor the weight to be given to the new recording. The jury was not even instructed that they could take an adverse inference from the misrepresentation.

In closing, Defense counsel told the jury that Plaintiffs could not tell a cohesive story, completely failing to acknowledge that Defendants' misconduct had ensured that Plaintiffs did not have the evidence that would permit them to do so.

As a result of Defendants' misconduct, Plaintiffs were denied a fair trial. Plaintiffs and the Court squandered considerable resources and time to working a case and trial that was fundamentally unfair.[14] In the interests of justice, Plaintiffs respectfully request that this Court grant them a new trial, with the additional sanction of attorneys' fees and costs for all work done on this case to date.

---

[14] Over the course of the trial, Plaintiffs' counsel together spent more than 260 hours in the courtroom alone. Plaintiffs' counsel invested more than $40,000 to present their experts. Based on the revelations regarding what the officers actually could have heard, the police practices experts will have to almost start anew.

# I.     The Legal Standard

## A. Rule 59 Standard

Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).

Importantly, a new trial is warranted based on a party's misconduct, including discovery violations, if the moving party "demonstrate[s] both that misconduct occurred and that it prejudiced him." *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 758 (7th Cir. 1994). In this case, Defendants hid crucial evidence before trial, which undermined the credibility of their case, and their suppression undermined the credibility of the trial process. As Chief Judge Castillo aptly explained in granting a new trial in another case involving misconduct by lawyers representing the City of Chicago:

> The improper conduct tainted the trial from opening statements through closing arguments, and the Court is not confident that the sustained objections, admonishing of counsel, and jury instructions sufficiently minimized the harm that resulted from the numerous inappropriate statements, questions, and arguments that occurred throughout trial. While there is insufficient evidence that the pattern of misconduct by the City's attorneys was intentional, their repeated disregard for the Court's rulings and careless presentation of barred evidence to the jury prejudiced Walden's case and entitle him to a new trial.

> There must be a bright line between aggressive advocacy and "win-at-all costs" unethical conduct. This bright line has been crossed by defense counsel's repeated ill-advised actions in this case. Walden is not entitled to a perfect trial nor is he guaranteed success at trial. Instead, he is entitled to a fair trial conducted within the legitimate contours of advocacy. He did not receive one.

*Walden v. City of Chicago*, 846 F. Supp. 2d 963, 980 (N.D. Ill. 2012). As in *Walden*, Plaintiffs are entitled to a new trial because the misconduct in this case irredeemably tainted the entire process.

Indeed, the misconduct in this case is far worse than the misconduct in *Walden*, and the prejudice to Plaintiffs is at least as great. [15]

A new trial is also appropriate where a court abuses its discretion in admitting or excluding evidence, so long as the error or errors were not harmless. *See Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013); *see also Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993) (403 and 404(b)); *United States v. Walker*, 652 F.2d 708, 714 (7th Cir. 1981) ("An error is harmless only if we are convinced that the error did not influence the jury, or had but very slight effect, *and* can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.") (internal formatting omitted) (citing *United States v. Shepherd*, 576 F.2d 719, 723-24 (7th Cir. 1978)).

A single erroneous ruling may justify a new trial, as may the cumulative effect of all such rulings. *See Walker*, 652 F.2d at 714; *see also Thompson*, 722 F.3d at 979 ("Cumulative prejudice occurs when (1) multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair.") (internal formatting omitted) (citing *Christmas v. City of Chicago,* 682 F.3d 632, 643 (7th Cir. 2012)); *see also Kiefel v. Las Vegas Hacienda* 404 F.2d 1163 (7th Cir. 1969) (upholding district court grant of a new trial based on cumulative errors and awarding sanctions against party who vexatiously multiplied the proceedings); *Hillard v. Hargraves*, 197 F.R.D. 358, 361 (N.D. Ill. Feb. 4, 2000).

---

[15] Although post-trial sanctions discovery is just getting underway, Plaintiffs also submit that a new trial is appropriate under Rule 59(e), based on the newly discovered evidence regarding the Zone Six call, which was not available until the end of Plaintiffs' case. *See Envtl. Barrier Co., LLC v. Slurry Sys., Inc.*, 540 F.3d 598, 608 (7th Cir. 2008)("To succeed on a motion under Rule 59, a party must show that: (1) it has evidence that was discovered post-trial; (2) it had exercised due diligence to discover the new evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a new result.")

B.  Rule 60 Standard

In relevant part, Federal Rule of Civil Procedure 60 permits a court to vacate a verdict based on "fraud or misconduct by an opposing party," and for "any other reason that justifies relief." *See* Fed. R. Civ. P. 60(b)(3), (6). A Plaintiff satisfies her burden under Rule 60(b)(3) by providing by clear and convincing evidence "that: (1) the party maintained a meritorious claim at trial; and (2) because of the fraud, misrepresentation or misconduct of the adverse party; (3) the party was prevented from fully and fairly presenting its case at trial." *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995). A "meritorious claim" is one that has survived summary judgment. *Id.* ("Lonsdorf presented a meritorious claim at trial by presenting a prima facie case of sexual harassment, demonstrated by the district court's denial of Seefeldt's motion for a judgment as a matter of law.").

Rule 60(b)(3) covers "both intentional and unintentional misrepresentations," and determining "whether the alleged misrepresentation altered the result of the case is unnecessary because Rule 60(b)(3) protects the fairness of the proceedings, not necessarily the correctness of the verdict." *Id.* Moreover, in considering Plaintiff's motion under Rule 60(b)(3), the court must accept as true all of Plaintiff's "undenied allegations." *Id.*

As explained above, and in more detail below, there is no real question as to whether Plaintiffs have satisfied their burden under Rule 60. Plaintiffs survived summary judgment; Defendants unquestionably committed misconduct; and their misconduct completely changed the case in a way that prevented Plaintiffs from fully and fairly presenting their case, and so a new trial is warranted.

Defendants' misconduct (including the misconduct of their lawyers) on its own justifies a new trial under Rule 59 and Rule 60 given the significance of the dispatch calls to their defense. Yet, as described below, Defendants' misconduct also led the Court to make erroneous rulings that further prejudiced Plaintiffs.

## II. OEMC-Related Errors

Defendants' misconduct caused multiple errors relating to the OEMC dispatch calls.

### A. Pretrial Ruling Allowing Fourth District Call Into Evidence

As noted above, Defendants' lies caused the Court to permit them to introduce the details of the Fourth District call that they did not hear. Specifically, Plaintiffs filed a written motion *in limine* to exclude evidence of that call on February 18, 2015. That filing occurred on the Thursday before the trial started. At that time, according to Mr. Marsh's own statements, he had almost certainly talked to Ms. Maderak and Ms. Dunaj about the existence of the Zone Six call. Then, on Friday, February 19, the Court held the final pretrial conference in this case, during which the Defendants orally opposed Plaintiffs' motion *in limine*. The Court denied that motion *in limine*, as well as Plaintiffs' subsequent motion to reconsider. *See* Dkt. Nos. 303, 305. In memorializing its ruling, the Court explained:

> Plaintiffs moved to exclude recordings of certain OEMC recordings. That motion is denied because the calls are relevant to Defendants' version of what information they allegedly heard before making the traffic stop. Under that version, the recorded calls went out; then later calls were made based on those calls but with some of the details altered or left out; Mosqueda and Sierra heard the later calls and, on the basis of the information in them, believed (in Mosqueda's formulation) that Pinex's Aurora was involved in a shooting. Plaintiffs' arguments all went to weight, not relevance.

> That said, at the hearing, the Court invited Plaintiffs to file a motion to exclude the portion of the dispatch recording where an unknown person says words to the effect of "we assume there's a gun in the car." The question is whether a reasonable officer would be disallowed—as a matter of law—from relying on a later call derived from that original "assumption" call. It might be that an officer who unreasonably relies on a purported fact is disentitled from asking the jury to consider the purported fact in assessing the reasonableness of the use of force. To illustrate the point with an extreme example, if a tipster told an officer that a suspect was carrying a gun and the tipster learned this by using his powers of telepathy, the officer could not reasonably rely on that information in deciding what kind of force to use. The question here would be whether an unwarranted assumption ("we assume there's a gun in the car") passed on through OEMC dispatches could be reasonably relied on by Defendants—though Defendants say that they

heard the message as saying that the Aurora was involved in a shooting (so Defendants did not hear anything about an "assumption").

Plaintiffs did file a reconsideration motion, R. 304, but the motion addresses the factual question again, rather than the legal issue. **The motion argues that there is no evidence of the broadcast call in which Mosqueda could have heard that the Aurora was involved in a shooting, and the evidence is therefore speculative (or at least it is speculative that the recorded calls were the basis of whatever was broadcast to Mosqueda). The [Plaintiff] is, however, essentially asking the Court to disbelieve that Mosqueda did hear a broadcast stating that the Aurora was involved in a shooting.** This the Court will not do, because it resolves a factual dispute that the jury must resolve. **Unlike the evidence involved in the two cases cited by the motion, Mosqueda purports to have personal knowledge of the broadcast.** Sure, he will be, and should be, ruthlessly cross-examined on the existence of the broadcast. **But the Court cannot simply find Mosqueda not credible against the defense on this factual point. And the existence and content of the prior OEMC recordings do have a tendency to make it more likely that Mosqueda heard what he claims to have heard. As the Court explained at the status hearing, if there were no such prior recordings, then the jury would be more likely to conclude that Mosqueda had not heard what he claims to have heard.** The motion to reconsider is denied.

Dkt. 330 at 3-4 (emphasis added). The Court issued that order on February 22, 2015, which was one day before the trial began, and a time when Marsh unquestionably knew that the Zone Six recording existed.

As set forth in the preceding paragraphs, the entire justification for admitting the recording was that the existence of the Fourth District call, with multiple details that Mosqueda claimed to have heard, made it more likely that the Zone Six call he also claimed to have heard, but that was not produced, actually existed. And that entire justification was based on Defendants' false representations that the Zone Six call no longer existed.

With that ruling in place, Defendants ensured that they got to tell the jury about a wanted Oldsmobile Aurora that had been involved in a shooting. *See* Dkt. 329 (evidentiary instruction reflecting details of stipulation regarding earlier call read to jury). Defendants' wrongdoing on this point was a fraud on the Court. They knew before trial that the Zone Six recording existed, but they

failed to tell the Court, and they allowed the Court to issue a favorable substantive ruling based on that misunderstanding.

Not only that, but the substantive ruling allowed them to bolster their own untruthful testimony, and in a way that was nearly impossible for Plaintiffs to overcome. Although Plaintiffs and the Court now know that the Defendants never heard a call about an Oldsmobile Aurora being involved a shooting, the jury was left with a muddled picture of what the Defendants may have heard. Defendants' introduction of the Fourth District call, based entirely on their made-up story about a similar but missing call, is no different than if Matthew Colyer had "remembered" that Gildardo Sierra shot Darius Pinex multiple times in the back while Pinex laid on his stomach. If Colyer's "memory" of an event that matched every detail of Sierra's killing Flint Farmer had led the Court to allow Plaintiffs to introduce into evidence the video of Sierra killing Farmer, it would hardly have mattered if Colyer had "remembered" different facts during the trial. And that was the same result from Defendants' use of the Fourth District call to bolster their story about pulling over a car with armed occupants.

## B. The In-Trial Remedies Did Not Cure The Prejudice

After the Zone Six call was finally produced, Plaintiffs moved for a directed verdict on liability as a sanction for Defendants' misconduct. The Court took Plaintiffs' motion under advisement, issued a limiting instruction regarding the calls, and permitted Plaintiffs to recall Mosqueda to testify about the call. *See* Dkt No. 322. Those remedies, however, did not cure the prejudice

### 1. The Limiting Instruction Was Insufficient

The Court's Order taking the motion for directed verdict under advisement included the instruction that that it intended to give. *Id.* Plaintiffs proposed a different instruction. *See* Dkt No.

324. Although the Court included some of the concepts that Plaintiff proposed, Plaintiffs were prejudiced by the Court's decision to not include the following statements:

> 3. According to the Defendants, the fact that they heard this description gave them a reason to pull over Pinex's car, and to treat the resulting encounter as a "high risk" traffic stop for which they were justified in taking out their guns.

> 7. Defense counsel was aware that a recording of all the calls made during the time period that Defendants said they heard the call about an Aurora existed, and knew that it had not been provided to Plaintiffs despite the obligation to have produced it.

> 8. Notwithstanding his knowledge, defense counsel did not tell Plaintiffs there was a possibility that a recording of the call existed.

> 14. You are instructed that you are permitted, but not required, to find that the Defendants intentionally failed to disclose the real call because it would have been harmful to their case.

> 15. You are further instructed to disregard the tape recording that was played for you of a different call from the night of the shooting. There is no dispute that the Defendants never heard that call. The call had previously been admitted by the Court based on a false representation by the Defendants about the nonexistence of the other call, and if the Court had not been misled by the defense about that other call, the Court would not have admitted the recording that you heard. That recording had no bearing on the Defendants' decision to shoot the Plaintiffs, and it should not be considered by you in any respect in your deliberations.

Dkt No. 324, ¶¶ 3, 7, 8, 14, 15. The Court's instruction informed the jury that the Defendants had failed to respond to a valid discovery requests, but there was nothing to tell them just how significant that failure was. The jurors were also left to wonder whether the failure to produce the documents may have been benign.

Although the sanctions-related discovery is just starting, there is no question that, at a minimum, Defendants' counsel (and multiple City of Chicago witnesses who testified at trial) knew that the Zone Six recording existed before the trial started, and yet no one said anything. Under these circumstances, the jury should have been informed that the Defendants knew that the call existed before trial but chose to say nothing. *See id.* ¶¶ 7-8. The remainder of Plaintiffs' proposed

instruction was appropriate because, as described above, the Court's decision to allow the Fourth District call into evidence *was* based on Defendants' false representations that the Zone Six call did not exist.

2. <u>Plaintiffs Should Have Been Given More Time to Prepare their Re-Cross Examination</u>

The Court ruled on Plaintiffs' Motion for Directed Verdict on Friday, February 27, 2015. The transcript of Mosqueda's testimony was not available that day, but it would have been ready by the next trial day, Monday, March 2, 2015. Therefore, Plaintiffs asked that they be permitted to recall Mosqueda on Monday instead of on Friday. This would not have caused any delay in the trial, as Defendants would still have been putting on their case then anyway. It would, however, have permitted Plaintiffs to impeach Mosqueda in the traditional manner, by referring to the trial transcript, and asking the following type of question: "Were you asked this question, and did you give this answer?" Without that ability, the impeachment lost substantial punch.

District courts have broad discretion in managing their dockets, including managing trials, but they must not act "unreasonably" in exercising that discretion. *See, e.g., Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998). Moreover, Federal Rule 611(a)(1) provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth." *See* Fed. R. Evid. 611(a)(1).

Plaintiffs respectfully submit that the Court erred by denying Plaintiffs' request to question Mosqueda one business day later than the Court originally proposed, so that Plaintiffs could use the trial transcript to properly impeach Mosqueda on his earlier trial testimony. Permitting Plaintiffs to wait one business day so that they could impeach Mosqueda with the transcript of his trial testimony would have been the most "effective [procedure] for determining the truth" of the matter. This is particularly true given that the proposed scheduling change would not have delayed the trial at all –

Defendants would have continued with their case, and then Plaintiffs could have called Mosqueda either between defense witnesses or immediately after Defendants were done. Given Mosqueda was being recalled because of Defendants' misconduct, the Court should have granted Plaintiffs' modest request to review the transcript of his earlier trial testimony before they recalled Mosqueda to testify.

## III. Other Errors Compounded the Harm

Some of the Court's pretrial rulings allowed Defendants to capitalize on the false presentation. This allowed the Officers to improperly represent themselves as innocent and frightened, while the Plaintiffs were armed and dangerous.

Because of the way the evidence came in at trial, these rulings became errors with a prejudicial cumulative effect. These are: (1) the decision to allow Defendants' to admit evidence showing that a loaded handgun was recovered from under Darius Pinex's seat; (2) barring questions regarding Sierra's previous federal testimony after defense counsel opened the door to that testimony; and (3) the Order barring the presentation of Rule 404(b) evidence.

### A. A Loaded Gun

The Defendants asserted that a gun was found in Plaintiffs' car. The police never bothered to send the weapon to the crime lab for an analysis of fingerprints and DNA. Ex. K, p. 109. This was despite the fact that Sierra was already a serial shooter. The Defendants argued that this gun gave the dead man, Darius Pinex, a motive to flee. The Court agreed. Dkt No. 260, ¶ 11. Before opening statements, Defendants indicated that they intended to state that the gun was loaded, because this would provide additional motive to escape, and the Court concurred. The Court, however, allowed the gun's admission for a narrow purpose only. It was not allowed for the purpose of eliciting sympathy for the Defendants or for evaluating whether their actions were reasonable. A jury instruction, fashioned by the Court, noted the narrow reasons for which the gun could be considered. Dkt No. 326, p. 8.

Plaintiffs submit that the Court erred by admitting evidence that there was a loaded gun in Darius Pinex's car. That is because the Officers did not know about the gun when they pulled Pinex over or when they shot at him and Colyer, and their actions must be judged only on what they knew at the time. *See, e.g., Common v. City of Chicago*, 661 F.3d 990 (7th Cir. 2011). Although there are limited exceptions to that rule, the Seventh Circuit has explained that if no witnesses testify that they saw a gun, the fact that a gun was later found is irrelevant. *Id.* at 994 ("On the other hand, the *Sherrod* court noted, "if the officer says 'I saw the suspect reach quickly for his pocket,' then proof of the contents of the pocket does not contradict the officer's testimony."). Here, no one testified that they saw a gun at any time before Pinex was dead, and so under *Common* and its predecessors, the fact that a gun was later recovered is irrelevant, and evidence relating to the gun should have been excluded. This is particularly true given that Plaintiffs offered to stipulate that the Defendants saw Colyer and Pinex reaching under their seats. *See* Dkt No. 242 at 7.[16]

Compounding this error, and causing undue prejudice, Defendants often used evidence of the gun to inflame the jury. They used the gun, to excuse their actions on the grounds of 'officer safety.' This went right to the heart of the reasonableness determination.

In opening, after narrating over an audio file, before introducing himself and his clients, Defense counsel stated, "[t]his is the same Darius Pinex who was drunk at that very moment he was driving that car and who had a loaded weapon under the driver's seat." Ex. H, p. 33.

Even worse, Defendants explicitly tied the handgun to the Fourth District call details, which had only been admitted based on Defendants' misrepresentations. Counsel stated, "[b]ased upon the

---

[16] Plaintiffs also recognize that the Court admitted evidence relating to the gun on the ground that its existence made it more likely that Pinex had tried to flee. But Plaintiffs maintain that this reasoning is far too attenuated, and that the Court erred in allowing Defendants to introduce the gun under that rationale as well.

earlier call and the actions of the Aurora, this was no ordinary traffic stop." Ex. H, p. 43. Other

examples abound,

> Now, this raised his suspicions that the occupants of the Aurora were
> either reaching to pick up a gun or trying to hide a gun, *again
> remembering what Officer Mosqueda had mentioned about that call from earlier
> in the night*.

*Id.* at 42-43 (emphasis added). And,

> You will hear they did this for officer safety. Again, based on that
> earlier call, they had reason to believe that there might be a gun in the
> Aurora.

*Id.* at 44-45. Then,

> Again, they suspected that there might be a gun in this car based on
> that earlier radio message, so they wanted to get the driver and the
> passenger out, pat them down for weapons, handcuff them, secure
> them, get them away from the car if possible, getting them away from
> any guns that might be in the car.

*Id.* at 45. Moreover, Sierra made a direct connection between his actions and details of the withheld

Fourth District dispatch when he testified, explaining:

> Well, at this point, they are moving around, okay, they are moving,
> and when the driver and passenger are going towards the floor seats
> in the vehicle, it raises my officer awareness, like it goes all the way
> up, because first of all, my partner related to me that a gun may be in
> the vehicle, and it was wanted from a shooting from another district.

Ex. P, at 73. Even during closing argument, after they had been caught hiding the actual Zone Six

recording, Marsh attempted to close the loop on their improper argument. "So we know that they

tried to flee. We know that the officers believed -- suspected there was a gun in the car." Ex. N,

Trial 3.03.15 am, p. 108.

Finally, Counsel made a direct plea to the jury to evaluate the gun as direct evidence of the

officer's reasonableness.

> Look at the photographs. *Look at the gun*. Look at the door. Look at
> the bumper. One foot of crushed damage. And think, what was that

scene like? Is that something where an officer would have no right to
believe that he or anyone else was in danger?

*Id.* at 115.

Defendants succeeded. Through the creation and redaction of stipulations, through a blurred
and confusing presentation of what the officers knew before the stop, and by using the gun they
attributed to Pinex as direct evidence of reasonableness the officers were able to create a portrait
unsupported by the admissible evidence. They were essentially able to say: they heard there was a
gun, there was a call about a gun, they thought there was a gun, and there was a gun.

### B. Sierra's Previous Sworn Testimony

The jury was left with the impression that Sierra, a serial shooter, had never given sworn
testimony regarding alleged misconduct. On cross examination, Plaintiffs' Counsel asked Sierra:

> Q. Officer Sierra, have you testified in court before?
> A. Yes, I have.
> Q. Approximately how many times have you testified in court?
> A. Probably 40 times approximately.

Ex. O, Trial 2.24.15 p.m., p. 112. This question was meant to elicit that Defendant Sierra is a veteran
at giving trial testimony. There was no danger of it being implied that he had been involved as a
Defendant in forty federal trials. The next two questions from Defense counsel were all that was
necessary to respond to the cross-examination,

> Q. Now, the times that you testified in court, was that as a witness, the other times?
> A. That is correct.
> Q. In criminal court?
> A. Correct.

Ex. P, Trial 2.25.15 a.m, p. 75.

During direct examination, however, Defendants' counsel and Sierra had the following
exchange,

> Q. You testified that you have testified in court about 40 times, is that right?
> A. Correct.

Q. Okay. How many times have you testified as a person accused in a civil court as a defendant, being accused essentially of civil murder? How many times have you.
A. This is my first time, and hopefully last.

Ex. P, Trial 2.25.15 a.m., 74-75. At the next opportunity, Plaintiffs addressed this line of questioning with the Court. Plaintiffs believed that the formulation of the question (which contained more information than the answer) opened the door to Defendants history of sworn testimony in civil matters. The Court ruled that the question had been narrowly tailored in response to Plaintiffs' examination. Plaintiffs respectfully disagree with that conclusion.

Sierra's answer regarding his federal testimony was misleading. Sierra previously testified at a deposition in a case in which he was accused in federal court of wrongfully killing Flint Farmer. Deposition testimony is given the same weight as trial testimony, and this trial was not Sierra's first time testifying as a defendant in a civil case. *See Giffin v. Summerlin*, 78 F.3d 1227, 1231 (7th Cir. 1995) ("Testimony by deposition is an important part of the judicial process and merits the same protection [with respect to witness immunity] as in-court testimony."); *see also Gupta v. Austrian Airlines*, 211 F. Supp. 2d 1078, 1087 (N.D. Ill. 2002) ("United States courts readily accept deposition testimony when the witness is beyond the reach of compulsory process.").

This error, when combined with the other errors, had a substantial cumulative effect— permitting the jury to think that Sierra had never been sued before, when he had in fact been sued in a case the City settled for $4.1 million. The Defendants appeared as though they had never been sued before, and that Defendant Sierra was an officer in good standing. These seemingly untarnished officers claimed that they were given information that had led them to believe that the Plaintiffs were armed and dangerous. The admission of evidence related to the gun (which never received forensic analysis), made it look like the information Defendants claimed to have received was accurate.

## C. The 404(b) Rulings Were Erroneous

Under *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) (en banc), evidence is not excluded merely because "a propensity inference can be drawn; rather, Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Id.* at 856 (emphasis added). In addition, "the list of permissible uses of bad-acts evidence in Rule 404(b) is introduced by "such as," and so is not exhaustive."' *United States v. Taylor*, 522 F.3d 731, 736 (7th Cir. 2008).

Six months to the day after shooting Mr. Pinex, Defendant Sierra shot and killed Flint Farmer, another defenseless civilian, under similar circumstances. Evidence of the Farmer shooting was admissible under Rule 404(b) to show that Defendant Sierra has planned to claim his life was endangered to allow him to escape punishment; to show that he has a unique *modus operandi* when he shoots civilians; and to rebut to impeach his trial testimony. It was also admissible once Sierra opened the door, as he did multiple times during trial. Plaintiffs respectfully submit that the Court erred by excluding the evidence before trial, and again by continuing to exclude it after Sierra opened the door to its admission.

### 1. Evidence Relating to Flint Farmer's Death Was Admissible Under Rule 404(b)

Plaintiffs sought to introduce a video of Sierra shooting Flint Farmer to death while Farmer lay on his stomach, in the dark, and to question Sierra about that shooting. The evidence was admissible under 404(b) because the substantial similarities between Sierra's behavior in the two shootings show a unique *modus operandi*, as well as providing evidence of a plan.

Sierra never told the investigating officers that he shot Farmer while Farmer was on the ground. Afterward, Sierra claimed in his Tactical Response Report (TRR) that Farmer was armed. He was not, and no weapon was recovered. Unfortunately and initially unbeknownst to him, an approaching officer, responding to a call of shots fired, captured the fatal shots on his squad video.

After learning of and viewing the video, Sierra claimed he fatally shot Farmer while Farmer was lying upon the ground because Farmer moved his shoulder and had his hand under his body, where Sierra could not see it.

Similarly, in this case Sierra shot at an unarmed civilian, at night, and then tried to cover up his misconduct. As Plaintiffs asserted in response to Defendants' motion *in limine*, Sierra was confident that no one would challenge his proffered explanation for his misconduct, regardless of how incredible it was. Put differently, Plaintiffs asserted that Sierra has a unique modus operandi, in that he is a police officer who shoots unarmed civilians in the dark and then lies about it.[17]

a. The Evidence Was Admissible To Show *Modus Operandi* and Plan

"Evidence of *modus operandi* is evidence that shows a defendant's distinctive method of operation." *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998). Sierra used his unique modus operandi when he shot at the Plaintiffs in this case: first shooting before the car moved, and still while they were fleeing and, months later, he used it again when shot and killed Famer while Farmer lay on the ground defenseless. Sierra was questioned about the Farmer shooting during his deposition in this case, and he was similarly questioned about it in a civil case brought by Farmer's estate. Moreover, there is a videotape of the shooting that shows him shooting Mr. Farmer in the back, while Farmer was lying on the ground.

In short, Sierra operates uniquely in that he overacts to routine incidents, shoots civilians, and then lies about acting in self-defense to try to cover up his actions. Plaintiffs are not suggesting that in any case involving a police officer who has shot at multiple people, each prior or subsequent shooting is automatically admissible. In this case, however, Sierra's unique *modus operandi*, combined with the fact that Plaintiffs have nearly incontrovertible proof of him acting in accordance with that

---

[17] Even assuming that the gun found under Darius Pinex's seat was not planted, he was still unarmed. All of the testimony on this point is consistent – the gun that was recovered was jammed so far under the seat that it could not have been removed by hand.

*modus operandi* (in the form of the Farmer videotape), justified admitting the evidence under Rule 404(b). Moreover, the Defendants can hardly claim it is common for police officers shoot civilians and then lie about acting in self-defense.

This type of evidence has long been admissible in civil rights cases and others. *See, e.g., Okai v. Verfuth*, 275 F.3d 606, 611 (7th Cir. 2001) (explaining that instances of other misconduct had been admitted against police officers when "the plaintiffs had *actual evidence*, in the form of sustained complaints *or potential witness testimony*, that they hoped to introduce.") (first emphasis in original; second emphasis added); *see also, e.g., Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993) ("Although evidence of prior bad acts is inadmissible to prove a propensity to commit such acts, it is admissible for other purposes, including intent, opportunity, preparation, and plan. Fed. R. Evid. 404(b). Jones's evidence would have served all four of these purposes, White's all but the third (preparation); and, since Burge had denied under cross-examination that he had ever had or used an electroshock instrument, Jones's evidence could also have been used to impeach that denial. The exclusion of these two witnesses' evidence incidentally doomed Wilson's case against Officer McKenna, and he was granted a directed verdict; if as we believe the exclusion of their evidence was error, so was the grant of the directed verdict.").

Although it is true that *modus operandi* evidence is frequently used to prove identity, that is not its sole purpose, and such evidence is admissible so long as there are strong similarities between the other acts and the acts at issue in the case. *See, e.g., United States v. Kieffer*, 68 F. App'x 726, 729 (7th Cir. 2003) ("Vaughn's testimony was also relevant to establish modus operandi, because it revealed Kieffer's distinctive way of luring his young victims into a situation where sexual contact would be easy to establish."); *United States v. Romero*, 189 F.3d 576, 588 (7th Cir. 1999) ("Each of the interactions with the other boys involved the same seduction techniques used on Erich and identified by Agent Lanning as the modus operandi of child molesters generally: assuming the

identification of a teenage boy named 'Kyle'; expressing emotional intimacy with the boy; giving advice about personal problems; expressing interest in the boy's interests; 'mirroring' the needs of the boy and seeking to fulfill those needs; and asking the boy to meet him in a hotel. This is classic modus operandi evidence used to respond to the defense argument that Romero had only innocent intentions for Erich and wanted to help him."). Here, Sierra's method of killing Flint Farmer and, more importantly, his attempted cover up, exhibited strong similarities with the way in which he shot at Plaintiffs and then attempted to cover up his and his partner's misconduct.

The evidence was also relevant to show his plan. "The plan exception to Rule 404(b) applies where the extrinsic act evidence helps explain how the charged offense unfolded or developed, not where the evidence merely indicates that the defendant committed the same crime on other occasions." *United States v. Tai*, 994 F.2d 1204, 1211 (7th Cir. 1993). Here, the evidence of the Farmer shooting, and Sierra's further misconduct by trying to cover up his actions, was relevant to show how this shooting, and the subsequent cover up, developed.

### b. The Evidence Was Admissible Under The Doctrine of Curative Admissibility

Finally, as described above, Sierra opened the door to at least some questions relating to the Farmer shooting when he testified in response to his own counsel's question, that he had never before provided testimony in a case in which he was accused of civil murder in civil court. *See, e.g.*, *Wilson*, 6 F.3d at 1238 ("since Burge had denied under cross-examination that he had ever had or used an electroshock instrument, Jones's evidence could also have been used to impeach that denial"). Sierra also opened the door when he described how traumatized he was after this shooting. Specifically, Sierra and his counsel engaged in the following colloquy:

Q. Okay. And what was your state of mind immediately after the incident.

A. It was very traumatic.

Q. What do you mean?

A. I was like in – it's like a surreal moment. It's like your adrenaline, it's subsiding. You see someone that – that you were giving orders to come out of the vehicle, they don't listen to you, and then that person is dead because they tried to run you over. It's very traumatic. And, you know, I'm kind of frustrated that I don't remember every aspect of who I spoke to, exactly where I stood. It's kind of frustrating.

Ex. P at 61-62. He also testified as follows:

Q. Okay. Have you played this over in your head?

A. Yes.

Q. How often have you played this over in your head?

A. A lot of times.

Q. How often have you thought about it?

A. Too many times. It's just that -- excuse me. When you go to work, you know, you don't expect to take someone's life, you know? This -- you know, you listen to the testimony of Mr. Pinex, being a father and everything, it is very – it's like why didn't he listen to us, and that is –

*Id.* at 62.

That testimony strongly suggested that Sierra had never been involved in another shooting, let alone killed anyone, which is plainly untrue. Under the doctrine of curative admissibility, Plaintiffs should have been permitted to cross-examine Sierra on this point, a request that the Court rejected during trial. *See, e.g., United States v. Bolin*, 514 F.2d 554, 558 (7th Cir. 1975) ("When a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject."). Although the Court has broad discretion in determining what evidence may be introduced under that doctrine, Plaintiffs respectfully submit that the Court abused its discretion by not permitting any questions into the Flint Farmer incident despite Sierra opening the door to that subject multiple times.

2. Sierra Would Not Have Been Unduly Prejudiced By Admitting Evidence Relating to <u>Flint Farmer</u>

Although introduction of the Famer shooting would likely have changed the result of this trial, that does not mean Sierra would have been unduly prejudiced by its admission, as "[a]lmost any bad act evidence simultaneously condemns by besmirching character." *Gomez,* 763 F.3d at 855 (citing *U.S. v. Beasley,* 809 F.2d 1273, 1279-80 (7th Cir. 1986)); *see also United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("all probative evidence is prejudicial to the party against whom it is offered"). Here, the evidence was relevant to highly disputed facts regarding Sierra's actions when he shot at Plaintiffs, and it should not have been excluded. *See Gomez,* 763 F.3d at 857 ("One important issue in Rule 403 balancing in this context is the extent to which the non-propensity factual proposition actually is contested in the case.").

<u>Conclusion</u>

For the reasons stated above, and for any other that the Court wishes to consider, Plaintiffs respectfully request that this Honorable Court grant them a new trial with the additional sanction of attorneys' fees and costs for all work done on this case to date.

Respectfully submitted,

/s/ James M. Baranyk
One of the Attorneys for Plaintiff Colyer

James M. Baranyk
Second City Law, P.C.
33 N. Dearborn, Suite 1950
Chicago, IL 60602
773.485.2267

/s/ Scott Rauscher
One of the Attorneys for Plaintiff Pinex

STEVEN A. GREENBERG
STEVEN A. GREENBERG AND ASSOCIATES, LTD.
53 W. JACKSON BLVD., SUITE 1260
CHICAGO, ILLINOIS 60604
(312) 879-9500

Jon Loevy
Scott Rauscher
Loevy & Loevy
312 N. May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

*Attorneys for Plaintiff Gloria Pinex, Administrator of the Estate of Darius Pinex*