UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW COLYER and | ) | |
| DARIUS PINEX, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 12 C 04855 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, GILDARDO SIERRA, | ) | |
| and RAOUL MOSQUEDA, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

## I. Introduction

In the very early hours of January 7, 2011, Chicago Police Officers Raoul Mosqueda and Gildardo Sierra pulled over an Oldsmobile Aurora in Chicago's Englewood neighborhood. The Aurora was driven by Darius Pinex; Matthew Colyer rode in the front passenger's seat. The officers say that they decided to stop the car because they thought it matched the description of an Aurora that other officers, from another Chicago Police District (the Fourth District), had unsuccessfully tried to pull over around 3½ hours earlier that night. Mosqueda claims he heard the description of the Aurora over his police-car radio, but not directly from the Fourth District officers—instead, Mosqueda heard it from a dispatcher in the Office of Emergency Management and Communications (OEMC). The dispatcher's radio broadcast summarized the Fourth District's description of the car. Sierra has

1

sometimes claimed that he himself heard the same dispatch as Mosqueda, and at other times has claimed that he only remembers Mosqueda telling him about it.

At various times before and during this litigation, Mosqueda has claimed that the OEMC call, which he heard over the police-car's "Zone" radio, warned that the Aurora was wanted for a shooting or that there might have been a gun in the car. Because of that warning, Mosqueda says, he already had his gun drawn the moment he got out of the police car. The parties intensely dispute what happened next. Under the officers' version, Pinex tried to drive away from the stop, endangering Mosqueda, who was standing next to the Aurora and who was pushed down by the Aurora's open door , and then endangering Sierra as Pinex eventually sped toward Sierra. The officers opened fire, killing Pinex. Under Plaintiffs' version, the officers aggressively cut off Pinex's car, rushed out with guns drawn and pointed, all the while screaming at Plaintiffs. In this version, the officers fired an initial shot without reason, provoking Pinex into fleeing.

Which version is true, whether the truth lies somewhere in the middle, and whether Mosqueda and Sierra acted with excessive force depends, in large part, on what Mosqueda heard on the police-car radio that night. Not surprisingly, after they sued, Plaintiffs asked for the recording of what Mosqueda claimed to have heard over the radio, as well as any documents related to the recording. A recording was available. But Plaintiffs did not get it. Documents identifying the location of the recording were also available. But Plaintiffs did not get those either. The discovery responses that they did get led them to believe that no recording of the call or

2

documents were available. From that, Plaintiffs reasonably concluded that Mosqueda was lying—that is, he actually had heard nothing, and the officers executed an overly aggressive traffic stop for their own reasons or no reason at all. Plaintiffs prepared to present that theory at the trial, as well as the theory that the radio call was an excuse concocted after the shooting with the help of other officers, and the trial began with that presentation. But on the fourth day of trial, it was revealed that there was an OEMC record showing the potential availability of a recording of the call the officers heard that night, and soon afterwards, it was revealed that the recording was in fact still available. The actual recording did *not* mention that the Aurora had a gun or that the car was wanted for a shooting, but it did describe an Aurora similar to the one Pinex was driving. Plaintiffs' Counsel scrambled to adjust their trial presentation to account for the undisclosed recording, both to defend against it and to use it to support their version, but the jury ultimately found in favor of Mosqueda and Sierra.

Plaintiffs have moved for a directed verdict in their favor or, short of that, a new trial along with attorneys' fees and costs. R. 367, 422. In order to determine the extent of the discovery violation and the propriety of the relief sought, the Court authorized post-trial discovery. That discovery has shown two things. First, it has shown that Jordan Marsh, one of the City Law Department lawyers representing the officers and the City of Chicago, learned about the OEMC record before trial and knew that the recording might still be available. The Court has no choice but to conclude, based on the record evidence, that Marsh intentionally withheld this

3

information from the Court, from Plaintiffs, and even from his own co-counsel. Second, post-trial discovery has shown that, in response to Plaintiffs' discovery request seeking the recording and related documents, Thomas Aumann, another Law Department lawyer for the officers and the City of Chicago, failed to make a reasonable inquiry, as required by the discovery rules, to search for the recording and responsive documents. Aumann only looked for documents in a Law Department file, but he had no idea *how* the documents in the file were gathered, from *what* sources, or even *who* gathered them.

Based on these two failings, the Court grants in part and denies in part Plaintiffs' post-trial motion. There will be no directed verdict, but there must be a new trial. Because of the recording's untimely disclosure, the first trial was unfair and Plaintiffs' trial presentation was hurt beyond repair by the surprise. And because Marsh's and Aumann's misconduct thwarted Plaintiffs' trial preparation and trial efforts, Plaintiffs are awarded their attorneys' fees and costs expended on preparing for the first trial, conducting the trial itself, and conducting the post-trial discovery and briefing.

## II. Background

### A. The Shooting

Chicago Police Officers Raoul Mosqueda and Gildardo Sierra started their January 6, 2011, shift at around 9:00 p.m. R. 422-4, PX 21, Sierra 2013 Dep. 17:21-18:13; R. 422-3, PX 18, 3B Trial Tr. at 72:11-13. [1] They were in a marked Chevy

---

[1]Citations to the record are "R." followed by the docket number and then a page, line, or paragraph number. This Opinion refers to Plaintiffs' Exhibits as "PX" and Defendants'

Tahoe; Mosqueda was the driver. *Id*. It was their first time working together. R. 422-4, Sierra 2013 Dep. 17:21-18:13.[2] Not long after their shift began, a series of radio transmissions about a police chase went out over police radio, but in a different Police District than Mosqueda and Sierra's, so they did not hear the transmissions.

The transmissions started at around 9:56 p.m. R. 422-2, PX 1, Fourth District Audio.[3] The transmissions said that police officers were chasing an Oldsmobile Aurora; that the Aurora was black; that it was a two-door model (although there was back and forth about two versus four doors); that it had rims; and that it had a temporary plate with the number 378 M 393. *Id*. Toward the end of the transmissions, the chasing officers called off their pursuit of the car, told the dispatcher (after the dispatcher repeatedly asked why the officers had started chasing the car in the first place) that the car was wanted for "fleeing and eluding," and opined that based on the "way he was driving and the amount of shootings in the area, we are going to assume there is a weapon in that car." *Id*. at 7:00-8:00. The dispatcher ran the plate, reporting over the air that it "comes back to" a 1998

---

Exhibits as "DX." Also, when not referring to them individually by name, the Opinion refers to Defendants and Respondents collectively as "Defendants."

[2]Although this was not disputed at trial, Sierra said in his Independent Police Review Authority statement that the pair had worked together on "two other occasions" "a few months ago." R. 422-3, PX 19, Sierra IPRA Statement at 3.

[3]The tape recording provided by plaintiffs does not have time stamps, but it does contain an on-the-air "time check," which identifies the 11 minute mark of the recording as 10:05 p.m. on January 6, 2011. PX1, Fourth District Audio at 11:00. From that point of reference, it is possible to figure out the time of day for each separate transmission.

Oldsmobile Aurora registered at a particular address and to a particular name; not Darius Pinex and not Matthew Colyer.

Sierra and Mosqueda did not hear these transmissions, which will be referred to as the Fourth District Calls. That is because the Fourth District Calls went out over a different radio channel than the one they were listening to. The Fourth District Calls went out on the police radio channel known as Zone 8. PX 1, Fourth District Audio (starting at 0:11). Zone 8 is the channel for the Fourth District, where the chase occurred. R. 422-3, PX 18, 3B Trial Tr. at 28:6-9; R. 422-3, PX 20, Mosqueda 2013 Dep. 210:5-23. Sierra and Mosqueda were assigned that night to the Seventh District. R. 422-3, PX 18, 3B Trial Tr. at 28:6-9; R. 422-3, PX 20, Mosqueda 2013 Dep. 210:5-23. And Seventh District calls go out on the Zone 6 radio channel. R. 422-3, PX 18, 3B Trial Tr. at 28:6-9. That is the channel Sierra and Mosqueda were listening to. *Id*. So Sierra and Mosqueda did not hear the Fourth District Calls themselves.

But they could have heard a related call that did go out over Zone 6. A dispatcher, broadcasting on Zone 6, repeated some—not all—of the information from the Fourth District Calls almost immediately after those calls originally aired in the other zone. R. 422-2, PX 7, Zone 6 Audio. At around 10:00 p.m., this went out over Zone 6:

> Zone 8 initiated a traffic pursuit at 8300 South Marquette, they were chasing 378 [M] 393, [a] '98 Olds' Aurora, last seen 9300 South East End travelling westbound. 420 terminated it. [inaudible question] 1998 Olds' Aurora, [with a] temp' title.

*Id*. This Zone 6 recap of the Fourth District Calls was different than the original calls: it did not give the car's color; did not mention that the car had rims; did not mention that the car was a two-door; described the chase as a "traffic pursuit" rather than as "fleeing and eluding"; and repeated *nothing* about the speculation that there was a "weapon" in the car connected to the shootings in the area.

It is possible that Sierra and Mosqueda heard this recap call in their Tahoe, because this call was at least broadcast over Zone 6, which they were listening to, rather than over the other district's radio zone. Mosqueda has consistently claimed that he did hear some variation of this call. R. 422-3, PX 18, 3B Trial Tr. at 27:23-28:14. At times Sierra has claimed that he remembered hearing the call too, R. 422-3, PX 19, Sierra IPRA Statement at 3-4, but at other times, he claims that Mosqueda told him about it, R. 422-4, PX 21, Sierra Dep. 30:15-17.[4]

About 3½ hours after some of the substance of the Fourth District Calls was repeated over Zone 6, Sierra and Mosqueda encountered an Oldsmobile Aurora with temporary plates. It was now a little after 1:35 a.m. on January 7. Pls.' Tr. Exh. 90, Dashcam Video. Mosqueda claims that he thought this Aurora was the one mentioned in the prior call and that he mentioned this to Sierra. R. 422-3, PX 20,

---

[4]Both before and after the Zone 6 recap of the Fourth District Calls, there were dispatches on Zone 6 that gave a snapshot of the gun violence plaguing Chicago. About five minutes *before* the recap there was a dispatch about a Blue Econoline Van and six male blacks with shotguns. *Id*. Then, around 20 or 30 seconds *after* the recap, a separate dispatch mentioned "shots fired at Garfield and Damen use caution in the area." PX 7, Zone 6 Audio. About five minutes after the recap there was also a dispatch about a "person with a gun." *Id*. In this case, the officers now argue that it is possible that the call that came on the heels of the Zone 6 recap caused the officers to conflate the "shots fired" information with the Aurora recap. Garfield and Damen is, however, around 10 miles away from 9300 South East End Street, where the Zone 6 recap reported that the Fourth District had stopped pursuing the Aurora.

Mosqueda 2013 Dep. 16:10-21. For that reason alone, R. 422-3, PX 17, Mosqueda's IPRA Statement at 3-5, the two pulled the car over. Pls.' Tr. Exh. 90, Dashcam Video. (Mosqueda and Sierra have never claimed that there were other, even pretextual reasons, to stop the car. R. 422-3, PX 18, 3B Trial Tr. at 25:13-15 ("No minor traffic violations, no."); R. 422-4, PX 21, Sierra Dep. 26:7-27:7.)

Mosqueda and Sierra did not do certain things that one might expect police officers pulling over a dangerous vehicle to do. Mosqueda and Sierra did not call for back-up. R. 422-3, PX 18, 3B Trial Tr. at 21:24-22:8. They did not call in to report that they were stopping the car. *Id*. And they did not call in the license plate to verify that this Aurora was, in fact, the Aurora from the prior call. *Id*. at 25:20-24. If they had, they likely would have learned that it was a different car. Pinex's plate was 337 M 648, R. 432-2, DX 11, Area File at 344; the Aurora's plate from the Fourth District calls was 378 M 393.

Having pulled the Aurora over, Sierra and Mosqueda got out of their Tahoe and approached it. R. 422-3, PX 18, 3B Trial Tr. at 80:7-24; R. 422-4, PX 22, 2B Trial Tr. at 129:25-131:9. Inside the Aurora were Darius Pinex and Matthew Colyer. R. 422-3, PX 18, 3B Trial Tr. at 84:4-10, 118:17-20. Pinex was in the driver's seat and Colyer was in the front passenger's seat. *Id*. Exactly what happened next—and in what sequence—was disputed at trial, but the basic events were these:

- Sierra approached Pinex on the driver's side of the car; Mosqueda approached Colyer in the passenger's seat.

- At some point, Pinex put the car in reverse and backed-up, hitting a light post.

- When the car started to back up, Colyer fell out and Mosqueda was knocked down.

- Colyer's hand was injured.

- While all that was happening, Sierra fired at the car but did not hit anyone.

- Pinex put the car in drive and drove away from the light post.

- Mosqueda opened fire, killing Pinex.

R. 422-5, PX 38, 1B Trial Tr. at 58-77 (Colyer Direct); PX 18, 3B Trial Tr. at 71-99 (Mosqueda Direct). The officers then called in the shooting. Pls.' Tr. Exh. 30, Post-Shooting Calls.

## B. The Aftermath

Detective Supervisor Dimitrios Lamperis was notified about the shooting roughly 15 minutes after it happened. DX 11, Complete Area File at Pinex 369. He assigned Detectives George Gallagher and Kevin Smith "to the immediate follow up investigation." *Id*. at Pinex 375. Gallagher and Smith arrived on the scene and, while there, interviewed Sierra and Mosqueda. *Id*. at Pinex 377. This was the first set of interviews of Sierra and Mosqueda after the shooting. R. 422-5, PX 35, Gallagher Dep. 33:19-44:11. Gallagher's handwritten General Progress Reports (a type of police report) for those interviews reflect that Mosqueda said the Aurora was a "wanted vehicle" and that Sierra said "my partner said there's an Aurora with temp tags. vaguely remember." *Id*. at Pinex 396-398. These handwritten General Progress Reports of the on-scene, first interviews do not say anything about the Aurora being wanted for a shooting or about a gun being in the car. R. 422-5, PX 35, Gallagher Dep. 38:24-39:2.

9

Sergeant Jeffrey Siwek also came to the scene. R. 422-3, PX 11, Siwek Dep. 16:20-17:2. Siwek was Sierra and Mosqueda's supervisor that night. *Id*. at 6:5-7. Around an hour after the shooting, Siwek was on the radio seeking additional details about the Fourth District Calls. R. 422-2, PX 9, Siwek Call at 5:56-8:53. Siwek asked a dispatcher to "find out what [that Aurora] was pursued for, that would help, thank you." *Id*. The dispatcher suggested that they move the conversation off radio and onto cell phones: "[Siwek], you want us, you want us to just call you, would that be best?" *Id*. Siwek responded in the affirmative, and telephone records show that Siwek had a short call with dispatcher Mike Tracey shortly afterwards. R. 422-2, PX 10, Siwek Letter. At around that time, Siwek and Mosqueda left for the hospital. R. 422-3, PX 13, Transport Rec. ("Siwek … transported … Mosqueda to Holy Cross Hospital … at approx. 0300 hours."). Mosqueda was uninjured, and so was released without treatment. *Id*. ("Dr. Malik examined and released PO Mosqueda."); R. 422-3, PX 18, 3B Trial Tr. at 13:7-14:13.

Just hours later, Sierra and Mosqueda were at the Area 1 Police Station where they were again interviewed by Detectives Smith and Gallagher, R. 422-5, PX 35, Gallagher Dep. 43:1-12, and where they also gave audio-recorded statements about the shooting to the Independent Police Review Authority (IPRA). It appears that the Smith and Gallagher interviews came first. Sierra's IPRA statement began around 11:35 a.m. R. 422-3, PX 19, Sierra IPRA Statement at 1. Smith's handwritten General Progress Report of Sierra's second interview appears to

indicate that it started at 8:10 a.m. and that Mosqueda's started at 9:15 a.m. DX 11, Complete Area File at Pinex 414, 419.

According to Detective Smith, in the second interview Sierra said something to the effect that the officers had "[o]bserve[d] a vehicle matching description of vehicle matching all-call wanted for shooting." *Id.* at Pinex 414. Smith's notes reflect that Mosqueda said something to the effect of "observe[d] car matching description of car wanted in all call message," *id.* at Pinex 419, but without a mention of a shooting or a gun in the car. Smith, by around the time of those interviews, appears to have heard the Fourth District Calls. Among his handwritten notes from that day is a (nearly exact) quote from them, and Smith set the words between quotation marks: "With the way he was driving and the amount of shootings that happened in and around that area today, we're gonna assume there was a weapon in that car." *Id.* at Pinex 416. The note also refers to "Blk Aurora," which likely stands for the color (black) of the pursued Aurora, another piece of information that was in the Fourth District Calls (Zone 8) but not in the Zone 6 Audio. *Id.*

In their IPRA statements, both Sierra and Mosqueda reported that they believed the Aurora was wanted for shots fired. In his statement, Mosqueda claimed that he "was on routine patrol … when I observed a vehicle that matched a description of an all call message over the radio." R. 422-3, PX 17, Mosqueda IPRA Statement at 3-5. Mosqueda said the message was about an "Oldsmobile Aurora by make and model and uh dark color that was uh wanted for shots fired." *Id.* Sierra

11

said that "the car we were approaching … fit the description of a vehicle that was wanted from a shooting in another district." R. 422-3, PX 19, Sierra IPRA Statement at 3.

Detective Gallagher's final, typed police report omitted the "shooting" reference that had appeared in Detective Smith's handwritten report of the second interview with Sierra. *Id.* at Pinex 377. Gallagher wrote that "PO MOSQUEDA related that he had monitored a police radio simulcast earlier in his shift and remembered a flash look-out message for a dark colored or black (Oldsmobile) Aurora with temporary plates from the 004th District." *Id.* at Pinex 377. As to Sierra, Gallagher wrote "PO SIERRA recalled that a dark colored Aurora with temp tags was mentioned in a look-out message earlier in the day." *Id.* at Pinex 378.

In the hours and days after the shooting, various Chicago agencies started requesting the recordings of the radio calls from before and after the shooting. The requests were sent to the Office of Emergency Management Communications (OEMC), which is the City's 911 and public-safety communications agency. On the day of the shooting, a Chicago police detective named J. Las Cola requested "Zone 8 voice transmissions relative [to the Fourth District pursuit] for 06 Jan 11, 2150 to 2245 hours." R. 431-2, DX 2, Las Cola Request Form for Zone 8. This request covered the audio of the Fourth District Calls. Detective Las Cola also requested "Zone 6 voice transmissions relative to [the shooting] for 7 JAN 11, 0115 to 0215." R. 431-2, DX 1, Las Colas Request Form for Zone 6. This request covered the time *after* the shooting, when Sierra and Mosqueda called in the shooting, but did *not* cover

12

the time period when the Zone 6 dispatcher repeated some aspects of the Fourth District Calls over Zone 6.

Three days later, Darwin Olortegui, a Supervising Paralegal at the City of Chicago Law Department, also put in a request to OEMC. R. 431-2, DX 3, Olortegui Request Form. Olortegui did not submit his request due to any formal instruction from a Law Department attorney, but simply because he saw an article about the shooting in a newspaper. R. 422-4, PX 25, Olortegui Dep. 17:16-19:21. Olortegui asked for "any & all fire & police communications, including but not limited to 911 calls, dispatch, radio calls, zone & telemetry" related to "fatal police shooting of Darius Pinex." R. 431-2, DX 3, Olortegui Request Form. Separate from the request to OEMC, Olortegui also emailed the Chicago Police Department to ask for "In-Car video for" the Tahoe driven by Mosqueda and Sierra. R. 434-6, DX 42, Olortegui Video Email.

Six days after the shooting, Sergeant Lamperis—remember, he was the supervisor of the detectives investigating the shooting—requested "Zone 6 voice transmissions relative to [the shooting, for] 06 JAN 2011, between 2145 and 2215 on ZONE 6." R. 422-4, PX 29, Lamperis Request Form. This request did cover the recap of the Fourth District Calls that went out on Zone 6. This would be the crucial audio and the crucial request later uncovered mid-trial.

With the exception of Olortegui's video request, which Olortegui emailed to the Chicago Police Department, all these requests were made on a standard OEMC form and were directed to and fulfilled by OEMC. An OEMC employee named Jill

13

Maderak responded to the two Detective Las Cola requests. R. 422-4, PX 28, Dunaj Dep. 56:2-57:11; R. 422-4, PX 30, OEMC Log. Her co-worker, Laura Dunaj responded to Olortegui's request by giving him what Maderak had already given to Las Cola. R. 422-4, PX 28, Dunaj Dep. 56:2-57:11. This did not include the recap of the Fourth District Calls that went out over the Zone 6 channel because Las Cola had not asked for that audio. Only Lamperis received that audio when, a few days after Dunaj fulfilled Olortegui's request, Maderak responded to Lamperis's request and sent him 3 CDs of Zone 6 radio transmissions covering the time of the call about the pursued Aurora. (This Opinion will refer to this recording as the Zone 6 Audio.)

According to their practice, Maderak and Dunaj respond to requests by locating the requested audio—which is otherwise by default saved for only about 30 days—and copying it to CDs for the requester and also saving it to OEMC's computer network. R. 422-5, PX 31, Muir Dep. 9:5-10:21, 11:7-12, 11:19-12:1, 13:5-17. After a request—like the ones made here—prompts the saving of audio to OEMC's computer network, it remains there essentially indefinitely. *Id*.

### C. Pre-trial Discovery

About nine months after the shooting, Pinex's Estate sued Sierra, Mosqueda, and the City of Chicago. *Pinex v. Sierra*, 11 C 07487, Doc. 1, Compl. That filing led the City's Law Department to request and receive the Chicago Police Department's Area File (largely a collection of police reports) for the shooting. DX 11, Complete Area File at Pinex 342 (Request Form). The original suit was dismissed without

14

prejudice a few months later. *Pinex v. Sierra*, 11 C 07487, Doc. 36-37. Then, a month after that, Colyer filed this case. R. 1, Compl. And a few months after that, Pinex's Estate sued again. R. 34 ¶ 4, and the two lawsuits were consolidated, R. 41. Colyer and the Pinex Estate alleged excessive force in violation of the Fourth Amendment.

Discovery ran throughout 2012 and 2013. The City of Chicago Law Department's Federal Civil Rights Litigation Division—specifically, attorneys Jordan Marsh, Tom Aumann, and Dana Pesha represented Sierra, Mosqueda, and the City during this time.[5] As discussed next, during discovery, Plaintiffs asked for the Zone 6 Audio. But they did not get it.

### 1. Document Request for the Zone 6 Audio

Under Federal Rule of Civil Procedure 34, Plaintiffs served a document request on Sierra and Mosqueda asking for "All transcripts, tape recordings, electronic communications and radio transmissions (or Documents memorializing the same) relating to the events at issue in the Complaint including but not limited to all Documents from the Office of Emergency Management Communications and all PDT communications." R. 422-4, PX 23, Joint Rule 34 Resp. at 5. Aumann prepared the response to this request and certified it under Federal Rule of Civil

---

[5]Marsh first appeared on behalf of Sierra early on in the dismissed Pinex case and again in this case. R. 51. He later entered an appearance for all three defendants. R. 294. Aumann originally appeared only on behalf of Mosqueda before entering a second, all-defendant appearance before trial. R.12, R. 302. Pesha, similarly, appeared for Sierra and then entered an all-defendant appearance just before trial. R. 62, R. 292. Although these three attorneys did not have appearances on file for the City until just before the trial, it is apparent—from the pretrial filings, from the attorneys' depositions, and from the pretrial in-court appearances—that they worked on the City's behalf throughout the case.

Procedure 26(g). He looked for responsive documents only in a Law Department case file set-up by paralegals in the Law Department. R. 422-2, PX 4, Aumann Dep. 25:24-32:21, 40:21-45:19. That file did not contain the Zone 6 Audio, so Aumann did not produce it.

Discovery continued. Around six months after Aumann failed to find and hand over the Zone 6 Audio, Sierra and Mosqueda were deposed. Sierra said that Pinex's Aurora was wanted for "[a] shooting in the 4th District." R. 422-4, PX 21, Sierra's 2013 Dep. 27:18-23. Sierra remembered that he learned this information over "OEMC dispatch." *Id*. at 27:24-28:20. But he was going on his memory because he had not been played any audio recordings of any dispatch calls by his lawyers. *Id*. at 28:18-20. Neither, apparently, had Mosqueda. R. 422-2, PX 4, Aumann Dep. 51:18-52:8 (explaining that defense counsel played the Fourth District Calls for Mosqueda during trial preparation but not before the deposition).[6]

Audio-wise, the file contained only what Olortegui (the Law Department paralegal) obtained from his 2011 request—the request that was not any more specific than asking for all police communications about the shooting. DX3, Olortegui Request Form. Olortegui did not get the Zone 6 Audio in that request because Dunaj only gave Olortegui what Maderak had already compiled and given

---

[6]Plaintiffs contend that Aumann must have played the Fourth District Calls for Mosqueda during discovery and that Mosqueda told Aumann that those calls were not what he had heard on the night of shooting. R. 435, Rep. Br. at 7-8. The contention relies on Mosqueda's post-trial deposition. R. 422-2, PX 3, Mosqueda's 2015 Dep. 14:11-18:6. Were this true, then Aumann would have been on notice to search for more audio, even back at the time of the deposition. Later in Mosqueda's post-trial deposition, however, he admits that the recording Aumann played for him during discovery could have been the post-shooting calls made by the officers. *Id*. 41:3-9. Mosqueda could very well have been confused about when he was played the Fourth District Calls.

to Detective Las Cola, and Las Cola had not asked for the Zone 6 Audio (remember, Las Cola had only asked for the Zone 6 audio covering the time period *after* the shooting, he did not ask for the time period *before* the shooting when the Zone 6 dispatcher repeated some aspects of the Fourth District Calls over Zone 6). Aumann did not know this at the time. Significantly, when he was responding to Plaintiffs' document request, Aumann did not even know how this file was compiled. R. 422-2, PX 4, Aumann Dep. 25:24-32:21, 40:21-45:19. He knew only that the files were created by "a paralegal or [a] secretar[y]" but he did not know where the file's creator looked for documents or how they made choices about what to include. *Id*. Aumann did not contact OEMC or anyone else to ask for additional documents responsive to this request. *Id*. And it appears that no one else on the defense team did either: Between the initial requests made in the hours and days just after the shooting and the month of trial, there appear to have been no requests to OEMC from Defense Counsel, in particular for the Zone 6 Audio. R. 422-4, PX 27, Maderak Dep. 112:16-23; R. 422-2, PX 4, Aumann Dep. 40:21-45:19; R. 422-2, PX 2, Marsh Dep. 10:6-11:8; R. 422-4, PX 24, Pesha Dep. 14:22-24, 18:2-4.

### 2. Mosqueda's Deposition Testimony about the Zone 6 Audio

Even without the Zone 6 Audio itself, Mosqueda purported to remember several details about the call. He testified at his deposition that the radio told them to "be on the lookout for a dark-colored Aurora with rims and a temporary plate" that was a "four-door" because "it had fled 4th District police officers" and had something to do with "shots fired." R. 422-3, PX 20, Mosqueda's 2013 Dep. 30:15-

31:23, 213:21-214:9. Mosqueda claims he specifically remembered that the call said something about "shots fired." *Id*. at 213:21-214:9. Mosqueda also said he "knew there was a gun in the car because dispatch – dispatch had earlier notified – notified everyone that this particular car … could be armed." *Id*. at 53:1-15. (As noted above, however, the Zone 6 Audio did *not* mention that the Aurora was wanted for a shooting or that there was a gun in the car.[7])

### D. Pretrial, Trial, and This Motion

### 1. Zone 6 Audio Is a Central Topic of Pretrial Preparation

Discovery closed, partial summary judgment motions were denied, and a trial date was set. During trial preparation—and apparently for the first time—Pesha and Marsh (Aumann was on a different trial at the time) played the Fourth District Calls for Sierra and Mosqueda. R. 422-2, PX 4, Aumann Dep. 51:18-54:14; R. 422-4, PX 24, Pesha Dep. 33:15-35:21; R. 422-6, PX 42, 4B Trial Tr. at 10:16-11:2, 12:18-13:15. Mosqueda told his lawyers that he had not heard the Fourth District Calls; that what he heard was something else that had similar substance. R. 422-2, PX 4, Aumann Dep. 51:18-54:14; R. 422-4, PX 24, Pesha Dep. 33:15-35:21; R. 422-6, PX

---

[7]That raises the question of how Mosqueda came to think that the OEMC dispatcher mentioned a gun in the car. The only source of that information was the Fourth District Calls, which Mosqueda did not hear before the shooting. It is unlikely that Defense Counsel played the Fourth District Calls for Mosqueda prior to his deposition. *See supra* note 6. What might have happened is that it actually was Detective Smith who gave Mosqueda this information. Smith quoted, almost verbatim, the Fourth District Calls in his police report from the day of the shooting. DX 11, Complete Area File at Pinex 416. So Smith must have heard them, and could have easily passed the information on to Mosqueda. If that did happen, then Smith likely made a basic investigatory mistake: he provided information *to* the subject of the investigation.

42, 4B Trial Tr. at 10:16-11:2, 12:18-13:15. This was the week before trial. R. 422-4, PX 24, Pesha Dep. 36:21-23.

Defense Counsel was surprised that Mosqueda had not heard those calls. R. 422-4, PX 24, Pesha Dep. 77:13-18. The defense lawyers had assumed that the Fourth District Calls were in fact what Mosqueda had always claimed to have heard. R. 422-2, PX 4, Aumann Dep. 51:18-54:14; R. 422-4, PX 24, Pesha Dep. 33:15-35:21; R. 422-6, PX 42, 4B Trial Tr. at 10:16-11:2, 12:18-13:15. The issue of zones—of radio channels—had not occurred to the defense lawyers. R. 422-6, PX 42, 4B Trial Tr. at 10:16-11:2, 12:18-13:15. Ever since the shooting, the officers had premised the stop of Pinex and Colyer, and the aggressive manner of the stop, in large part on what the officers contended they had heard about the Aurora on the radio. Now, just days before trial, Defense Counsel realized that they did not have audio of what their clients had heard.

### 2. Marsh Learns of the Zone 6 Audio Record from OEMC

Defense Counsel started looking. After Mosqueda revealed that he had not heard the Fourth District Calls, Mosqueda explained to his lawyers the issue of different radio zones for different police districts. *Id*. at 36:4-19. Marsh instructed Pesha to call OEMC to ask for more audio. R. 422-4, PX 24, Pesha Dep. 33:15-35:21. So Pesha called OEMC, spoke with Laura Dunaj, and asked for Zone 6 recordings. *Id*. at 36:21-23. Dunaj was no help. *Id*. at 36:21-38:19. Dunaj told Pesha that OEMC would no longer have audio from that night. *Id*. at 36:21-38:19. As it turns out, Dunaj was wrong. The Zone 6 Audio was saved on OEMC's computer network per

19

OEMC's practice of saving audio that had been the subject of a request (remember, Sergeant Lamperis had requested it just a few days after the shooting). R. 422-4, PX 27, Maderak Dep. 103:14-21.

Pesha reported back to Marsh. R. 422-4, PX 24, Pesha Dep. 39:1-42:14. Marsh decided to follow-up himself. *Id.* at 39:1-42:14. In the meantime, Plaintiffs' Counsel also realized that, due to the differences in radio zones, Mosqueda and Sierra could not possibly have heard the Fourth District Calls. Based on that understanding, Plaintiffs' Counsel filed a motion *in limine* seeking to bar the Fourth District Calls from the trial and to bar Mosqueda from testifying to his memory of hearing any call. R. 298.

The morning after Plaintiffs' Counsel filed the motion, Marsh made his follow-up call to OEMC. He spoke with Maderak. R. 422-2, PX 2, Marsh Dep. 52:14-54:8, 58:19-60:20; R. 422-4, PX 27, Maderak Dep. 67:6-69:4. Maderak told Marsh that just a few days after the shooting—now more than four years past—she had sent Lamperis the 3 CDs with Zone 6 Audio covering the relevant time span on the night of the shooting. R. 422-2, PX 2, Marsh Dep. 52:14-54:8. Marsh admits that Maderak said that "[s]he had a record of a request by a Sergeant Lamperis" for the particular timeframe, and "that her records indicated that she sent I think three copies of that audio to Sergeant Lamperis." R. 422-4, PX 2, Marsh Dep. 53:24-54:5. Maderak looked for the audio on OEMC's computer network as well—she knew it should have been there per OEMC's practice of saving requested audio—but she could not (at that time) find it. R. 422-2, PX 2, Marsh Dep. 52:14-54:8.

20

### 3. Zone 6 Audio Is a Central Topic of the Pretrial Conference

Marsh's call with Maderak occurred on February 19, 2015, which happened to be the same day as the second session of the pretrial conference. At the end of the call, Maderak told Marsh to call Lamperis. R. 422-4, PX 27, Maderak Dep. 81:5-24. Just after Marsh and Maderak finished their call, and as Marsh walked from his office to the courthouse for the second (and final) pretrial conference session, Marsh called Lamperis at "Area Central."[8] R. 422-2, PX 2, Marsh Dep. 62:23-63:4. Marsh was unable to reach Lamperis and he did not leave a message. *Id.* at 132:23-133:21 Marsh did not tell his two co-counsel, Aumann or Pesha, that the Zone 6 Audio might still exist. *Id.* at 60:21-24.

The second pretrial conference session convened at 11:00 a.m., with Marsh and Pesha as defense counsel. R. 422-6, PX 46, Pretrial Conf Tr. The subject of what OEMC audio Mosqueda and Sierra could have possibly heard came up almost immediately, due to Plaintiffs' motion *in limine* to exclude the Fourth District Calls. Marsh stated the Defendants' position:

> [P]laintiff, at this point in time, wants to prevent and preclude Officer Mosqueda from testifying to the same thing he has been testifying to since the very date of the incident … they [Plaintiffs' counsel] are saying [a call over Zone 6] doesn't exist, which is absolutely untrue. We know that it exists. We know that it went out over [Zone 8], because we have the audio, and we know that Officer Mosqueda testified to hearing a flash message containing substantially the same information.

R. 422-6, PX 46, Pretrial Conf. Tr. at 27:6-18. Marsh added that it was Defendants' intention to introduce the Fourth District Calls, including the part where an officer

---

[8]Area Central is the new designation for what, at the time of the shooting, was referred to as Area 1. R. 422-4, PX 26, Lamperis Dep. 6:3-7.

speculates that "there is a weapon in that car." *Id*. at 27:22-28:5. Marsh offered this theory of admissibility during the pretrial conference: "[W]e should be able to play [the Fourth District Calls] to establish that there was something very similar [to what Mosqueda says he heard] that went out, and that makes it more likely that indeed there was [such a call.]" *Id*. at 36:3-17.

The Court had earlier in the session discussed that theory of relevancy, and agreed with it: "the existence of the [Fourth District Audio] ma[de] it more likely that [Mosqueda] heard what [Mosqueda] said" he heard. *Id*. at 29:21-23. Without the Fourth District Calls, the jury would be getting an "incomplete" picture, namely, that Mosqueda claimed to have heard a dispatch referring to the Fourth District Calls, yet the jury would get no evidence of even the Fourth District Calls themselves. *Id*. at 30:9-10. That there was no record (at least none that anyone except Marsh knew about) of any Zone 6 call that Mosqueda could have heard was not grounds for exclusion but rather for "ruthless[] cross-examin[ation]." R. 305, Order at 4.

The Court did have one concern, however, about allowing into evidence the Fourth District Calls: "You [referring to Marsh] understand the concern about additional facts that would justify the use of force being played and considered by the jury when Officer Mosqueda did not have that information at the time of the use of force?" R. 422-6, PX 46, Pretrial Conf. Tr. at 34:22-35:1, 31:7-19. The point was that the Fourth District Calls might contain details that did not make it into the call that Mosqueda actually heard (the Zone 6 Audio) and that, if those details

tended to justify the use of force, Plaintiffs would be unfairly prejudiced: "If there is a mismatch where the first call has more factual detail that would make the use of force reasonable. And Mosqueda didn't hear that in what he said is the all call, the flash message, [then] those extra facts" are prejudicial to the Plaintiffs. *Id.* at 34:22-35:1, 31:7-19. The Court specifically asked Marsh, "You understand that concern?" *Id.* at 35:1. Marsh answered, "Depending on what those facts are. I understand your concern, in theory, and then the question is, what facts are we talking about." *Id.* at 35:2-4. Despite all of this discussion about the Zone 6 Audio (and whether it even existed), and the concern that it might not match what was in the Fourth District Calls, Marsh said nothing about what he had learned about the OEMC record of the Lamperis CDs and the possible availability of the Zone 6 Audio.

### 4. Zone 6 Audio Is a Central Topic at the Trial

Marsh's silence about the Zone 6 Audio record and its possible availability continued during the trial, even when the issue arose again and again. It happened during opening statements, when Plaintiffs argued that "these officers never heard the earlier call" and when Marsh's co-counsel, Aumann, said that Mosqueda and Sierra heard a call telling them to "be on the lookout for a dark colored Aurora with rims and temporary license plates that had been wanted for fleeing and eluding." R. 422-5, PX 38, 1B Trial Tr. at 21:20-21, 34:17-21. It happened during Mosqueda's cross-examination, when Plaintiffs asked and Mosqueda agreed that what Mosqueda heard that night was "pretty important" and reminded Mosqueda that "we have taken the position that the call never was made." R. 422-3, PX 18, 3B Trial

Tr.at 29:1-30:19. It happened during Dunaj's testimony, which—as far as Plaintiffs were concerned—was all about establishing that there was no record of a call that Mosqueda could have heard. R. 422-5, PX 40, 4A Trial Tr. Trans. at 118-127. And Marsh himself addressed the issue in his trial examination of Dunaj.

Marsh asked Dunaj about the searches she ran in 2011 in response to Olortegui's request. *Id*. at 124:21-127:1. Rather than ask questions about OEMC's search for the Zone 6 Audio, Marsh asked very specific questions, such as, "as you sit here today, can you say one way or another whether there was any radio call over Zone 6 on January 6th, 2011, regarding a 4th District incident?" *Id*. at 127:2-5. At the point she faced this question, Dunaj had known for several days about the record showing that Maderak had sent the CDs to Lamperis. R. 422-4, PX 27, Maderak Dep. 94:20-95:4. Maderak told her the day after she told Marsh. *Id*. So she knew that it was possible that the Zone 6 Audio was out there. Nonetheless, Dunaj answered, "I am not aware of it." R. 422-5, PX 40, 4A Trial Tr. Trans. at 127:2-5. *Id*.

After Marsh's examination of Dunaj, Plaintiffs re-crossed Dunaj. This time, it came out that Defense Counsel had failed to pass on Plaintiffs' trial subpoena to Dunaj. R. 422-5, PX 40, 4A Trial Tr. at 130:12-131:1; R. 422-4, PX 28, Dunaj Dep. 175:14-24. The subpoena asked for, among other things, "all records regarding all-calls." R. 422-5, PX 40, 4A Trial Tr. at 130:19-24.[9] At a sidebar discussion of the issue, Marsh told the Court and Plaintiffs' Counsel that Dunaj "doesn't have documents related to [the calls]. She has looked. There are no such documents

---

[9]Plaintiffs did not file the actual subpoena, so this characterization of the subpoena is taken from counsel's statements during the trial, which Defendants have not contested.

related that are currently in existence relative to that call." *Id.* at 131:18-23. And later Marsh added that "[Dunaj] and I have talked and she has looked recently. But that information would no longer be – certainly the audio would have been recycled a long time ago." *Id.* at 133:21-24. Marsh did not mention the Lamperis information at the sidebar.

The gist of Plaintiffs' concern at sidebar was that they had asked, in the subpoena and in discovery, for audio of what Mosqueda claims to have heard—a call broadcast on Zone 6 about an Aurora that fled from Fourth District police officers— and that Dunaj was appearing to say that she had not looked for that audio since immediately after the shooting. *Id.* at 134:5-25. Marsh did not at that time reveal what Maderak had told him about the Lamperis CDs. But he did suggest that Plaintiffs were at fault for their lack of information: "What [Plaintiffs] have known the entire time is that Officer Mosqueda heard this call, he stated it from the very beginning, they never – if that was a discovery issue, it was never followed up on … ." *Id.* at 135:1-4.

The Court ended the sidebar by deciding to authorize both parties' counsel to speak to Dunaj over the jury's lunchbreak, in an effort to determine whether "she might be able to clarify what she thought she was asked to do … ." *Id.* at 136:9-15. Over the break, Plaintiffs' Counsel, Defense Counsel, and Dunaj met. During that meeting, Dunaj revealed the existence of the OEMC record stating that Maderak had sent 3 CDs of the Zone 6 Audio to Lamperis. R. 422-5, PX 42, 4B Trial Tr. at 3:19-22. Marsh still told no one that he already knew this information. R. 422-2, PX

4, Aumann Dep. 21:1-22:24; R. 422-4, Pesha Dep. 78:9-79:13; R. 422-6, PX 42, 4B
Trial Tr. at 13:16-14:6, 19:18-20:16.

When the trial reconvened (with just the lawyers and without the jury),
Marsh reported to the Court on what was learned during the lunch-break meeting
with Dunaj: "there was back and forth communication with Ms. Dunaj, and what we
know is that there was a CD that was requested by Sergeant [Lamperis] ... that
would have been Zone 6 radio transmissions that would run from 2145 hours to
2215 hours ... which encompasses the time of the 4th District call. ... I just spoke to
the sergeant now. He is going to look for it ... ." PX 42, 4B Trial Tr. at 3:20-4:7. But
Marsh did not mention that he himself had already learned about Lamperis's
request before trial. In response to Marsh's report, Plaintiffs' Counsel complained
that "we specifically asked for this information during discovery. ... This is
information that if it exists we should have it, and we should have had it long ago."
*Id.* at 4:18-24. In an effort to shift blame to Plaintiffs' counsel, Marsh replied: "They
never – the way we look at it is they never closed the circle, they had a production
request, but they never deposed anyone from OEMC for the information now that
they are seeking." *Id.* at 5:8-17.

The parties and the Court then started to discuss a possible stipulation to
clear up Dunaj's testimony for the jury. *Id.* at 5-7. Following that abbreviated
discussion, the discussion turned to Lamperis's role, why he would have requested
the Zone 6 Audio, and what his CDs would be likely to contain. *Id.* at 8-10. The
Court asked why this information had not been disclosed earlier. *Id.* at 10. Marsh

26

disclosed that, until just before trial, Defense Counsel had assumed the Fourth District Calls were what Mosqueda actually heard and that, with those recordings on hand, they did not think they needed to look for anything else. *Id*. at 10-11.

Eventually, the Court asked Marsh, "When did you learn that Lamperis has this CD?" *Id*. at 13:16-14:6. Here, for the first time, Marsh revealed that he had learned about the CDs before anyone else then present in the courtroom. *Id*. at 13:16-14:6. What Marsh said was "It was sent to him a couple of days ago." *Id*. at 13:16-14:6. But it was clear in context, from the other attorneys' reactions, and from the remainder of the conversation that Marsh was answering that he (Marsh) learned of it "a couple of days ago." Marsh himself would characterize his statement this way the next day. R. 422-6, PX 44, 5A Trial Tr. 13:20-23. And the parties agree with this take on what Marsh meant. R. 422, Pls.' Br. at 41; R. 431, Resp. Br. at 24. It was what Marsh meant, but it was not true. The Dunaj sidebar and its aftermath occurred on February 26, 2015, which was the fourth day of trial. Marsh had learned about the Lamperis CDs from Maderak on February 19, which was more than "a couple of days" prior.

This in-court revelation was how Marsh's co-counsel, Aumann and Pesha, first learned that Marsh knew about Lamperis before they did—and that Marsh did not tell them. Aumann was "shocked." R. 422-2, PX 4, Aumann Dep. 21:1-22:24. Pesha was "upset." R. 422-4, PX 24, Pesha Dep. 78:9-79:13. And Plaintiffs' Counsel was stunned too: "If they knew about it two days ago, why didn't we learn it until 20 minutes ago when we asked [Dunaj]?" R. 422-6, PX 42, 4B Trial Tr. at 14:7-9.

27

The Court inquired further, asking Marsh, "What prompted your inquiry to Lamperis?" *Id*. at 14:19. Marsh responded that it was "Laura [Dunaj] or Jill [Maderak] that told me that the only record they had was of this disk going out to a sergeant … ." *Id*. at 14:20-24. Following-up, the Court asked, "So once you learned of the existence of a CD with Zone 6 recordings from 9:45 to 10:15, why didn't you disclose it at that point?" *Id*. at 15:8-10. To which Marsh replied, "My thought process was I want to see what is on that. You know, in retrospect, I think I should have but it just – my thought process was I wanted to see what on that, I wanted to talk to the sergeant, and to see whether it was even relevant." *Id*. at 15:11-15. But the Court pointed out the flaw in that excuse, because based on the CD's time frame, "whether that CD had no call or did have a call, it was going to be relevant either way." *Id*. at 15:21-22. Marsh conceded, "You are right." *Id*. at 15:23.

Eventually, the discussion was tabled. Trial continued with the understanding that much would depend on whether the Lamperis CDs were located and, if they were, what was on them. At the end of that trial day, several hours later, Marsh asked (outside the jury's presence) if he "could address one thing." *Id*. at 116:22. Marsh repeated the reference to having learned of the Lamperis CDs "a couple days" ago, and tried to explain why he had not disclosed the information:

> The discussion we had had before about the OEMC, specifically there were a number of aspects to it but the aspect about the fact that I knew about – that there had been a CD transmitted or sent to Sergeant Lamperis a couple days before I mentioned it, when I thought it at the time, I thought this is something that would – if found, would be favorable to us, so not telling them isn't hurting anything, and it was a complete blind s[p]ot on my part. It should have been disclosed. I don't practice that way. I feel – there is no question that – well, I don't know if there is any question, but somewhere in

the back of my mind you are an advocate, I can separate that from advocacy, it was wrong. I don't operate that way. I apologize to counsel and I apologize to the Court. I just wanted – it bothers me profoundly, and I don't do that. So I just wanted to let the Court know, that is not the way I operate. I apologize.

*Id*. at 116:24-117:15. Moments later Aumann reported that "it turns out, it sounds like OEMC was able to find a copy" of the Zone 6 Audio. *Id*. at 117:20-23. OEMC had retained, per their usual practice, exactly the audio they sent to Lamperis. R. 422-4, PX 27, Maderak Dep. 97:1-8, 103:20-104:6, 107:1-108:20. Dunaj and Maderak had just not found it earlier because it was not in the same computer folder as the rest of the audio associated with the case. *Id***.** That revelation concluded the trial day.

That evening, Defense Counsel obtained the Zone 6 Audio from OEMC and forwarded it to Plaintiffs' Counsel. In court the next morning, there was a great deal to discuss before the jury could be brought in. Plaintiffs moved for a directed verdict based on the apparent discovery violation. R. 319. The Court decided to hold off on that motion and finish the trial but the Court did craft an instruction to explain the situation to the jury. R. 332; R. 329.

Before the jury was brought back in that morning, Marsh addressed the Court, this time to correct his prior statement that he had learned about the Lamperis CDs a "couple of days" ago. It was, in fact, the week before trial:

Judge, as I am thinking about this issue with the CD and Sergeant Lamperis, I represented to the Court yesterday that it was a couple of days ago that I first learned about the CD. I spoke with Jill Maderak at my office – I remember that I was sitting in my office when I did it – I was going over the event queries, and I have to – I have to believe that was *sometime last week*, because I don't think I would be speaking with her after Court. So it may very well – and certainly, I have talked to her and Ms. Dunaj about the CD

29

multiple times, it may have been that I learned about the CD Thursday or Friday of last week. I don't know. I just wanted to let the Court know that — I may have been mistaken yesterday when it came up that – the first time I heard about it was Tuesday, or I said a couple days before, because I do have that recollection of talking with Jill Maderak in the office. So it may have been prior to trial.

R. 433-3, DX 24, 5A Trial Tr. at 13:20-14:11 (emphasis added). The trial then continued and concluded. The Zone 6 Audio was played for the jury and the Court allowed Plaintiffs to re-examine Mosqueda. The jury found in Defendants' favor. R. 345.

To determine how the Zone 6 Audio came to be disclosed so late, which needed to be known in order to decide Plaintiffs' post-trial motions (including the motion for a directed verdict), the Court reopened discovery to investigate that issue. R. 360. Attorneys filed appearances to represent Aumann, Pesha, and Marsh, and other attorneys replaced the original trial team as counsel for the individual officer-defendants and for the City. R. 354-357, 362-363. Aumann, Pesha, and Marsh were all deposed, as were other OEMC, Chicago Police Department, and City Law Department witnesses with knowledge of the issues. Mosqueda and Sierra were re-deposed as well. Discovery on these issues ran for almost six months. Finally, Plaintiffs filed a renewed motion for a directed verdict or, in the alternative, a new trial. R. 422. At the status hearing that was held to set the remainder of the briefing schedule, all parties announced that they did not want an in-court, live-witness hearing. R. 424; *see also Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997) ("We have explained in the past that Rule 37 requires no evidentiary hearing … .")

## III. Analysis

Mistakes do happen in discovery. Most often, the mistakes are innocent and no fault can be fairly assigned to the lawyer. But when a lawyer acts unreasonably and the other side does not get all the evidence to which it is entitled, then a remedy must follow to prevent the lawyer's negligence from unfairly harming the opponent. Even worse, when a lawyer crosses the line into *intentional* wrongdoing, then more severe punishment is warranted, because our system of justice depends on the honesty and good faith of lawyers to abide by the rules of discovery. For the reasons detailed below, the Court finds that City Law Department attorney Tom Aumann acted unreasonably during discovery. Worse, based on the record evidence, the Court must conclude that City Law Department attorney Jordan Marsh intentionally concealed the existence of the OEMC record that would have led to the discovery of the Zone 6 Audio before the trial.

What Marsh did justifies a new trial, as well as the awarding of all of the Plaintiffs' attorneys' fees and costs incurred after February 19 (when he learned of the OEMC record), including post-February 19 preparation for the first trial, conducting it, and the post-trial discovery and briefing. Furthermore, Aumann's discovery negligence, which occurred much earlier than Marsh's misconduct, justifies awarding Plaintiffs' their attorneys' fees and costs for *all* of the first-trial preparation, as well as through the post-trial discovery and briefing. As discussed next, the attorney misconduct triggers various legal grounds on which to premise the sanctions, each of which independently supports particular sanctions. For the

sake of analytical clarity, the Opinion divides the analysis into two parts, focusing first on Marsh's misconduct and then Aumann's negligence.

## A. Marsh's Misconduct

Based on the record evidence, the Court has no choice but to conclude that Jordan Marsh intentionally concealed from Plaintiffs and from the Court the existence of the OEMC record memorializing that Maderak had sent Sergeant Lamperis CDs containing the Zone 6 Audio. After hiding that information, despite there being numerous times when the circumstances dictated he say something about it, Marsh said nothing and even made misleading statements to the Court when the issue arose. This misconduct justifies a new trial and attorneys' fees and costs from February 19, 2015—the date that he learned of the OEMC record and the Zone 6 Audio's potential availability—through the post-trial discovery and briefing.

Three legal grounds support these sanctions. First, Marsh violated the duty to supplement or correct a discovery response under Federal Rule of Civil Procedure 26(e). This failure, punishable under Rule 37, fully justifies a new trial and attorneys' fees and costs from February 19, 2015 through post-trial discovery and briefing. Second, Marsh's discovery and related misconduct justifies a new trial under both Rule 59(a)(1) and Rule 60(b)(3). Finally, and partially in the alternative to the rule-based sanctions, Marsh's overall course of misconduct justifies a new trial and attorneys' fees and costs from February 19, 2015 onward as a sanction under a federal-court's inherent authority to punish bad-faith conduct.

32

### 1. Federal Rules of Civil Procedure 26 and 37

Under Rules 26(e) and 37(c), federal courts may level "appropriate sanctions" against a party that fails to timely supplement or correct its discovery responses. Jordan Marsh—acting on behalf of all Defendants—did just that by failing to immediately disclose the OEMC record of the Lamperis CDs and what Jill Maderak told Marsh about the CDs. The most appropriate sanction under all the circumstances is to require a new trial and award Plaintiffs' their attorneys' fees and costs from the time Maderak told Marsh about the Lamperis CDs—February 19, 2015—through post-trial discovery and briefing.

### a. The Discovery Violation

Marsh violated Rule 26(e)'s duty to supplement an incomplete response to discovery. Specifically, Rule 26(e) provides:

> A party … who has responded to a[] … request for production … must supplement or correct its … response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Marsh violated this rule by failing to disclose the OEMC record stating that Maderak had sent Lamperis 3 CDs of the Zone 6 Audio in January 2011.

The premise of the discovery violation is a document request sent by Plaintiffs to Defense Counsel. The document request sought "all transcripts, tape recordings, electronic communications and radio transmissions (or Documents memorializing same) relating to the" shooting "including ... Documents from [OEMC]." PX 23, Joint Discovery Resp. at No. 13. The OEMC record memorializing

the Lamperis CDs was responsive to this request, because the Zone 6 Audio was not only "relat[ed] to" the shooting, *id.*, but indeed formed the primary basis for Mosqueda and Sierra's decision to make the traffic stop that led to the shooting, R. 422-3, PX 17, Mosqueda's IPRA Statement at 3-5. Marsh knew that Mosqueda and Sierra were relying on the Zone 6 Audio to justify the traffic stop. R. 422-6, PX 46, Pretrial Conf. Tr. at 34:22-36:17 ("[Mosqueda] should obviously be able to testify as to the reason he stopped [Plaintiffs]"). And given the centrality of the Zone 6 Audio to the case, Marsh had to know that Plaintiffs' counsel had sought the audio, and any records related to it, in discovery. Indeed, during the trial, when the existence of the Lamperis CDs arose for the first time, Plaintiffs' Counsel described this document request when it complained about the late disclosure, and Marsh's only response was that "we thought we had given everything that was responsive." R. 422-6, PX 42, 4B Trial Tr. at 12. Marsh did not deny knowledge of the request.

It could go without saying, but for completeness's sake: there is also no doubt that Marsh knew Plaintiffs were in the dark about the OEMC record and possible existence of the Zone 6 Audio, because Plaintiffs had just filed a motion *in limine* (of which Marsh was absolutely aware, R. 422-2, PX 2, Marsh Dep. at 61:19-62:1) arguing that there was no record whatsoever of any call on Zone 6. R. 298. So Marsh of course knew that Plaintiffs had no idea about the OEMC record and the potential availability of the Zone 6 Audio. And Marsh's duty to supplement was triggered on February 19, 2015, when Maderak informed Marsh about the OEMC record.

It is true that, after the duty to supplement is triggered, Rule 26(e) does allow a lawyer some leeway in how quickly the supplement is made. The Rule's text requires the supplementation take place in a "timely manner." Fed. R. Civ. P. 26(e). The timeliness of supplementation is measured against all the circumstances. But where trial preparation is concerned, timely can mean immediate or nearly so. *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 266 (1st Cir. 1993) (affirming sanction even though document was disclosed promptly after it was created and before trial because the disclosure was so close to trial as to "compromise[] [the opposing party's] pretrial preparations"); *see also Labadie Coal Co. v. Black*, 672 F.2d 92, 95 (D.C. Cir. 1982) (noting that "Plaintiff was caught having rested its case when the documents were finally produced …" and reversing for failure to sanction). Here, given how close the case was to trial when Marsh learned of the potential availability of the Zone 6 Audio file—the trial was scheduled to begin three business days later—and given the centrality of the Zone 6 Audio to the trial, the circumstances dictated immediate disclosure. But rather than disclose immediately, or at the pretrial conference, or even before jury selection, Marsh said nothing and by doing so violated the duty to supplement. R. 422-2, PX 2, Marsh Dep. at 68:8-9, 137:12-138:9 ("I definitely violated the rules of discovery"); R. 431, Resp. Br. at 21.[10]

---

[10]Indeed, beyond the duty to disclose the OEMC record, once the duty to supplement the production-request response was triggered, Marsh then had a duty to make a "reasonable inquiry" in order to make the supplemental document response complete and correct. Fed. R. Civ. P. 26(g)(1). After speaking with Maderak on February 19, 2015, Marsh now knew that the Zone 6 Audio itself (not just the OEMC record) might still be available and must be turned over to supplement the document production. But the few attempts by Marsh to reach Lamperis did not come close to a reasonable pursuit of the audio.

### b. Appropriate Sanction for the Rule 26(e) Violation

With a discovery violation established, the question turns to the appropriate sanction under Rule 37: "If a party fails to provide information … as required by Rule 26(a) or (e) … the court … may impose [] appropriate sanctions … ." Fed. R. Civ. P. 37(c)(1). For Marsh's violation of Rule 26(e), the appropriate sanction is, as explained below, a new trial and attorneys' fees and costs. This is so because (i) Marsh's conduct was in bad faith, (ii) it prejudiced Plaintiffs, and (iii) no lesser sanction will restore Plaintiffs to where they would be absent Marsh's misconduct. Under Rule 37, the fees-and-costs award must be assessed against the parties for whom Marsh was acting—Mosqueda, Sierra, and the City (presumably the City, which has provided for Mosequda and Sierra's defense, would indemnify the officers anyway). *Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003) ("We agree with the appellants that *Insurance Benefit Administrators v. Martin*, 871 F.2d 1354, 1360 (7th Cir.1989) … does not permit the imposition of Rule 37(c) sanctions on attorneys.").

### i. Marsh Acted in Bad Faith

Based on the record, the Court has no choice but to find that Marsh acted in bad faith because he knew that he had an obligation to disclose what Maderak had told him about the OEMC record and the Zone 6 Audio, yet Marsh intentionally withheld that information. The evidence of this bad faith is clear and convincing.[11]

---

[11]To impose the most severe forms of sanctions, courts must find bad faith or willfulness by clear and convincing evidence. *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas LLC*, 516 F.3d 623, 625-26 (7th Cir. 2008) (discussing *Maynard*, 332 F.3d at 468). Whether this heightened burden of proof is appropriate is a matter of debate

The most powerful evidence of Marsh's knowledge that the rules required him to disclose the information is that it was much, much too important for Marsh not to have realized it needed to be disclosed. The importance was blatant. From the very start of the case, and indeed from the start of the investigation that began just hours after the shooting, Mosqueda and Sierra claimed that they pulled Pinex's Aurora over because of what they heard[12] on the Zone 6 radio. R. 422-3, PX 17, Mosqueda's IPRA Statement at 3-5; R. 422-3, PX 18, 3B Trial Tr. Trans. at 25:13-15; R. 422-4, PX 21, Sierra Dep. 26:7-27:7. The Zone 6 Audio was indeed more important than the Fourth District Calls, because Mosqueda and Sierra could only have heard the Zone 6 call, and thus the reasonableness of their initial traffic stop and subsequent use of force depended, at least in part, on what they actually learned from the Zone 6 Audio, not the Fourth District Calls. In fact, at the time Marsh decided not to disclose the OEMC record of the Lamperis CDs, as far as Marsh knew it was even possible that the CDs would definitively show that Zone 6 did *not* broadcast any recap of the Fourth District Calls. That would have

in the case law. *Id.* There is no need to resolve that debate here because the Court specifically finds by clear and convincing evidence that Marsh engaged in the misconduct willfully and in bad faith. Moreover, even if Marsh had been merely reckless or even grossly negligent, the Court could and would still impose every sanction the Court has selected. Severe sanctions under Rule 37 only require "fault" and "fault" includes recklessness and gross negligence. *In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 724 (7th Cir. 2006) ("When ordering the sanctions of default judgment or dismissal of the case under Rule 37(b), the court must find that the party against whom these sanctions are imposed displayed willfulness, bad faith or fault."); *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 222 (7th Cir. 1992) (affirming terminating sanction under Rule 37 based on party's gross negligence).

[12]Or at least based on what Mosqueda heard and relayed to Sierra, depending on what version of Sierra's story is credited (that is, whether Sierra heard the call himself, R. 422-3, PX 19, Sierra IPRA Statement at 3-4, or heard the information about the call from Mosqueda, R. 422-4, PX 21, Sierra Dep. 30:15-17).

completely undermined Mosqueda and Sierra's version of the stop—and suggested that the Fourth District Calls were being used as part of an effort to cover-up an unjustified shooting. Maderak told Marsh that she had a record showing that the audio covering the relevant time period was sent to Lamperis, and thus there was strong reason to believe that the Zone 6 Audio—so crucial to the case—was available.[13] The sheer obviousness of the audio's importance is strong circumstantial proof that Marsh knew the information must be disclosed.

In addition to the obvious prominence of the audio, there was in fact an additional warning sign alerting Marsh to the information's significance. Marsh knew that Plaintiffs' counsel had filed a motion *in limine*, R. 298, seeking to exclude the Fourth District Calls and telegraphing that Plaintiffs were making the absence of any Zone 6 Audio a centerpiece of their case, all because Mosqueda and Sierra had premised the traffic stop on what they purported to hear on the Zone 6 call. Indeed, the motion *in limine* was argued at length—*by Marsh*—during the second pretrial conference session, R. 422-6, PX 46, Second Pretrial Conf. Tr. at 27:6-42:13—which took place on the very same day (February 19, 2015) that Marsh learned about the OEMC record. On top of this, during that pretrial session, the Court expressly identified a concern about comparing the Fourth District Calls to what was broadcast on Zone 6 and the Court explicitly asked Marsh a question that turned the warning sign into a blaring siren: "If there is a mismatch where the first call has more factual detail that would make the use of force reasonable. And

---

[13]Indeed, Lamperis had in fact placed one of the CDs into the Chicago police's evidence storage section, so the audio was still available. R. 422-6, PX 43, Non-Law Dept. Resps. Am. Resp. to Pls.' Requests & Interrogs. at No. 7.

Mosqueda didn't hear that in what he said is the all call, the flash message, [then] those extra facts are prejudicial to the Plaintiffs." *Id*. at 34:22-35:1, 31:7-19. After that explanation, the Court specifically asked Marsh, "You understand that concern?" *Id*. at 35:1. Marsh answered, "Depending on what those facts are. I understand your concern, in theory, and then the question is, what facts are we talking about." *Id*. at 35:2-4. So, even assuming the officers heard a Zone 6 call about the Fourth District Calls, Marsh knew that there could be a "mismatch" between the two sets of calls—and as it turns out, there are differences, including that, in the Zone 6 Audio, there is *no* mention of there being a gun in the Aurora or that the Aurora was wanted for a shooting. *Compare* PX 1, Fourth District Calls *with* PX 7, Zone Six Audio**.** Even before all this, the audio's centrality was obvious, but here was an explicit warning to Marsh that the audio was crucial.

Nothing more is needed to compel a finding that Marsh knew he had to disclose the information, but there is more. Even if perhaps a novice lawyer could plausibly profess ignorance of the information's importance, Marsh could not. He is an experienced lawyer who did understand his discovery obligations in this situation. For the last eight years, Marsh has defended civil-rights cases exclusively. R. 422-2, PX 2, Marsh Dep. 6:7-24. He thus has substantial familiarity with the governing procedural law—that is, the discovery obligations set forth in the Federal Rules of Civil Procedure—as well as expertise in the governing substantive law—namely, the case law on illegal-stop and excessive-force claims, and what evidence is relevant to those claims.

39

So Marsh realized he had an obligation to disclose. The record evidence demands the related finding that the failure to live up to that obligation was intentional. Indeed, Marsh actually admitted that he consciously considered disclosing the information right after learning it. At trial, Marsh stated that "when I thought about it at the time [that is, when Maderak told him], I thought this is something that would—if found, would be favorable to us, so not telling them isn't hurting anything, and it was a complete blind s[p]ot on my part." R. 422-6, PX 42, 4B Trial Tr. at 117:3-6. In other words, Marsh did consider disclosure at the time.

In the face of all the evidence to the contrary, the Court does not credit Marsh's assertion that he had a "blind s[p]ot" to the disclosure obligation: as discussed earlier, given the importance of the information and his experience, Marsh must have realized that he had a duty to disclose the information. It is implausible that Marsh would make any decision about such important information without consciously considering his options. Similarly unbelievable is that Marsh never considered the possibility that the Lamperis CDs would be favorable to *Plaintiffs*. First, at the second pretrial conference, the Court specifically discussed with Marsh the possibility that the Zone 6 call did not contain all the details in the Fourth District Calls, and Marsh affirmatively answered that he understood that concern. R. 422-6, PX 46, Second Pretrial Conf. Tr. at 34:22-35:1. And second, Marsh could not be certain that there even was a call matching Mosqueda's version on the CDs. That an experienced lawyer like Marsh did not even consider the possibility that this evidence might not go his way is unlikely to the extreme.

40

The notion that the information Marsh received from Maderak did not engage his thinking is simply not believable under the circumstances. The information was too important to a case that he was going to start trying in a few days, and the second pretrial conference shined an intense spotlight on the Zone 6 Audio. Marsh must have considered the possibilities and his options. Given all that, and the undisputed fact that Marsh did not disclose what he knew, the only reasonable inference to draw is that he intentionally chose not to disclose.

What's more, Marsh even hid the discovery from his own trial-team colleagues, Pesha and Aumann, and his colleagues' reactions to the non-disclosure further support the inference of intentional concealment. Both Aumann and Pesha learned about what Marsh knew at the same time the Court did, namely, when Marsh admitted it in open court. R. 422-2, PX 4, Aumann Dep. 21:1-22:24; R. 422-4, PX 24, Pesha Dep. 78:9-79:13. Aumann was "shocked." R. 422-2, PX 4, Aumann Dep. 21:1-22:24. Pesha was "upset." R. 422-4, PX 24, Pesha Dep. 78:9-79:13. Of course they were surprised that Marsh had not shared the information with them: not only were they his colleagues and co-counsel on the trial team, but the information was also critically important to their case. For that reason alone, Marsh should have told them—unless he wanted to hide the information because they would have pushed him to disclose. Moreover, as to Pesha, Marsh would naturally have shared the information with her because Marsh had originally assigned her the job of finding out from OEMC whether there were additional recordings or records available on the Zone 6 Audio. PX 24, Pesha Dep. 33:15-35:21. So when

41

Marsh learned about the OEMC record and the Lamperis CDs from OEMC, Marsh was just following-up on Pesha's work, and telling her the result would be the ordinary thing to do.

Keeping the information from Aumann was equally suspicious. Aumann was responsible for Mosqueda's testimony at trial, both in presenting Mosqueda's direct examination and defending Mosqueda against cross examination. If the Zone 6 Audio was still available, then Aumann would need it either to include as an essential part of Mosqueda's direct examination (in support of Mosqueda's primary reason for stopping the Aurora and in partial support for the use of force) or as an essential part of preparing Mosqueda against cross examination (if the Zone 6 Audio turned out to be different from the Fourth District Calls). So, as to both Pesha and Aumann, saying nothing to them actually speaks volumes now: the unfortunate inference is that Marsh wanted to bury, or at least retain the option of burying, the information. It also means that his conduct was deliberate, and that he considered the possibility that his colleagues might not stand for non-disclosure.

The last straw on intentionality is the inconsistency in Marsh's explanation for why he did not immediately disclose the information. When first asked at trial why he did not disclose the OEMC report and the potential availability of the Zone 6 Audio, Marsh responded, "My thought process was I want to see what is on that." R. 422-6, PX 42, 4B Trial Tr. at 15:8-15. Put another way, in this first explanation, Marsh was saying that he first wanted to find out the contents of the Lamperis CD, and then he could further consider disclosure or not. But then at the end of the

same trial day, Marsh offered this excuse: "when [I] thought about it at the time, I thought this is something that would – if found, would be favorable to us, so not telling them isn't hurting anything … ." *Id*. at 117:3-6. So Marsh was not waiting to learn the contents of the Zone 6 Audio—which was the first explanation—but instead he had concluded that its contents would be favorable, so non-disclosure would not hurt Plaintiffs' case. The third version of the explanation was offered at his post-trial deposition, where Marsh explained that he did not "tell anyone" about this conversation with Maderak because "[i]t was a nonissue to me." R. 422-2, PX 2, Marsh Dep. 60:17-61:1. Marsh further explained:

> [The audio, if it existed] was not something that I believed we would be able to get admitted because it had never been disclosed to my knowledge. It was new to me, news to me. I thought that's exactly what we were looking for, but it was not of any assistance to use because there's no way – there's no way it would be admitted, so I was focused on finding something in the produced materials that would support – that would support Mosqueda's testimony that he had heard this call.

*Id*. at 60:17-61:18. So the importance of the disclosure obligation was supposedly tamped down because the defense could not possibly get the audio into evidence and Marsh had to look for other ways to support Mosqueda's testimony that there had in fact been a Zone 6 recap of the Fourth District Calls. Given three chances to answer essentially the same question, Marsh offered a different answer each time.

Against all of this, Defendants' arguments do not come close to undermining the evidence of intentional non-disclosure. The argument section of Defendants' brief says that Plaintiffs failed to show bad faith, but the brief omits any particular reasons for this contention. Resp. Br. at 59-60. And the defense's entire brief (whether in the facts section or the argument section of the brief) ignores the

43

cumulative impact of Marsh's repeated failures to mention what Maderak told him when the audio issue came up again and again at the pretrial conference and at trial. The brief's background section does argue the facts. Resp. Br. at 14-22. But the arguments do not make sense.

First, Defendants argue that Marsh's silence was innocent because he thought that Lamperis requested the Zone 6 Audio "personally, as opposed to official channels." *Id.* at 14. This argument is based on Marsh's deposition testimony that, having not previously seen a reference to the Lamperis CDs, "[i]t was just like a sergeant who called up, for reasons I have no idea, and requested this audio … ." R. 422-2, PX 2, Marsh Dep. 135:3-21. That testimony is not credible. Lamperis was the supervisor of the detectives investigating the shooting, so of course Lamperis's request was not based on some personal, "no idea" quest for the Zone 6 Audio. If Marsh somehow did not know that Lamperis was the supervisor of the investigating detectives, then Marsh consciously decided not to undertake the simple task of finding out who he was. And even if Marsh really came to the conclusion that Lamperis had asked for the Zone 6 Audio for some unknown personal reason, that would not change anything: Marsh knew of the OEMC record, which was responsive to the document request, and he knew that the audio might still be available.

Defendants also argue that Marsh had no motive to hide what he learned because the Zone 6 Audio turned out, according to Defendants, to be good for the defense. Resp. Br. at 21-22, 29 ("The content of the Zone 6 Audio was

unquestionably beneficial for the defense."). It is true that perhaps a jury would find that the Zone 6 Audio's content was close enough to the details in the Fourth District Calls to support Mosqueda's testimony and also to support the reasonableness of the stop and shooting. But obviously a jury could just as well find that the absence of any mention of a gun or shots fired in the Zone 6 Audio seriously hurt Mosqueda's credibility and also seriously undermined the reasonableness of the stop and the shooting. In any event, at the time Marsh chose not to say anything, he did not know what was on the CDs; it could have revealed that there was *no* Zone 6 call recapping the Fourth District Calls, or it could have revealed, as it turns out, that the Zone 6 Audio left out important details from the Fourth District Calls. In sum, despite Marsh's denials of intentional misconduct and the defense arguments against that conclusion, the Court finds clear and convincing evidence that Marsh intentionally withheld the information and that doing so violated the discovery rules.

### ii. The Severe Harm to Plaintiffs' Trial Presentation

To fashion the appropriate sanction for Marsh's misconduct, the Court must evaluate how the misconduct prejudiced Plaintiffs. First, the misconduct unfairly pulled the rug out from under Plaintiffs' theory of the case, and with it, undercut Plaintiffs' Counsel's credibility with the jury. Plaintiffs' Counsel repeatedly told the jury that there was never any call broadcast over Zone 6 recapping the Fourth District Calls. The lawyers said it in opening. R. 422-5, PX 38, 1B Trial Tr. at 21:22. And Plaintiffs' cross examination of Mosqueda outright challenged whether the

45

Zone 6 call ever actually happened. R. 422-3, PX 18, 3B Trial Tr. at 29:21-22. In view of what Plaintiffs' Counsel knew at the time, it was a reasonable position to take. But as reasonable as it was, it turned out to be wrong. Ultimately, the jury heard the call that Plaintiffs' Counsel had told them did not exist. That contradiction of Plaintiffs' Counsel's position must have severely undermined, to say the least, their credibility with the jury.

The prejudice to Plaintiffs also includes the very trial itself. If Marsh had disclosed the information, then it is virtually certain that the Court would have postponed the trial, at least until the CDs were located and the audio reviewed, because Plaintiffs' case had to change radically. The case Plaintiffs started out with was that Sierra and Mosqueda pulled over Pinex for no reason and, by their aggression, scared Pinex into attempting to flee, which in turn provoked the shootings. Then, after the shootings, Siwek, Gallagher, and Smith helped Defendants concoct an excuse for the shooting based on the Fourth District Calls. But when the Zone 6 Audio finally came out, Plaintiffs had to account for what Mosqueda and Sierra could have heard—that an Aurora with some similarities to Pinex's had been pursued by other officers earlier that night.

This was a different set of facts, calling for a different set of arguments from Plaintiffs. It is easier to show that a highly aggressive stop is unjustified if it has literally no basis than if it is in reaction to the genuine belief that the car earlier had been pursued. Plaintiffs' trial preparation, prior examinations, expert discovery strategy, and opening argument were all calibrated—and reasonably so—to a

46

factual scenario that dissolved midtrial. If Marsh had made the disclosure before the trial, then a postponement would have given Plaintiffs a fair chance to develop a theory of the case consistent with the Zone 6 Audio and to take discovery into the audio, including asking—before trial—deposition questions of Mosqueda and Sierra about the stop and the use of force while equipped with the actual audio. Instead of having several months of pretrial discovery to work-up their trial theory, Plaintiffs' counsel had to extensively re-tool the trial presentation and do it on the fly.

The second prejudicial effect of Marsh's misconduct was that it allowed the jury to hear the content of the Fourth District Calls. (More specifically, the jury heard a stipulation about the Fourth District Calls, and included in the stipulation was that the calls stated, among other things, that "the vehicle was wanted for fleeing and eluding and was assumed to have had a gun." R. 422-6, PX 47, 3A Trial Tr. at 44:23-44:22.) This would not have happened absent Marsh's misconduct, because if Marsh timely disclosed what he learned from Maderak, then the trial would have been postponed, the Zone 6 Audio located, and the Fourth District Calls would have been excluded from the trial, as only the audio Mosequda and Sierra actually could have heard would have been relevant. Critically, without those calls, the jury would not have heard the statement that the "vehicle ... was assumed to have had a gun," R. 422-6, PX 47, 3A Trial Tr. at 44:23-44:22. As noted earlier, the Zone 6 Audio made no mention of a gun or a shooting, at least in connection with the Aurora.

47

Defendants argue otherwise, contending that the absence of the gun reference in the Zone 6 Audio was not really a disadvantage to the defense. Resp. Br. at 29. Defendants reach that conclusion by pointing to another Zone 6 call, made around 20 to 30 seconds after the Zone 6 call about the Aurora, in which the dispatcher stated "shots fired at Garfield and Damen." *Id.* (quoting PX 7, Zone Six Audio at 16:07)**.** Defendants say that Mosqueda could have "conflated" the two calls in his mind, so the jury still would have had a basis to find that Mosqueda believed that the occupants of the Aurora might be armed. Resp. Br. at 29. That is too much of a stretch. Setting aside whether the Court would even have allowed the subsequent "shots fired" Zone 6 call into evidence, it is much more likely that the Fourth District Calls advantaged the officers because those calls suggested that there was a gun *in the Aurora*, which of course would have put the officers on heightened alert for danger when pulling over the Aurora. In contrast, a separate report, after 20 to 30 seconds of silence, of "shots fired" at Garfield and Damen— which is 10 miles away from where the chase terminated at 9300 South East End Street—would not likely have convinced the jury that the officers should have approached the Aurora as if the occupants were armed. So the Zone 6 Audio is very likely much better for Plaintiffs than the Fourth District Calls.

The introduction of the Fourth District Calls into evidence hurt Plaintiffs in other ways too, not just by comparison to what Mosqueda and Sierra could have heard. First, it made it seem more reasonable for Mosqueda and Sierra to have treated the stop of Pinex's Aurora as a high-risk encounter. The jury could have

interpreted the Fourth District Calls to mean that other police officers assumed that drivers who flee the police would be armed. That in turn made Sierra's and Mosqueda's testimony about their fear for their own safety seem more reasonable, especially if the jury credited the officers' opinion that Pinex intentionally refused to pull over. Additionally, the Fourth District Calls muddled the effect of Plaintiffs' cross examination of Mosqueda. The first time Plaintiffs questioned Mosqueda during trial was before the Zone 6 Audio was revealed. So the Plaintiffs first tried to cross examine Mosqueda primarily by pointing to inconsistencies in Mosqueda's own prior statements, without the additional impeachment of the Zone 6 Audio that could have been brought to bear during Mosqueda's first cross examination. It is true that, after the Zone 6 Audio was played for the jury, Plaintiffs re-examined Mosqueda, but already the cross examination was watered down by the surprise disclosure.

All in all, Marsh's concealment of the OEMC record and the availability of the Zone 6 Audio led Plaintiffs to present a flat-wrong argument that could not be fixed in the middle of trial. The misconduct also prevented Plaintiffs from developing and presenting their strongest case—that the Zone 6 Audio certainly did not mention a gun or shooting—free from the content of the Fourth District Calls, which included the assumption that a gun was in the Aurora. The only way to remedy the misconduct is to award a new trial and grant attorneys' fees and costs for conducting a trial that would have been radically different had there been no misconduct.

### iii. No Greater nor Lesser Sanction is Appropriate

The new trial and attorneys' fees and costs are the appropriate sanctions for Marsh's discovery violation. No sanction less than a new trial and attorneys' fees and costs would be sufficient because no lesser sanction will put Plaintiffs back to where they would have been absent Marsh's misconduct. Despite the defense argument to the contrary, the misconduct was not harmless. The Court cannot say that, absent Marsh's discovery violation, the outcome of the trial would have been the same, because the trial itself would have been very different, as discussed above. What's more, this was a close case on the merits. On the authority of *Estate of Starks v. Enyart*, 5 F.3d 230, 234-35 (7th Cir. 1993), the Court instructed the jury that "An officer is not justified in using deadly force when his actions unreasonably created a physically threatening situation that led him to use deadly force." R. 341. The jury could have found that Sierra and Mosqueda unreasonably created a physically threatening situation by aggressively curbing Pinex's Aurora and, based on Colyer's testimony, rushing out shouting with their guns drawn. Whether this aggressive approach was justified or not depends largely on what Mosqueda and Sierra knew when they pulled the car over. And that depends on the Zone 6 Audio. Thus, Marsh's discovery violation went right to a (if not *the*) crucial point in the case. For that reason, a new trial is absolutely necessary.

And that means attorneys' fees and costs are necessary too. Marsh's misconduct wasted the first trial and necessitated the post-trial discovery. So it is only fair to require Defendants to pay Plaintiffs' attorneys' fees and costs for those

efforts. The date on which Marsh learned of and should have disclosed the Maderak information is an appropriate start date for the fees and costs, because disclosure on that date would have put a halt to the wasted trial preparation and trial. Thus, Defendants must pay Plaintiffs' attorneys' fees and costs from February 19, 2015 through the post-trial discovery and briefing. This fees-and-costs liability overlaps with that generated by Aumann's misconduct, as will be explained later in this Opinion.

Moreover, no lesser sanction would provide an adequate deterrent against attorney misconduct. The authority to sanction severely under Rule 37 is justified, in part, because severe sanctions not only "penalize those whose conduct may be deemed to warrant such a sanction, but [] deter those who might be tempted to such conduct in the absence of such a deterrent." *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005) (quoting *Nat'l Hockey League v. Metrop. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam)); *Roland v. Salem Contract Carriers, Inc.*, 811 F.2d 1175, 1179-80 (7th Cir. 1987) (same). Much of the rules of discovery rely on attorneys acting in good faith. The federal-court system cannot achieve its goal of fair, just, and accurate judgments without requiring that good faith be instilled into the discovery decision-making of every attorney. Attorneys who might be tempted to bury late-surfacing information need to know that, if discovered, any verdict they win will be forfeit and their clients will pay the price. They need to know it is not worth it.

51

The facts here illustrate the special importance of deterrence in situations like these. That importance derives from just how unlikely it is that this kind of misconduct will be discovered. If the Court had not authorized the lawyers to speak with OEMC witness Laura Dunaj during the trial, then it is unlikely that the Zone 6 Audio would ever have come to light. Marsh was hiding it, and Dunaj—who knew about the Lamperis CDs and the OEMC record memorializing them—had already spent a morning testifying without revealing anything about it. Marsh came very close to successfully withholding this information all the way to final judgment. Given how hard these kinds of violations are to detect, it is especially important to punish them severely when they do come to light.

Having said that, just as no *lesser* sanction is appropriate, the Court concludes that no *greater* sanction is warranted. Plaintiffs have asked for a directed verdict in their favor, without the need for a re-trial. Pls.' Br. at 1. It is true that Marsh's misconduct was more than serious enough to trigger a directed verdict— gross negligence can sustain a case-ending sanction and Marsh's conduct was in bad faith. *See, e.g.*, *Greviskes*, 417 F.3d at 759; *Marrocco*, 966 F.2d at 222 (affirming directed verdict under Rule 37 based on gross negligence in the handling of important evidence); *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 75 (7th Cir. 1992) (affirming dismissal under Rule 37 based on party's willful refusal to hand over requested documents). But precedent—not to mention common sense and fundamental fairness—requires that courts consider lesser sanctions, even when greater ones are justified. And, as the Court just explained, the lesser sanction of a

new trial, plus attorneys' fees and costs, puts Plaintiffs back where they deserve to be.

Moreover, most (but admittedly not all) cases involving case-ending sanctions involve circumstances not present here. In some, the sanctioned party's misconduct somehow prevented the other side from *ever* getting a fair trial. *E.g.*, *Marrocco*, 966 F.2d at 222 (sanctioned party lost crucial physical evidence). In others, the sanctioned party—as opposed to its lawyer—had made it clear that he or she simply refused to participate in the litigation. *E.g.*, *Pendell v. City of Peoria*, 799 F.3d 916, 916 (7th Cir. 2015) (party refused to appear for deposition repeatedly). In cases like those, anything short of a case-ending sanction would hand the case to the wrongdoer. Not so here. Plaintiffs can still get a fair trial, so a directed verdict is denied.

### 2. Rules 59(a)(1) & 60(b)(3)

Even without invoking Rules 26 and 37, Marsh's discovery misconduct would still require a new trial under either Rule 59(a)(1) or Rule 60(b)(3). Rule 59(a)(1) provides that the Court "may, on motion, grant a new trial on all or some of the issues … after a jury trial, for any reason for which a new trial has heretofore been granted … ." Under the rule, "the failure to disclose information within the scope of proper discovery requests can, in certain circumstances, constitute grounds for a new trial." *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 758 (7th Cir. 1994). "[T]o obtain this dramatic relief, the movant must demonstrate both that misconduct occurred and that it prejudiced him." *Id*. Plaintiffs have made the required showing under Rule

59. The Court has already explained how Marsh committed discovery misconduct and how it prejudiced Plaintiffs. Additionally, as the Court will explain in a later section, Marsh's co-counsel, Thomas Aumann, also committed discovery misconduct that prejudiced Plaintiffs. Either attorney's misconduct is enough to entitle Plaintiffs to a new trial under Rule 59(a)(1).

Similarly, a new trial would also be justified under Rule 60(b)(3). That rule allows the Court to "relieve a party ... from a final judgment [because of] misconduct by an opposing party." Attorney misconduct is a form of misconduct that triggers the rule. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1206 (Fed. Cir. 2005) ("The Seventh Circuit has held that a new trial on all issues may be granted as a form of sanction for attorney misconduct.") (citing *Petrilli v. Drechsel*, 94 F.3d 325, 330 (7th Cir. 1996)). And discovery misconduct also justifies vacatur of a judgment under Rule 60(b)(3). Wright & Miller, *Fed. Prac. & Proc.* § 2860 (3d ed., 2015) ("Failure to disclose or produce materials requested in discovery can constitute 'misconduct' within Rule 60(b)(3) ... .") (collecting cases). To win under the rule, the moving party "must show that she has a meritorious claim that she was prevented from fully and fairly presenting at trial as a result of the adverse party's ... misconduct." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 758-59 (7th Cir. 2010). Again, Plaintiffs have made this showing as to both Marsh's misconduct, described above, and, independently, Aumann's misconduct, described in another section below.

In response to Plaintiffs' Rule 60(b)(3) argument, Defendants do not argue that Plaintiffs lacked a meritorious claim or that no misconduct occurred; they say only that—despite everything—Plaintiffs had a full and fair opportunity to present their case. Resp. Br. at 54-56. That is wrong. As explained above, Plaintiffs' Counsel lost credibility with the jury because they (reasonably) took the position that the Zone 6 Audio did not exist, but were shown to be wrong. In a close case like this, that alone is enough to deprive Plaintiffs of a full and fair chance to present their case to the jury. What's more, as also detailed earlier in the Opinion, Plaintiffs' trial preparation and strategy would have dramatically changed had Marsh made the required disclosure. And, finally, Defendants overvalue the curative instruction that was given to the jury. R. 433-6, DX 33, 5B Trial Tr. at 7-8. The instruction told the jury, in essence, that there had been a discovery violation, but ultimately the instruction could not help Plaintiffs' Counsel reset their case in the middle of trial. In the midst of trial, the Court fashioned the instruction in an attempt to just keep the trial moving forward, because the alternative—ending the trial—would by definition decide the prejudice question right then and there, and because the full scope of the misconduct had not come to light. No, the attempted curative instruction did not give Plaintiffs a full and fair opportunity to present their case, and Rule 60(b)(3) provides another basis to award a new trial.

### 3. Inherent Authority and Misleading Statements to the Court

There remains one more basis to impose sanctions for Marsh's misconduct: the inherent authority of federal courts to sanction misconduct in litigation. *See*

*Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 399-401 (7th Cir. 2015) (affirming terminating sanction entered under inherent authority). To be sure, federal courts should not casually invoke their inherent authority to sanction misconduct when a statute or rule covers the misconduct at issue. Wright and Miller, *Fed. Prac. & Proc.* § 2282 (3d ed., 2015) ("the Supreme Court said that Rule 37 is the sole source of sanctions for the discovery violations described in that rule, there are some violations of the discovery rules not within the compass of Rule 37, and it should be held that the court has inherent power to deal with these violations.") (citing *Societe Internationale v. Rogers*, 357 U.S. 197, 206-07 (1958)). But when statutory or rule-based authority is insufficient to fairly remedy and punish misconduct, then the Court should invoke its inherent authority.

The Court has already discussed most of Marsh's misconduct under the Federal Rules of Civil Procedure. But there is still a need to invoke inherent authority here for three reasons. First, Rule 37 authorizes sanctions against parties, not the attorneys for the parties. *Maynard*, 332 F.3d at 470. But attorneys can be sanctioned directly under the Court's inherent authority. *Magnus Elecs., Inc. v. Masco Corp. of Indiana*, 871 F.2d 626, 632 (7th Cir. 1989) ("[Under its inherent authority,] the district court may assess costs and attorneys' fees against counsel … ."). Here, if somehow the City does not indemnify the individual defendant-officers or contests its liability for sanctions as a party, then Marsh should be personally and jointly liable with Mosqueda and Sierra for the fees and costs, lest Plaintiffs not be made whole.

56

The second reason to invoke inherent authority is to rely on it as an alternative basis for sanctions, if the Court has somehow mistakenly construed Marsh's conduct as violating the discovery rules. Severe sanctions are authorized under a Court's inherent authority if an attorney acts in bad faith, which is what happened here. *See Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009) (affirming sanction of directed verdict based on bad faith attorney misconduct).

The final and most important reason to invoke inherent authority is that some of Marsh's misleading statements to the Court do not fit under a particular rule and so are appropriately sanctioned under inherent authority in the first instance. During the trial, Marsh made misleading statements to the Court at the sidebar that concluded Dunaj's testimony. The Court convened that sidebar at Plaintiffs' request when a confusing line of testimony suggested that Defense Counsel had failed to give to Dunaj a trial subpoena issued by Plaintiffs. R. 422-5, PX 40, 4A Trial Tr. at 130:12-131:1**.** In view of Dunaj's role at OEMC and the purpose for which Plaintiffs called her—to establish that OEMC had no record of the call relied on by Mosqueda—one topic of discussion at the sidebar was, not surprisingly, the existence of any police-radio recordings or related records responsive to the subpoena. The lawyers and the Court referred to the call recapping the Fourth District Calls as an "all call" and sometimes a "flash" message, *id*. at 130-31, which are terms that Mosqueda used to describe the call, R. 422-3, PX 20, Mosqueda Dep. at 53 ("flash"), R. 422-3, PX 17, Mosqueda IPRA

Statement at 3 ("all call"). On the topic of the availability of records and calls at OEMC, Marsh said "[t]here are no such documents related that are currently in existence relative to that call." R. 422-5, PX 40, 4A Trial Tr. at 131:21-23. That was false. The OEMC record on the Lamperis CDs that Maderak saw—and told Marsh about—in fact was a document that related to the Zone 6 call. As discussed earlier in this Opinion, the audio that Lamperis received either included a call recapping the Fourth District Calls or it did not, the latter of which was exactly the point that Plaintiffs wanted to prove. Saying that no documents existed related to the call was a misrepresentation, and Marsh knew it. He should have disclosed what he knew.

Later during the sidebar, Marsh made another misleading statement. The Court, incredulous that Dunaj had not searched for an all-call (again, this was the term the officers were using to describe the call recapping the Fourth District Calls), asked Marsh, "So the witness has testified that she has never searched for or heard evidence about an all-call. Do you think she is misremembering that?" R. 422-5, PX 40, 4A Trial Tr. at 133:9-12. Marsh responded by saying, among other things, that "She and I have talked and she has looked recently. But that information would no longer be – certainly the audio would have been recycled a long time ago." *Id*. at 133:21-23. That was misleading. Although it was possible that OEMC would have recycled—that is, recorded over—dispatcher audio that it had never saved separately, Marsh knew at the time that the audio might very well still exist on the Lamperis CDs.

Defendants' arguments about these statements do not exonerate Marsh. They argue that Marsh was simply referring to "all calls," and that—whatever an "all call" is—it has nothing to do with the Lamperis CDs. Resp. Br. at 21-23. Not so. The context made it crystal clear that the lawyers, parties, and the Court were simply using one of Mosqueda's and Sierra's labels for the radio call that they relied on. R. 422-3, PX 17, Mosqueda IPRA Statement at 3:14, 3:30 ("all call"); R. 422-4, PX 21, Sierra Dep. at 31:23 ("all call"). Indeed, during the defense opening statements, Plaintiffs objected that the defense was, for the first time, saying that there was a "flash message," which the defense defined for the jury as a "message calling for all officers to be on the lookout for something." R. 422-5, PX 38, 1B Trial Tr. at 34:14-15. During the sidebar discussion of that objection, the Court asked what an all call was, and Marsh answered, "That's what he called it, an All Call. I don't know if he—whether it was an All Call or 7th District call. This was simply from Officer Mosqueda's recollection." *Id.* at 36:11-16. So there is no question that the issue under discussion during the Dunaj sidebar was the audio that Mosqueda claims he heard. To claim otherwise is not credible. So when Marsh said that no document exists related to the call and that any audio must already be gone, the statements were misleading, and therefore sanctionable under the Court's inherent authority.

## B. Aumann's Failure to Reasonably Respond to the Document Request

All of this last-minute surprise and nondisclosure of the OEMC record pointing to the Zone 6 Audio would have, and should have, been avoided if City Law Department lawyers had simply complied with the rules of discovery much earlier

in the case. As detailed below, defense counsel Thomas Aumann violated the rule that requires attorneys to make a reasonable inquiry before responding to a document-production request. Fed. R. Civ. P. 26(g). The violation occurred on December 5, 2012. Independent of Marsh's misconduct, Aumann's discovery violation warrants a sanction that overlaps[14] with and also goes beyond the sanction imposed for Marsh's misconduct. In addition to the new trial, and attorneys' fees and costs from February 19, 2015 through post-trial discovery and briefing, this additional discovery violation warrants attorneys' fees for *all* the time spent preparing for the now-wasted first trial, even pre-February 19, because this violation occurred well before trial preparation began.

Under Federal Rule of Civil Procedure 26(g), "[e]very … discovery … response … must be signed by at least one attorney of record in the attorney's own name … ." The signature is the attorney's certification that the discovery request complies with the rules, and must be made "to best of the person's knowledge, information, and belief formed after a reasonable inquiry … ." Fed. R. Civ. P. 26(g). It "certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." Fed. R. Civ. P. 26(g), 1983 Advisory Comm. Notes.

On December 5, 2012, Aumann signed Sierra and Mosqueda's Joint Response to Plaintiffs' Request for Production under Rule 26(g). R. 422-4, PX 23, Joint Rule 34 Resp. at 12. But the certification violated the Rule's requirement because

---

[14]For clarity's sake, to the extent that the fees sanctions overlap, the Court is *not* ordering double recovery of fees.

Aumann's inquiry was not reasonable.[15] It was not reasonable because, as Aumann admits, he searched for responsive documents merely by looking through the Law Department's files and without knowing how those files were compiled. R. 422-2, PX 4, Aumann Dep. 25:24-32:21, 40:21-45:19. Aumann was asked at his deposition, "How was the initial Redwell [the folder of documents] that you got compiled? … [H]ow were the documents requested, chosen?" *Id*. at 28:13-14, 28:17-18. To which he responded: "That I'm not sure. I know that the Redwells are put together either by a paralegal or one of secretaries. … I'm not sure who put them together … ." *Id*. at 28:19-21. With regard to OEMC recordings, Aumann did not "talk to anybody at all about how OEMC went about getting relevant documents for this case." *Id*. at 48:10-49:8. Despite that lack of knowledge, Aumann purported to respond to the production request that sought OEMC recordings relating to the events at issue in the complaint. R. 422-4, PX 23, Joint Rule 34 Resp. ¶ 13. What's more, in response to that request, Aumann also wrote, "Investigation continues." *Id*. But in reality he was not really making any further investigation into the OEMC recordings. R. 422-2, PX 4, Aumann Dep. at 44:21-23 (Q: "What investigation were you referring to?" A: "I'm not really sure actually."); *id*. at 44:24-45:4 (Q: "Did you do any further investigation?" A: "I—I don't recall one way or the other.").

That approach to discovery does not come close to qualifying as a reasonable inquiry. It is not reasonable to rely on another person's work in compiling

---

[15]It also violated the Rule's requirement that the signer be "one attorney of record." Aumann was Mosqueda's attorney of record at the time he signed, but had not yet entered an appearance on behalf of Sierra. He was therefore not Sierra's attorney of record, but was acting as if he were.

documents to respond to a discovery request if you do not even know *who* did the work. It is not reasonable to rely on a set of documents compiled by another person if you do not know what *sources* were used to compile the file. It is not reasonable to rely on a set of documents compiled by another person if you do not know *when* the documents were gathered, or whether the set was ever updated. Aumann knew none of these things, and so his certification that he had made a reasonable inquiry was invalid.

Aumann responds that his document-production efforts were reasonable because he was only representing the individual officers. According to Aumann, when he responded to the document request, Aumann understood himself to be representing only Mosqueda and Sierra. R. 422-2, PX 4, Aumann Dep. 30:13-32:21. Aumann thought his efforts were reasonable because Mosqueda—as distinct from the City of Chicago—really had no documents in his possession, custody, or control, other than those already in Aumann's Law Department file. *Id*. at 30:13-32:21, 36:14-23. This argument misses the point. Even if Aumann is right that, because he was representing individual officers, he had no obligation to seek responsive documents from City agencies, that would not change the fact that Aumann had *no* idea what he was relying on. Without knowing how the documents were compiled, Aumann could not possibly have made a reasonable inquiry.

In any event, Aumann's premise—that he represented only the individual officers and thus had no obligation to seek responsive documents from City agencies—is wrong. As an initial matter, that characterization of the situation does

not fit what Aumann was actually doing when he answered the document requests at issue. For example, another document request from the same set asked for "Attendance & Assignment sheets for the Defendant Officers." PX 23, Joint Rule 34 Resp. at 4. And another request asked for the "Watch Commander's Log, the Watch Commander's Summary Report, the Supervisor Management Logs." *Id*. at 4. Aumann wrote in response to these requests that he would request those documents. *Id*. Those documents are not Mosqueda's or Sierra's personally maintained documents, and they must not have been in his file since he needed to request them, so Aumann must have had to ask the Chicago Police Department for them. So, in responding to the discovery request, Aumann was asking City agencies for documents. He was not, as he claims, limiting himself to what was solely in the officers' direct possession. Nor does it make sense for Aumann to limit himself as if he did not have access to Chicago Police Department and OEMC records. During his post-trial deposition, Aumann acknowledged that no City agency has *ever* turned down his request for a document. R. 422-2, PX 4, Aumann Dep. at 33-34; at 38:9-13. He also acknowledged that "[t]here are instances where attorneys for the officers"— not just the attorneys for the City—"can and do order documents, too." *Id*. at 40:8-10.

Even if Aumann did not actually ask other City agencies for documents, there would be no way for Plaintiffs to know, based on Aumann's written responses, that Aumann had taken the overly narrow position on what documents were within his clients' possession, custody, or control. Not only did Aumann request the attendance

sheets and reports mentioned in the last paragraph, he also disclosed some OEMC records and police reports. This would have suggested to Plaintiffs that Aumann was contacting other City agencies to obtain documents, and that, as a City of Chicago Law Department attorney, his document requests to other City agencies would be honored. This lulled Plaintiffs into a false sense of security as to the scope of Aumann's inquiry in responding to the production requests.

In sum, the Court must reject Aumann's attempt to excuse his lapse based on his only responding for the individual officers. His inquiry was not reasonable. If Aumann had made a reasonable inquiry, he would have learned that no one in the Law Department had asked for Zone 6 Audio, and his reasonable next step would be to make the request to OEMC. That would have revealed the OEMC record of the Lamperis CDs and would have revealed the Zone 6 Audio itself, at least one copy of which was sitting exactly where an investigating detective would have put it—the Evidence and Recovered Property Section of the Chicago Police Department. R. 422-6, PX 43, Non-Law Dept. Resps. Am. Resp. to Pls.' Requests & Interrogs. at No. 7.

Because Rule 26(g) was violated, the Court must impose an appropriate sanction. *Rojas v. Town of Cicero*, 775 F.3d 906, 909 (7th Cir. 2015) ("[Rule 26(g)] gives the judge discretion over the nature of the sanction but not whether to impose one."). The appropriate sanction is a new trial and the attorneys' fees and costs in preparing for, and conducting, the first trial and post-trial discovery and briefing. The same reasoning that applies to Marsh's misconduct also applies to Aumann's, but stretches back in time to before February 19 (the date of Marsh's misconduct)

because Aumann's unreasonable inquiry occurred much earlier, in December 2012.[16] A new trial is needed because nothing less will restore Plaintiffs to where they would have been had Aumann conducted a reasonable inquiry. Aumann's misconduct contributed to the same harm caused by Marsh's misconduct: the wasted first trial, where Plaintiffs could not repair their trial presentation, which was premised on the absence of the Zone 6 Audio.

The final question is who should pay the fees-and-costs award for Aumann's discovery violation. The Court may assess the monetary sanction against the "the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3). Plaintiffs argue that the City, rather than Aumann, should shoulder the burden of the sanctions. The Court agrees: the sanctions for Aumann's violation are assessed against his employer at the time, the City of Chicago.[17] Sanctions against the City are justified because the violation was not just Aumann's fault: the post-trial record has revealed that the Law Department's Federal Civil Rights Litigation Division's discovery practices put its line attorneys at risk for the violation that occurred here. This does not excuse Aumann's violation, but it does put the violation

[16]To be clear, the Court is not ordering payment of fees going back to December 2012, but instead is ordering payment of fees expended in preparing for the first wasted trial, that is, pretrial-order preparation, pretrial-conference preparation, trial-witness preparation, and so on.

[17]In their opening brief, Plaintiffs expressly asked for the monetary sanctions to be assessed against the City, rather than Aumann personally, in the interest of avoiding burdening Aumann personally with a significant financial penalty. Pls.' Br. at 17, 63 ("Plaintiffs submit that it would be appropriate under Rule 26 to sanction the Defendants and the City … ."). Although Plaintiffs then seemed to change course in their reply brief, R. 435, Pls.' Rep. Br. at 10, it is usually too late to assert a new argument in a reply brief. If the City contests liability for the sanction, then Plaintiffs may move to reconsider whether to impose the sanction against Aumann personally (but he will have an opportunity to respond in writing before any decision on a reconsideration motion is made).

in context and warrants imposing the financial burden on the City rather than him personally.

The problem begins with the lack of training at the Law Department on the collection of documents for discovery. R. 422-2, PX 2, Marsh Dep. at 26:12-18 (Q: "Have you ever attended any training at the Law Department about the procedures that are to be followed … in the collection of documents?" … A: "No."). This appears to cause wide gaps in knowledge about what documents and recordings are available from the City agencies that are most frequently relevant for purposes of civil-rights discovery: OEMC and the Chicago Police Department. None of the three trial counsel had a firm grasp of OEMC's retention policies for recordings. R. 422-2, PX 4, Aumann Dep. at 46-48 ("I guess in theory there could be like a litigation hold on it, too"; basis for knowledge of policy is "Anecdotally I've heard it"; "Personally I don't—I don't know how they [OEMC employees] look for them [relevant dispatch recordings]."); R. 422-2, PX 2, Marsh Dep. at 66-67 (Q: "As a corp counsel, were you aware that once a request is made for audio it's saved in a permanent retention file?" A: "I don't know that I specifically knew that."); R. 422-4, PX 24, Pesha Dep. at 24-26 ("I don't know specifically what their [OEMC's] policy is," other than recording is "recycled" after 30 days). Nor did trial counsel understand the differences in Zone radio channels and how that interacted with the Chicago Police Districts. R. 422-6, PX 42, 4B Trial Tr. at 10:18-25 ("[W]e had the 4th District audio [and] we probably believed that was what he heard … . [I]t was only recently that we prepared for trial … when we really looked at the zones … .") Nor did trial

counsel understand why certain General Progress Reports of the Chicago Police Department were not produced in the case until after the first trial. R. 422-2, PX 2, Marsh Dep. 94:12-24; R. 422-4, PX 24, Pesha Dep. 71:21-72:9.[18]

The attorneys' gaps in knowledge are exacerbated by the additional fact that paralegals in the Civil Rights Litigation Division, who play a prominent role in gathering documents, also are uncertain of OEMC and Chicago Police Department document policies. Darwin Olortegui, who has been one of two Supervising Paralegals in the Division since 2000, acknowledged that there is no procedure "to ensure that all relevant documents are obtained in a case." R. 422-4, PX 25, Olortegui Dep. at 6:19-21, 7:20-21, 10:20-23. There is no procedure to check or ensure that all police recordings or OEMC calls are obtained for a case. *Id.* at 10-11. There is no requirement that the assigned paralegal "sit down with the attorneys and make sure that they have ordered all of the discoverable documents in a case." *Id.* at 11. Olortegui gathered the initial set of documents for the Law Department in the days after the shooting, but no one ever told Olortegui that, before the shooting, the officers had heard an OEMC radio call that would be relevant. *Id.* at 14-16, 17:10-12.

---

[18]There is yet another example of the lack of knowledge of Chicago Police Department records that often are relevant in civil-rights cases: records of communications on portable data terminals (commonly referred to as PDTs), which officers in the field can use to communicate with OEMC. Marsh has never been trained on the system or on what a PDT message even is. R. 422-2, PX 2, Marsh Dep. at 28:17-29:18 (opining that "PDTs are the personal data transmitter I think is what they're referred to" and acknowledging that he received no training on the PDT system and on what a PDT message is).

Similarly, the paralegal who was eventually assigned to the case, Georgia Beloso, does not know OEMC's retention policies beyond a set of default deadlines for three types of records. R. 422-5, PX 36, Beloso Dep. at 52. And when it comes to Chicago Police Department documents, paralegals go through the Police Department's Office of Legal Affairs. *Id.* at 12:19-23. So there is another layer between the Law Department's attorneys—who are actually reviewing document requests from opposing lawyers—and the actual gathering of documents. It goes from Law Department attorney to Law Department paralegal to Office of Legal Affairs to who knows. Even when it comes to those Chicago Police investigators or officers who are assigned to the Civil Rights Litigation Division to "help us [the Law Department] look in their system," *id.* at 16:19-20, Beloso does not know what those officers can and cannot obtain from the Chicago Police Department computer system, other than knowing that inventories and arrest reports are available, *id.* at 51-52.[19]

This attorney-and-paralegal unfamiliarity with records policies poses an even greater risk to accomplishing complete discovery when it acts in combination with the lack of transparency exemplified by the document-production response in this case, where Aumann sometimes agreed to produce Chicago Police Department and OEMC records, but sometimes—without telling the other side—took the position in

---

[19]An example of the incomplete discovery that can be caused by a lack of knowledge of the Chicago Police Department's records system is that the Defense Counsel and paralegals did not know that there was a separate "RD" number (an "RD" number is a records division number, R. 422-4, PX 27, Maderak Dep. 14:23-24) for the investigation into Pinex's alleged battery against the police officers, which was different from the RD number assigned to the flip-side investigation of the officers' shooting of Plaintiffs. R. 422-5, PX 36, Beloso Dep. at 17:10.

his own mind that he did not need to inquire further of those agencies, purportedly because he formally represented only the individual officers, not the City. And the harmful effect of this sometimes-yes, sometimes-no practice is in turn worsened when defense lawyers interpose themselves between plaintiffs' lawyers and the Chicago Police Department and OEMC in responding to subpoenas, as happened in this case. Plaintiffs issued a trial subpoena to Dunaj, which Defense Counsel accepted but never gave to her. R. 422-4, PX 28, Dunaj Dep. at 175:21-24. Defense lawyers must either take on the duty to produce documents from these agencies—with the corresponding obligation to make a reasonable inquiry to find responsive documents—or defense lawyers must get out of the way and allow subpoenas to be served directly on the Chicago Police Department and OEMC—with the corresponding obligation falling directly on those agencies' employees. The absence of absolute clarity on who bears the obligation will only serve to undermine the completeness of discovery.

It is of course true that Civil Rights Litigation Division lawyers, and indeed all Law Department attorneys, have a tough job in responding to discovery, because OEMC and the Chicago Police Department generate and maintain a massive quantity of records. Budgets are tight, the attorneys are probably overworked, and mistakes are inevitable. But that is all the more reason to establish procedures that will minimize negligent mistakes and to instill a culture that will promote complete discovery. Failing to do so will cost even more in the long run, not just in dollars,[20]

---

[20]In another case that was on this Court's docket, a serious discovery violation required a new trial and payment of $450,000 in Plaintiffs' attorneys' fees. *Hadnott v. City*

but more importantly, in undermining justice. Because Aumann's discovery violation can in part be traced to this larger context of discovery practices, the fees-and-costs sanctions will be assessed against his employer, the City of Chicago.

## C. Other Misconduct

As a final note, Plaintiffs' motion rests on more than what the Court has just discussed. As to the other discovery misconduct—the inexplicable failure to turn over certain police reports,[21] inventory forms, request forms, and even other audio—the Court has factored that into its choice of sanctions. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011) (when considering discovery sanctions "we weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit"). As to the Court's pretrial and trial rulings on the Pinex gun, on the Flint Farmer evidence, and giving Plaintiffs' extra time to prepare to re-examine Mosqueda, there is no need to address these issues because, at most, they would warrant a new trial, which Plaintiffs are already getting. And, finally, as to Plaintiffs' allegation that Sierra and Mosqueda perjured themselves, the Court finds that the inconsistencies

---

*of Chicago*, 07 C 06754, Order Granting New Trial, R. 554 (filed as PX 45), R. 588, 590, 594. In that case, the defense attorneys similarly claimed that one reason for not disclosing a Chicago Police Department document was that they did not understand the document. 07 C 06754, R. 554 at 17-18. And, similarly, the defense also tried to excuse the non-disclosure by reasoning that they thought, if anything, the document supposedly could only help the defendants, and not the other side. *Id.* at 20.

[21]The unproduced police reports, of all the assorted other discovery violations, troubles the Court the most. Plaintiffs argue that Marsh intentionally withheld these documents. But the Court is not convinced and finds Defendants' arguments persuasive on this point. Resp. Br. at 5-7 (noting that the Area File that was produced and the Area File that was not have different handwritten notations, which suggests that they are copies of the Area File produced to the Law Department at different times).

in their statements and between their statements and the objective evidence—while troubling—do not conclusively prove perjury. *Montano v. City of Chicago*, 535 F.3d 558, 562-66 (7th Cir. 2008). They are, instead, the grounds for vigorous cross examination, so the Court declines to award any relief based on the perjury argument.

## IV. Conclusion

For the reasons discussed, Plaintiffs' post-trial motion [R. 367, 422] is granted in part and denied in part. No directed verdict will be entered against Defendants, but the judgment in their favor is vacated and the case will be set for a new trial. The City of Chicago and Jordan Marsh are jointly and severally liable for all attorneys' fees and costs incurred by Plaintiff from February 19, 2015 through post-trial discovery and briefing, and the City of Chicago is also responsible for attorneys' fees and costs Plaintiffs expended in preparing for the first trial, even those incurred before February 19, 2015. If the parties cannot reach agreement on the amount of attorneys' fees and costs, then Plaintiffs must file a fee petition that adheres to Local Rule 54.3, including using the deadlines in that rule. The status hearing of January 7, 2016, is reset to January 14, 2016, at 1:15 p.m. At that status hearing, the parties should be prepared to set a pretrial conference and trial

schedule, unless the parties wish to take a pause for settlement negotiations before

setting the schedule.

ENTERED:

                                          s/Edmond E. Chang
                                    Honorable Edmond E. Chang
                                    United States District Judge

DATE: January 4, 2016